**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LATERAL RECOVERY LLC, BENCHMARK BUILDERS, INC., FTE NETWORKS, INC., JUS-COM LLC and FOCUS WIRELESS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>FUNDERZ.NET, LLC d/b/a HOP CAPITAL and d/b/a BUSINESS MERCHANT FUNDING, JOSEPH YITZCHAKOV a.k.a JOSEPH ISAACOV; AND GAVRIEL YITZCHAKOV a.k.a. GABE ISAACOV, and JOHN and JANE DOE INVESTORS,<br><br>Defendants. | Civ. A. No.: 1:22-cv-02170-ALC |

**AMENDED COMPLAINT**

Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC ("Focus") (collectively "FTE") as and for their Complaint against Funderz.net, LLC, d/b/a Hop Capital (a/k/a Hop Capital, LLC) and d/b/a Business Merchant Funding ("HOP"), Joseph Yitzchakov a.k.a. Joseph Isaacov ("Joe"), Gavriel Yitzchakov a.k.a Gabe Isaacov ("Gabe"), and John and Jane Doe Investors, states as a follows:

**NATURE OF THE ACTION**

1.     This is a RICO action against several related merchant cash advance ("MCA") companies that are controlled and manipulated by the Isaacov's (a group of brothers Ben, Simon, Gabe and Joe) to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain millions of dollars in funds from FTE.  Over the course of just over a month,

the Defendants' companies entered into six so-called "Merchant Agreements" with FTE pursuant to which they purportedly paid lump sums to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments.  While couched as the purchase of future receipts, the agreements' terms, conditions and the Isaacovs' actions demonstrate that despite the form of their agreements (collectively, the "FTE Agreements"), no sale of receipts ever took place.

2.      Rather, the FTE agreements were loans for which the Isaacov's negotiated and demanded repayment within a fixed time period—***as short as nine days***.  The payment term and interest charged are the metrics that the Isaacov's use to dictate the terms of each transaction. And under New York law, intent is the touchstone of whether a transaction is a loan, regardless of what the face of the contract purports it to be.  Acknowledging these transactions as the true loans that they are, these loans charged interest rates that exceeded ***5,000%***, multiple worlds and universes greater than the maximum 25% permitted under New York Penal Law.

3.      The Isaacovs are not alone.  Numerous other MCA companies use the same sham MCA agreement as a cover for their loansharking activities.

4.      The sham nature of these form MCA agreements has recently drawn scrutiny by New York's highest court:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

5.      New York's highest court is not alone.  The Attorneys General of both New York and New Jersey each filed separate actions against others using the same sham form of MCA agreement, alleging that the transactions are disguised loans subject to this state's usury laws. *See* Exs. 1-2.

6.      The amount of money unlawfully obtained here is staggering.  In the span of just five months, FTE received no more than $2,050,000 in actual cash from the Isaacovs, and paid back in excess of $12,756,450.

7.      Notably, at the time of these transactions, FTE, a then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement. The Isaacovs took advantage by effectively robbing FTE's shareholders and its creditors of millions of dollars—in just a period of months.

8.      It is against this backdrop that Plaintiffs file this Complaint.

<u>**THE PARTIES**</u>

9.      FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

10.      At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

11.      At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

12.     At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

13.     At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

14.     Defendants have been operating Business Merchant Funding as doing business under a trade name, e.g. simply "Business Merchant Funding," since at least 2018.  *See* Ex. 3 (Affidavit of Defendant Gavriel Yitzchakov in support of judgment on behalf of Business Merchant Funding, dated October 4, 2018).

15.     Funderz.net, LLC, d/b/a Hop Capital (a/k/a Hop Capital, LLC) and d/b/a Business Merchant Funding ("HOP") is a limited liability company duly organized under the laws of New York with its principal place of business in Florida.

16.     While Defendants currently present the HOP entity under the corporate name of Funderz.net, LLC, Defendants have employed a variety of trade names and business names to HOP over time to better obscure the identities of the entities involved in their criminal enterprise, including doing business under "Hop Capital." *See* Ex. 4 (Affidavit of Joseph Isaacoff in support of judgment on behalf of Hop Capital, dated July 9, 2018).  In this manner, the Issacoffs further attempt to insulate themselves from potential personal liability while using the various assumed names to conceal with whom merchants are contracting.  Indeed, the New York Department of State lists 18 assumed names for Funderz.net LLC.

17.     New York Department of State records further confirm that Funderz.net LLC has been doing business under the business name "Hop Capital" since April 14, 2016.  *See* Ex. 5.

18.     Joseph Yitzchakov a.k.a. Joseph Isaacov ("Joe Isaacov") is an individual who resides in Florida.

19.     Gavriel Yitzchakov a.k.a Gabe Isaacov ("Gabe Isaacov") is an individual who resides in Florida.

20.     Upon information and belief, each of the John and Jane Doe Investors is a citizen of New York or New Jersey.

## JURISDICTION

21.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

23.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry

24.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*

5

admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

25.    The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[4]

26.    This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

27.    The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.    The Isaacov Umbrella**

28.    The Isaacovs own Funderz.net LLC and operate an illegal loansharking enterprise through assumed names with brother operating an aspect of the enterprise through a distinct d/b/a.

29.    For example, Joe holds himself out as the CEO of HOP Capital.  *See* Ex. 6 (LinkedIn Profile).

---

[3] *Id.*
[4] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

30.     Ben (a.k.a Binyamin Yitzchakov) holds himself out as the CEO of Panthers Capital.  *See* Ex. 7 (LinkedIn Profile).

31.     Gabe holds himself out as the CEO of BMF Capital.  *See* Ex. 8 (LinkedIn Profile).

32.     Simon is the youngest brother and holds himself out as a direct funder for BMF Capital.  *See* Ex. 9 (LinkedIn Profile).

33.     Although each maintain separate books and records from each other, the Isaacovs form a cohesive unit to further the goals of the Enterprise.

34.     The collection tactics used by the Isaacovs demonstrate that the transactions are loans.

35.     Ben:  When one merchant could not pay, Ben used threats that are so heinous that the words cannot be repeated here.  *See*, *e.g.,* Ex. 10.

36.     Joe and Gabe:  For a period of years, Joe provided high interest loans to Avantgarde Living Facility, an assisted living facility in California.  Joe would later bring his brother Gabe, who likewise funded Avantgarde multiple times.  When Avantgarde could not pay its high interest loans due to the COVID-19 pandemic, Gabe demanded the title to the owner's collector's edition Trans Am from Smokey and the Bandit as payment for the loans.

37.     Simon:  When a North Carolina Urgent Care Facility, Haymount Urgent Care, could not afford to pay due to the recent Omicron surge, Simon flew up to North Carolina and demanded to see the owner's watch collection, and asked to "borrow" one of the watches.  When the victim insisted that the watch be papered as collateral for the loans, Simon relented.

**C.      The MCA Agreements Are Substantively And Procedurally Unconscionable.**

38.      The Isaacov agreements (the "MCA Agreements"), including those entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

39.      Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans.

40.      Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

41.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.   Among these knowingly false statements are that:   (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant Underwriting Fee or Origination Fee.

42.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

43.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

**D**.     **The Intent of the Isaacov Enterprise is to Issue Fixed-Term Loans Using a Sham Reconciliation Provision to Disguise the Loans.**

44.     In order to evade state usury laws, the Isaacov Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

45.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

46.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

47.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

48.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

49.     In fact, the daily payment is calculated by dividing the payback amount by the intended duration of the loan.

50.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**G.     The Isaacov Enterprise Intentionally Disguised the True Nature of the Transaction.**

51.     Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)      The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)      The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)      While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)      The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)      The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)      The Enterprise assumed no risk of loss if an account debtor failed to pay an allegedly purchased receivable because the daily payments would be deducted from the next merchant that paid a merchant.

(i)      The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

11

(j)      The Enterprise required that the merchant obtain business interruption insurance and name the Enterprise as both an additional insured and a loss payee under the policy.

(k)      The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

(l)      Bankruptcy was an event of default under the agreements.

(m)      The Enterprise required that the merchant's owners guarantee the representations, covenants, and warranties under the agreements and the owners guaranteed obligations were triggered upon the filing of bankruptcy.

52.      But most important is intent:  New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Isaacovs, which determine the payback based on the number of days in which the Isaacovs want to be paid back. The number of days for payback has no relation to the timing of the percentage of receivables that the Isaacov MCA companies were purporting to purchase.

53.      Instead of providing reconciliation, troubled merchants, like FTE here, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many thousands percent range.

54.      On information and belief, the Isaacovs systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

55.      The Isaacovs also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

12

56.     The Isaacovs also show in their underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions, the Isaacovs do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all—yet they still charge hundreds of thousands for their so-called underwriting.

57.     When the Isaacovs go to collect upon their agreements, they treat them just like loans.   For example, they require that the merchant make fixed daily payments under their agreements and grant security interests to the Isaacov MCA Companies in substantially all of the merchant's assets to ensure that the daily payments are made.

58.     They also require that the merchants execute confessions of judgment that the Isaacov MCA Companies could file if the merchant fails to make as few as two daily payments under their agreements.   In other words, the Isaacovs structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

59.     The Isaacovs also engage in other unscrupulous behavior toward their merchants. Among other things, the Isaacovs often fail to advance merchants the full amounts provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

## THE UNDERLYING FTE TRANSACTIONS

**A.     FTE Networks.**

60.     At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network

infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies. The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation. Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

61. Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

62. Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

63. Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.      Lateral**

64. On or about October 28, 2016, Lateral, as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

14

65.     FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

66.     Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

67.     In or around July 2019, FTE defaulted under the terms of the Credit Agreement, due to increasing financial stress incurred through Defendants' MCA agreements' onerous and usurious terms.  Thus, like FTE, Lateral's cash flow was materially impacted by Defendants' usurious business practices.

68.     Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, without limitation, the claims asserted herein.

**C.      FTE Networks and the MCA Industry**

69.     In 2017, prior to defaulting under the Credit Agreement, FTE needed additional financing.  To procure that financing, FTE turned to the merchant cash advance industry, including the Isaacovs, falling victim to the tactics described above.

**D.      The BMF Advance ("BMF") Transactions**

70.     Over a three-month period between October 15, 2018 and November 9, 2018, FTE entered into three transactions with the Isaacovs through BMF.

71.     The first transaction was dated October 15, 2018.  On the face of the agreement, BMF was to advance $400,000, which was disguised as the "Purchased Price."

72.     The amount to be repaid was $729,000, which was disguised as the "Purchased Amount."

73.     As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of $9,999 (a "Daily Payment"), which was disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by BMF and the Isaacovs.

74.     The negotiated term of the loan was 73 business days.  On its face, the loan had an interest rate in excess of 345%.

75.     In addition, FTE was required to pay $50,000 as a purported "Service Fee" as further consideration for making the loan.

76.     Just ten days later, on October 25, 2018, the parties entered into a second loan through BMF.

77.     On the face of the second agreement, BMF was to advance $1,000,000, which was disguised as the "Purchased Price."

78.     The amount to be repaid was $1,499,000, which was disguised as the "Purchased Amount."

79.     As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of $14,999 (a "Daily Payment"), which was disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by BMF and the Isaacovs.

80.     The negotiated term of the loan was 100 business days.  On its face, the loan had an interest rate in excess of 150%.

81.     In addition, FTE was required to pay $100,000 as a purported "Service Fee" as further consideration for making the loan.

82.     As a requirement of the second loan, FTE was also required to repay the full amount of the balance on the prior loan with proceeds of the second loan, which was $626,000.

83.     Thus, on the first loan, FTE was advanced just $350,000 and paid back $729,000 in just 10 calendar days.  The effective interest rate was in excess of *3,900%*.

84.     Just fourteen days later, on November 8, 2018, the parties entered into a third loan through BMF.  *See* Ex. 10.

85.     On the face of the second agreement, BMF was to advance $1,550,000, which was disguised as the "Purchased Price."

86.     The amount to be repaid was $2,323,450, which was disguised as the "Purchased Amount."

87.     As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of *$38,724* (a "Daily Payment"), which was disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by BMF and the Isaacovs.

88.     The negotiated term of the loan was 60 business days.  On its face, the loan had a negotiated interest rate in excess of 250%.

89.     In addition, FTE was required to pay $155,000 as a purported "Service Fee" as further consideration for making the loan.

90.     As a requirement of the third loan, FTE was also required to repay the full amount of the balance on the second loan with proceeds of the third loan, which was $1,281,900.

91.     Thus, on the second loan, FTE was advanced just $900,000 (and less than $300,000 in actual cash) and paid back $1,499,000 in just 14 calendar days.  The effective interest rate was in excess of *1,738%*.

**E.      The HOP Funding ("HOP") Transactions**

92.      Over nearly the exact same three-month period between October 16, 2018 and November 9, 2018, FTE entered into three transactions with the Isaacovs through HOP. Between October 16, 2018 and February 22, 2019, the total cash advanced was $1,200,000 and the total paid back in cash was $4,196,933.  That is an interest rate of 7,500%.

93.      The first transaction was dated October 16, 2018.  On the face of the agreement, HOP was to advance $1,000,000, which was disguised as the "Purchased Price."

94.      The amount to be repaid was $1,459,000, which was disguised as the "Purchased Amount."

95.      As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of $29,999 (a "Daily Payment"), which was disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by HOP and the Isaacovs.

96.      The negotiated term of the loan was 49 business days.

97.      In addition, FTE was required to pay a staggering $350,000 as a purported "Service Fee" as further consideration for making the loan.

98.      Just nine days later, on October 25, 2018, the parties entered into a second loan through HOP.

99.      On the face of the second agreement, HOP was to advance $1,750,000, which was disguised as the "Purchased Price."

100.     The amount to be repaid was $2,623,250, which was disguised as the "Purchased Amount."

18

101.    As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of $39,999 (a "Daily Payment"), which was not even disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  It was just a Daily Payment unilaterally dictated by BMF and the Isaacovs.

102.    The negotiated term of the loan was 65 business days.

103.    In addition, FTE was required to pay $100,000 as a purported "Service Fee" as further consideration for making the loan.

104.    As a requirement of the second loan, FTE was also required to repay the full amount of the balance on the prior loan with proceeds of the second loan, which was $1,249,000.

105.    Thus, on the first loan, FTE was advanced $650,000 and paid back a staggering $1,459,000 in just 9 calendar days.  The effective interest rate was in excess of *5,000%*.

106.    Just fifteen days later, on November 9, 2018, the parties entered into a third loan through HOP.

107.    On the face of the second agreement, HOP was to advance $2,750,000, which was disguised as the "Purchased Price."

108.    The amount to be repaid was $4,122,250, which was disguised as the "Purchased Amount."

109.    As expressly negotiated between the parties, the loan was to be repaid through fixed daily ACH withdrawals in the amount of *$69,999* (a "Daily Payment"), which was disguised as a purported good-faith estimate of 10% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by BMF and the Isaacovs.

110.    The negotiated term of the loan was 59 business days.

111.    In addition, FTE was required to pay $200,000 as a purported "Service Fee" as further consideration for making the loan.

112.    As a requirement of the third loan, FTE was also required to repay the full amount of the balance on the second loan with proceeds of the third loan, which was $2,250,000.

113.    Thus, on the second loan, FTE was advanced just $650,000 (and just $250,000 in actual cash) and paid back $2,623,250 in just 15 calendar days.  The effective interest rate was in excess of *7, 387%*.

114.    The third loan was, in reality, an additional loan of no more than $1,372,250 because it was merely disguising the prior two loans through a third loan.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

115.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

116.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

117.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

118.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

20

119.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

120.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

121.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

122.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

123.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

124.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

125.     Defendants issue usurious loans under the guise of MCA agreements to borrowers facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

126.     While these MCA agreements purport to be a purchase of identifiable receivables, their terms actually involve Defendants' purchase of "all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or other third party payors." Ex. 11 at 1.

127.     While the MCA agreements purport to allow for reconciliation, their actual terms reveal this to be illusory as borrowers are limited to two (2) reconciliation requests per month—

while the borrower must pay upwards of $38,724/per day—and there is no actual promise to reconcile. *Id*. § 1.4.

128.    Defendants structure the MCA agreements to ensure absolute repayment through the aforementioned sham reconciliation provision, which leaves the loan's term definite as a matter of mathematics, and forcing the borrower's principals to personally guaranty the Merchant's entire obligations in the even the Merchant

**B.    Culpable Persons.**

129.    Joe, Ben, Gabe and Simon ("the Isaacovs") are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

130.    At all relevant times, each of the Isaacovs was, and is, a person that exists separate and distinct from the Enterprise, described below.

131.    Joe is the CEO and principal owner of HOP.  During the relevant time period, Joe (jointly with Ben, Gabe and Simon) controlled transactions within the Enterprise.  *See*, *.e.g.*, Ex. 12 (2019 email chain between FTE and Joe and Gabe, representing HOP and Business Merchant Funding, respectively, collectively receiving and ignoring reconciliation requests and requests to fix overdraws).

132.    Joe purports to be the "Manager" of "Hop Capital" for the purpose of appearing in Court to collect on the usurious loans HOP issues through itself and Hop Capital's alter-ego business names.  *See* Exs. 4 and 5.

133.    Gabe is the CEO and principal owner of BMF.  During the relevant time period, Gabe (jointly with Ben, Joe and Simon) controlled transactions within the Enterprise.

134.    Gabe purports to be the "Manager" of Business Merchant Funding, a doing business name that provides an alter-ego for BMF to obscure its identity when contracting with unsophisticated borrowers.  Gabe appears in court as "Manager" of Business Merchant Funding for the purpose of collecting on the usurious loans BMF or Business Merchant Funding issue. Ex. 3.

135.    Ben is the CEO and principal owner of Panthers.  During the relevant time period, Ben (jointly with Joe, Gabe and Simon) controlled transactions within the Enterprise.

136.    Simon is a funder for BMF and operates and controls a book of business separate and apart from BMF.  During the relevant time period, Simon (jointly with Ben, Gabe and Joe) controlled transactions within the Enterprise.

137.    Through their operation of BMF, HOP and Panthers, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

### C.    The Enterprise.

138.    Funderz.Net LLC, the Issacovs and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

139.    Funderz.Net, the Issacovs and the John and Jane Doe Investors are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

140.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership,

shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

141.    Over this period the Enterprise individual members would assume various trade names to do business under.  This was intentionally done as part of the Enterprise's hierarchy to ensure that corporate members of the Enterprise were as insulated as possible from liability under the usurious Agreements by creating plausible deniability as each specific member's liability and obligations under each specific Agreement.

142.    Indeed, through the use of various alter-ego identities for the individual members of the Enterprise, Defendants intended to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Enterprise was automatically withdrawing monies from the borrowers' accounts.

143.    The Enterprise's use of alter-ego names for its members was orchestrated by the Isaacovs, as the common thread between all these members and their alter-egos was that they were ultimately controlled and for the benefit of the Isaacovs.

144.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

145.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

146.    On January 14, 2019, and on January 16, 2019, for example, Defendant Business Merchant Funding had overdrawn at least $89,688 from FTE's bank account above and beyond what FTE owed under any of then-operative MCA agreements.  *See* Ex. 12.

147.    In total, by January 2019, Defendants Gabe, Joe, Business Merchant Funding and HOP had fraudulently withdrawn or converted $409,614 from FTE's account above and beyond what FTE owed under any of then-operative MCA agreements.  *Id.*

148.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of  the individual companies within the Enterprise.**

149.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    Joseph Isaacov**

150.    Together with the other Isaacovs, Joe is responsible for the day-to-day operations of the Enterprise, primarily through the assumed name Hop, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

151.    In his capacity as a member of the Enterprise and oldest brother, Joe, together with the other Isaacovs, is responsible for creating, approving and implementing the policies,

practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

152.     Joe has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

153.     Joe has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Isaacovs.

**ii.     Gabe Isaacov**

154.     Together with the other Isaacovs, Gabe is responsible for the day-to-day operations of the Enterprise, primarily through the assumed name BMF, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

155.     In his capacity as a member of the Enterprise and sibling to the other Enterprise members, Gabe, together with the other Isaacovs, is responsible for creating, approving and

implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

156.    Gabe has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

157.    Gabe has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Isaacovs.

**iii.    Ben Isaacov**

158.    Together with the other Isaacovs, primarily through the assumed name Panthers Capital, Ben is responsible for the day-to-day operations of the Enterprise and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

159.    In his capacity as the mastermind of the Enterprise and sibling to the other Enterprise members, Ben, together with the other Isaacovs, is responsible for creating, approving

and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

160.    Ben has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

161.    Ben has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Isaacovs.

**iv.    Simon Isaacov**

162.    Simon is a funder for BMF and owns and operates a book of business separate and apart from BMF.  Together with the other Isaacovs, Simon is responsible for the day-to-day operations of the Enterprise and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

163.    In his capacity as a member of the Enterprise and youngest brother, Simon, together with the other Isaacovs, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

164.    Joe has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

165.    Simon has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Isaacovs,

**v.      Funderz.Net LLC, BMF, HOP and Panthers.**

166.    Funderz.Net LLC is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

167.    Through its assumed names, BMF, HOP and Panthers, Fundez.Net participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund

the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

168.    In this case, Funderz.Net LLC, through the Isaacovs and its assumed names, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### vi.    The John and Jane Doe Investors

169.    The John and Jane Doe Investors (the "Investors") are a group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members.

170.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

171.   The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

**E.    Interstate Commerce**

172.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

173.   Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

174.   In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the agreements and collect the Daily Payments via interstate electronic ACH debits.

175.   In addition, at the direction of Defendants, each of the Agreements was executed in Florida, and original copies of the agreements and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New York via Federal Express using labels prepared by Defendants.

**F.    Injury and Causation.**

176.   Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at

trial, but no less than $12,756,450, the amount of the unlawful debt collected by the Enterprise form FTE.

177.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

178.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

179.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

180.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

181.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

182.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

183.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

184.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

185.     The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

186.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing, but no less than $12,756,450.

187.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

188.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

189.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

a)     Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)     Against Defendants Joseph Issacov and Gabe Issacov, joint and severally, on account of the First Cause of Action, in an amount to be determined at trial but no event less than  12,756,450, plus treble damages and attorneys' fees;

c)     Against Defendants Joseph Isaacov, Gabe Issacov, Funderz.Net and the John and Jane Doe Investors on the Second Cause of Action in an amount to be determined at trial but no event less than 12,756,450, plus treble damages and attorneys' fees;

d)     Any further relief deemed appropriate by the Court.

Dated:  August 8, 2022

WHITE AND WILLIAMS LLP

By: _____
Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

34