# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | |
|           Petitioners, | |
|   -against- | |
| RICHMOND CAPITAL GROUP LLC, also doing business as Ram Capital Funding and Viceroy Capital Funding, and now known as RCG Advances LLC; | **AMENDED VERIFIED PETITION** |
| RAM CAPITAL FUNDING LLC; VICEROY CAPITAL FUNDING INC., also doing business as Viceroy Capital Funding and Viceroy Capital LLC; | Index No. 451368/2020 |
| ROBERT GIARDINA, individually and as a principal of RICHMOND CAPITAL GROUP LLC, RAM CAPITAL FUNDING LLC, and VICEROY CAPITAL FUNDING INC.; | IAS Part 53 |
| JONATHAN BRAUN, also known as John Braun, individually and as a principal of RICHMOND CAPITAL GROUP LLC, RAM CAPITAL FUNDING LLC, and VICEROY CAPITAL FUNDING INC.; | Assigned to Justice Borrok |
| TZVI REICH, also known as Steve Reich, individually and as a principal of RICHMOND CAPITAL GROUP LLC, RAM CAPITAL FUNDING LLC, and VICEROY CAPITAL FUNDING INC.; and | |
| MICHELLE GREGG, individually and as a principal of RICHMOND CAPITAL GROUP LLC, RAM CAPITAL FUNDING LLC, and VICEROY CAPITAL FUNDING INC.; | |
|           Respondents. | |

The People of the State of New York (the "People"), by their attorney, Letitia

James, Attorney General of the State of New York (NYAG), bring this special

proceeding pursuant to Executive Law § 63(12) against Richmond Capital Group

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 3 of 53

LLC ("Richmond"), Ram Capital Funding LLC ("Ram"), Viceroy Capital Funding

Inc. ("Viceroy"), Robert Giardina, Jonathan Braun, Tzvi "Steve" Reich, and Michelle

Gregg.

The NYAG, on behalf of the People, alleges upon information and belief:

## **PRELIMINARY STATEMENT**

1.      Since at least 2015, Respondents have preyed upon victims by offering

them funding in the form of so-called "merchant cash advances." These merchant

cash advances are in fact fraudulent, usurious loans with interest rates in the triple

and even quadruple digits, far above the maximum rate permissible for a loan

under New York law.

2.      Richmond, Ram, and Viceroy issue, service, and collect on the loans.

Individual Respondents Giardina, Braun, Reich, and Gregg have operated

Richmond, Ram, and Viceroy at all times relevant to this Petition.

3.      Respondents have issued more than 3,000 fraudulent, usurious loans

since 2015 and have illegally collected from merchants more than $77 million in

payments on the loans.

4.      On information and belief, Respondents have collected tens of millions

more from merchants' bank accounts by executing on judgments issued against

merchants by New York State Supreme Court.

5.      Respondents' victims are small businesses located in New York and

throughout the United States. Such merchants often find themselves short of

capital and unable to quickly get small business loans from traditional banks. In

desperate need of funding to pay their expenses and keep their businesses afloat,

2

Case 1:22-cv-02170-ALC    Document 44-1    Filed 08/08/22    Page 4 of 53

they succumb to Respondents' deceptive, high-pressure sales tactics and their promise of readily available, short-term funding with rapid approval.

6.      Respondents loan money to merchants under the guise of a merchant cash advance, which they describe as a "Purchase and Sale of Future Receivables." As a general matter, an issuer of a merchant cash advance ("MCA") provides a merchant with a lump sum payment in exchange for a share of the merchant's future sales proceeds, or "receivables," up to a certain total repayment amount.

7.      As a result, unlike a loan, an MCA does not in theory guarantee an issuer with a regular payment or a fixed, finite term. Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with its actual receivables. Because payment amounts vary, the lengths of repayment terms also vary.

8.      This variability and lack of security create certain risks for issuers but also create certain protections for merchants by reducing required payments when business is slow.

9.      In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term. In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

3

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 5 of 53

10.    Respondents style their transactions as MCAs – "purchases of receivables" – in order to evade New York's 16% interest rate cap and the other legal protections and requirements that exist for loans.  But in fact, Respondents' transactions function as loans, and as a result their customers are entitled to the protections afforded to borrowers under New York law.

11.    Respondents market and collect upon their MCAs as loans.  They require merchants to repay the loans through daily payments, which are debited from merchants' bank accounts each day at set amounts ranging from $199 to $14,999.  They require the loans to be repaid in short terms, such as 60 days, at annual interest rates far above the 16% threshold that defines usury under New York law.  In fact, the annual interest rates charged by Respondents regularly exceed 100% – and in some cases exceed even 1,000%.

12.    Respondents regularly defraud the merchants to whom they loan money.  They issue loans in smaller amounts than promised and withdraw more money from merchants' bank accounts than the merchants agree to pay.  They advertise MCAs with no upfront fees, only to require merchants to pay upfront fees in their agreements.  They then charge merchants these fees – which do not relate to any expense or labor of Respondents but are simply more profit for them and their brokers – in amounts even higher than the high fees they actually disclose.

13.    Respondents advertise MCAs with no need of a personal guarantee, then require merchants to sign personal guarantees prior to receiving cash advances.

4

14.     Respondents advertise that they will arrange flexible repayment plans if a merchant is unable to make its daily payments, and they represent in their agreements that they will adjust or "reconcile" payment amounts based on the merchants' actual receipts, or "receivables."

15.     These representations are false.  In fact, Respondents debit payments from merchants' bank accounts in fixed daily amounts that do not change from day to day.

16.     Respondents structure their loans to ensure that merchants have no choice but to repay them at Respondents' onerous terms and despite their fraudulent abuses.  They do this by requiring merchants to sign confessions of judgment, in which each merchant confesses judgment for the full repayment amount of its loan.  Respondents promise that they will file the confessions in court only in certain narrow circumstances.  They then regularly break those promises and file confessions in New York State Supreme Court – regardless of whether the merchants are located in New York – based on mere missed payments or even based on no default at all.  With the confessions, Respondents also file false affidavits in which they misrepresent to courts the nature of their loans and often the amounts paid and still due.

17.     Using the confessions and their own false affidavits, Respondents obtain judgments against merchants quickly, with no legal notice to the merchants, no judicial review, and no other evidence showing that judgment is warranted.  On information and belief, Respondents have obtained judgments in this way against more than 400 merchants.

5

18.     Respondents create a climate of intimidation and fear to discourage merchants from missing their payments or from questioning Respondents' tactics, typically through phone calls made by Respondent Braun.  Braun has regularly called merchants' representatives and harassed, insulted, sworn at, and threatened them.  He has told them that he knows where they live and threatened to seize their assets, destroy their businesses, and do violence to them and their families.

19.     Respondents inflict immense financial and personal harm upon the merchants they purport to help.  They wrongly obtain judgments against merchants, strip money from their bank accounts, and force them into downward spirals of unending debt.  Merchants have been forced to take desperate measures to deal with their purported debts to respondents.  Many have been forced to shut their doors, file for bankruptcy, or both.

20.     Respondents' practices were first highlighted in an exposé in the financial news periodical *Bloomberg*.  Zeke Faux & Zachary Mider, "Sign Here to Lose Everything, Part 4: Marijuana Smuggler Turns Business-Loan Kingpin While out on Bail," *Bloomberg*, Dec. 3, 2018, *available at* https://www.bloomberg.com/graphics/2018-confessions-of-judgment-marijuana-smuggler-turns-business-loan-kingpin/ (Ex.17).  *Bloomberg* reported that merchants had complained that Richmond, through its filing of confessions of judgment and other tactics, had "cheated them, sometimes threatening to leave them penniless, or worse."

21.     The NYAG brings this petition pursuant to New York Executive Law § 63(12) for an order (a) permanently enjoining Respondents from engaging in the

6

fraudulent and illegal practices alleged herein; (b) ordering Respondents to cease all collection of payments on MCAs; (c) declaring void and ordering rescission of each of Respondents' usurious, fraudulent, and illegal agreements; (d) ordering Respondents to apply for vacatur of all judgments obtained by them pursuant to such agreements; (e) staying all marshals and/or sheriffs who hold executions under such judgments from executing or collecting upon them; (f) ordering Respondents to file papers sufficient to terminate all liens or security interests related to their cash advances; (g) ordering Respondents to provide an accounting; (h) ordering Respondents to pay full restitution and damages; (i) ordering Respondents to disgorge all profits; (j) awarding costs to the NYAG; and (k) granting such other and further relief as the Court deems just and proper.

## PARTIES AND JURISDICTION

22.     Petitioners are the People of the State of New York.

23.     The NYAG brings this special proceeding on behalf of the People pursuant to, *inter alia*, Executive Law § 63(12), which authorizes the NYAG to seek injunctive relief, restitution, damages, and costs when any person or entity has engaged in repeated fraudulent or illegal acts or has otherwise demonstrated persistent fraud or illegality in conducting its business.

24.     Respondent Richmond Capital Group LLC is a New York limited liability company.  Richmond does business from an office in New York County and maintains a registered agent for the service of process in Kings County.

25.     Richmond has admitted that it has done business under the names Ram Capital Funding and Viceroy Capital Funding.

7

26.     On or about May 6, 2019, Richmond filed paperwork with the New York Department of State to change its name to RCG Advances, LLC.  Because this name change occurred after the events set forth herein, the company is referred to here as "Richmond."

27.     Respondent Ram Capital Funding LLC is a limited liability company organized under the laws of New Jersey.  Ram does business from an office in New York County and maintains a registered address for the service of process in New York County.

28.     Respondent Viceroy Capital Funding Inc. is a domestic business corporation organized under the laws of New York.  Viceroy does business from an office in New York County and maintains a registered address for the service of process in New York County.

29.     Respondent Robert Giardina, as Managing Partner of Richmond and owner of Richmond and Viceroy, formulates, directs, controls, or participates in Respondents' acts and practices.  Giardina resides, on information and belief, in Richmond County, New York.

30.     Respondent Jonathan Braun, also known as "John Braun," is a principal of Richmond, Ram, and Viceroy and formulates, directs, controls, or participates in their acts and practices.  Braun is currently an inmate at Federal Correctional Facility Otisville in Otisville, New York.

31.     Braun was convicted on November 3, 2011 in United States District Court for the Eastern District of New York of the crimes of conspiracy to import marijuana and money laundering conspiracy, and on May 28, 2019 he was

INDEX NO. 451368/2020

RECEIVED NYSCEF: 01/09/2021

sentenced to a term of imprisonment of 10 years as punishment for those offenses. *United States v. Braun*, No. 10-cr-00433-KAM-1 (E.D.N.Y), ECF Nos. 36, 48, 163. Braun engaged in the conduct set forth herein while on supervised release under the supervision of the United States Probation Department during the years after his conviction and prior to his sentencing.

32.     Respondent Tzvi Reich, also known as "Steve Reich," is owner of Ram and is also involved in the management of Richmond and Viceroy.  Reich formulates, directs, controls, or participates in the three companies' acts and practices.  Reich maintains a place of business in New York County and on information and belief resides in New Jersey.

33.     Respondent Michelle Gregg, as Managing Director and Director of Finance of both Richmond and Viceroy, formulates, directs, controls, or participates in Respondents' acts and practices.  Gregg resides in New York County.

## FACTS

34.     The facts summarized here are set forth more fully in the Affirmation of John P. Figura in Support of the Amended Verified Petition, the exhibits thereto, and the Memorandum of Law in Support of the Amended Verified Petition, each of which is incorporated by reference herein.

### A.     Respondents Use Deception and Aggressive Tactics to Market Their Loans to Merchants

35.     Respondents prey upon cash-strapped small businesses in New York and throughout the United States.  The merchants are often unable to quickly obtain conventional funding from banks in the form of small business loans and

9

INDEX NO. 451368/2020
RECEIVED NYSCEF: 01/09/2021

have few, if any, other resources to obtain the capital they need to pay their employees' wages, pay rent and other expenses, and keep their businesses afloat.

36.     Respondents expressly advertise their MCAs as "loans" and directly market them to merchants by cold-calling them on the telephone.  Respondents tell merchants that the loans are repaid through daily payments at set amounts and are subject to finite repayment terms.

37.     Respondents promise to merchants, however, that those payments can be adjusted as needed.  Respondents and the brokers who work with them to market the cash advances – many of whom work with Richmond, Ram, and Viceroy on an interchangeable basis – represent to merchants that Respondents will provide flexible repayment terms.  They tell merchants Respondents will "work with" them if they have difficulty making their daily payments.

38.     These representations are false, as set forth below.  In fact, Respondents charge merchants daily payments set to fixed amounts that Respondents do not reconcile or adjust.

39.     Respondents also misrepresent the amounts of the cash advances they will provide.  They falsely advertise "No Upfront Costs" and misrepresent to merchants, *inter alia*, their net advance amounts, the fees they will deduct from the advances, and the amounts of the daily payments they will debit from merchants' bank accounts.

40.     Once a merchant agrees to apply for a loan, Respondents send the merchant an initial draft of a "Merchant Agreement," an affidavit of confession of judgment, and other forms and draft agreements for the merchant to sign.

10

INDEX NO. 451368/2020
RECEIVED NYSCEF: 01/09/2021

41. Much of the Merchant Agreement is printed in small type. Until late 2017 and early 2018, Respondents printed most of their agreements' language in tiny type of about a 4-point type size that was for all intents and purposes illegible, as shown below:

11

INDEX NO. 451368/2020

RECEIVED NYSCEF: 01/09/2021

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 13 of 53

Ex.99 at RCLG000079113.

42.     Respondents and the brokers they work with urge merchants to sign and return their agreements immediately after receiving them, leaving merchants with insufficient time to review the agreements' terms or consult professionals concerning them.

**B.    Respondents Market and Underwrite their MCAs as Loans**

43.     Although Respondents attempt in their Merchant Agreements to disguise each MCA as a "Purchase and Sale of Future Receivables," in reality, Respondents market, underwrite, and collect upon the transactions as loans, with interest rates far above those permissible under New York law.

44.     In their marketing, Respondents expressly describe the transactions as "loans" and describe themselves as "lenders."

45.     In its website, for example, Ram advertises, "As a private lender, Ram Capital Funding takes pride in investing in projects that traditional banks may deny . . . .  Our rapport with the borrowers can be summarized as a partnership for the duration of the loan . . . ."  Ex.21 at 2 (Ram Capital Funding, http://ramcapitalfunding.com/Home/#scrolltop (last visited June 6, 2020)).[1]

46.     Richmond also advertises its cash advances as "loans," as shown here:

Have a few questions? **We have the answers!**

Here are some inquiries that you may ask when applying for a business loan.

---

[1] Exhibits cited herein are exhibits to the Affirmation of John P. Figura, as filed June 10, 2020, unless otherwise stated.

Case 1:22-cv-02170-ALC    Document 44-1    Filed 08/08/22    Page 14 of 53

Ex.20 at 5 (Richmond Capital Group, "Have a few questions?,"

http://www.richmondcapitalgroup.com/faq.html (last visited June 6, 2020)).

> **How quickly will I receive my loan?**
> Most Loans are completed and money your business account within 48 hours.

*Id.*

47.     Respondents also consistently describe their MCAs as "loans" in their

direct communication with merchants.  For example, Braun urged a merchant to

take out a cash advance from Richmond by asking, "Are you ready to take our

loan?" and stating, "We'll go ahead and loan you the money."  Ex.69 ¶ 8.

48.     Respondents use other terms to convey to merchants that they are

providing loans, describing themselves as "lenders" and referring to the merchants

as "borrowing" funds.

49.     The "loans" that Ram and Richmond advertise are simply another

name for their MCAs.

50.     Respondents have provided no products or services apart from their

MCAs.

51.     Respondents also show in their underwriting practices that their

MCAs are loans.  When underwriting new cash advances, Respondents evaluate not

merchants' receivables, which are the assets they are purportedly buying, but

instead such factors as merchants' credit ratings and bank balances.

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 15 of 53

### C.    **Respondents Structure Their MCAs to Subject to Repayment Absolutely, Just Like Loans**

52.    Respondents attempt to escape liability for usury by styling each MCA as a "Purchase and Sale of Future Receivables" and by stating in their agreements that the advances are not loans.  *E.g.*, Ex.1 at RCLG000098909, RCLG000098910 § 1.8.

53.    But under New York law it is the substance of a transaction, as shown by the dealings of the parties – and not its form – that determines whether it is a loan.  *E.g.*, *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 183 (1st Dep't 2013).  A transaction is a loan if, among other things, repayment is provided for "absolutely," and the principal is "in some way be secured as distinguished from being put in hazard."  *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947).

54.    Respondents structure their MCAs so that they are subject to repayment absolutely, not on a contingent basis, and as a result the transactions are thus loans.  Respondents do this in a number of ways.

55.    First, Respondents require merchants to repay the cash advances through daily payments, which Respondents debit from merchants' bank accounts in fixed amounts that do not change from day to day.  Ex.24.

56.    These amounts are stated in Respondents' agreements and called either a "Specific DAILY Amount" or an "Estimated Daily Amount," as shown below, in an agreement for an advance from Ram:

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 16 of 53

| Total Purchase Price: $40,000.00 | Specified Percentage: 10 % | Specific DAILY Amount:$ 999.00 | Total Purchased Amount:$ 59,960.00 |

Ex.218 at RCLG000086674.

57.     Respondents repeat the fixed daily amounts in a form that
memorializes merchants' consent for Respondents to debit money from their bank
accounts ("ACH Debit Form").  For example, Ram's ACH Debit Form for the
agreement excerpted above states a fixed daily payment amount of $999, as shown
here:

I, (We) PRECISION PLANT SERVICES, INC. _____ Hereby Authorize, Ram Capital Funding, LLC
(Hereinafter known as "RCF") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

Bank Name: EAST WEST BANK _____ Branch: PARK VILLAGE

ABA: Routing: 061103894 _____ DDA: Account: ███████ _____ For the

amount of: $ 999.00 _____ (Or) Percentage of each Banking Deposit: % N/A _____

On the Following Days:  MONDAY - FRIDAY

Ex.218 at RCLG000086678.  This $999 amount is the same amount stated as the
"Specific DAILY Amount" in Ram's Merchant Agreement with the same merchant
shown above.

58.     Respondents state in their agreements that they will "reconcile"
merchants' payment amounts based on a "Specified Percentage" of their
"receivables," but this contract language is a sham.

59.     Respondents' ACH Debit Forms include a line where Respondents can
enter a "Percentage of each Banking Deposit," indicating the percentage by which
Respondents would recalculate merchants' daily payment amounts, but

16

Respondents either fill in this line with "N/A," as shown above, or leave the line blank.

60.     Similarly, Respondents frequently leave blank the "Specified Percentage" portion of their agreements, which purportedly states the percentage by which Respondents would reconcile merchant's payments, as shown below.

Total Purchase Price: $30,000.00 _____ Specified Percentage: _____ % Estimated Daily Amount:$ 699.00 _____ Total Purchased Amount:$ 44,970.00 _____

Ex.70 at RCLG000049775.

61.     Respondents' failure to enter a percentage of receivables in their ACH Debit Forms or their agreements reflects that their practice is to debit merchants' bank accounts not by any percentage but instead only by fixed daily amounts.

62.     Second, each of Respondents' agreements indicates a finite repayment term.  The repayment term is the total repayment amount of the cash advance, called a "Total Purchased Amount," divided by its fixed daily payment amount.

63.     For example, in the agreement excerpted above, *supra* ¶ 56, Ram required the merchant to repay it $59,960 through fixed daily payments of $999, indicating a finite repayment term of 60 business days ($59,960 ÷ $999 = 60). Ex.218 at RCLG000086674.

64.     Consistent with Ram's agreement, Reich described the term of that MCA as "60 days" in an email to Giardina and Braun, among others.  *Id.* at RCLG000086673.

65.     In another example, Richmond provided a $10,000 advance and required the merchant to repay Richmond $19,900 through daily payments of

17

$1,999, indicating a 10-day term.  In an email to Giardina and Gregg, Braun wrote, "$10K @ 19,900 – 1,999 DAILY ( YES THAT IS 10 PAYMENTS )."  Ex.101 at RCLG000051250.

66.     Respondents regularly discuss the finite terms of MCAs in their communications, as shown in the chart attached to the Figura Affirmation, filed herewith, as Exhibit A.

67.     Third, Respondents draft their MCA agreements to provide them with security in the event of default far beyond merchants' mere "receivables." Respondents' agreements state that (a) Respondents acquire not only a merchant's receivables but instead a wide array of assets, including "all of merchant's future accounts, contract rights, and other entitlements"; (b) the MCAs are personally guaranteed by guarantors, who are in most cases merchants' principals; (c) Respondents hold security interests under the Uniform Commercial Code over "all accounts" and other assets of merchants; (d) any suspension or termination of a merchant's business, even one resulting from bankruptcy, is an event of default triggering immediate payment of the entire amount due; and (e) in certain events of default, Respondents can immediately file merchants' and guarantors' signed and notarized confessions of judgment in New York courts, enabling Respondents to immediately obtain judgments for the full repayment amounts of the MCAs – with no notice, no judicial review, and no other proof of default aside from Respondents' own self-serving (and often false) affidavits.  *See*, *e.g.*, Ex.1 at RCLG000098909, RCLG000098911 § 1.10, RCLG000098914.

68.     Each of these practices of Respondents ensures that their MCAs are subject to repayment absolutely and are thus loans under New York law.

**D.      Respondents Loan Money at Interest Rates in the
          Triple and Quadruple Digits**

69.     Under New York law, a person or entity engages in usury when it charges, takes, or receives interest on a loan at an annual rate above 16%.  General Obligations Law § 5-501(1), Banking Law § 14-a(1).  A person or entity commits criminal usury when it charges, takes, or receives interest on a loan at a rate above 25%.  Penal Law § 190.40.

70.     Respondents charge merchants annual interest rates on their loans in the triple and even quadruple digits, far above the maximum permissible interest rate of 16% for loans under New York law.

71.     The interest rate charged by Respondents to an MCA recipient can be calculated based on (1) the amount, or principal, of the MCA; (2) the daily payment amount; and (3) the total repayment amount.

72.     For example, Richmond agreed in a Merchant Agreement that it would provide a merchant with a cash advance of $20,000, minus fees.  The advance was to be repaid in the amount of $29,980 through daily payments of $599, resulting in a 50-day term ($29,980 ÷ $599 = 50).  Ex.2 at RCLG000052215.

73.     The principal of the MCA was $20,000, and the amount of interest, not including fees, was $9,980 ($29,980 – $20,000 = $9,980).  This interest amount, paid over 50 days, yields an annual interest rate of 250%.  Ex.43 ¶¶ 17-24.

19

74.    If Respondents' fees are also treated as interest, the principal is less, and the interest amount and interest rate are higher.  In the example above, Richmond deducted $3,998 in fees from the $20,000 advance, resulting in a net cash advance of only $16,002.  Ex.2 at RCLG000052223.  If this $3,998 in "fees" is actually interest, then the principal is $16,002 ($20,000 − $3,998 = $16,002), the interest amount is $13,978 ($29,980 − $16,002 = $13,978), and the annual interest rate over a 50-day term is 438%.  Ex.43 ¶¶ 25-31.

75.    And in fact, such "fees" do constitute interest under New York law, for they do not reflect any labor or expense by Respondents but instead are simply profit for Respondents and the brokers they work with.

76.    Respondents regularly charge merchants interest in the triple and even quadruple digits.  *See generally* Ex.283.  In an example discussed above, Respondents loaned a merchant $10,000 and required it to pay back $19,900 in daily payments of $999 over a 10-day term.  *Supra* ¶ 65.  The merchant's annual interest rate, including interest that was purportedly "fees," was 3,910 percent. Ex.283 at 1.

77.    Neither Richmond nor Ram nor Viceroy is licensed as a lender under New York law.

### E.    Respondents Engage in Repeated and Persistent Fraud in Their Dealings with Merchants

78.    Respondents repeatedly engage in fraud in violation of Executive Law § 63(12) in their dealings with merchants.

20

       1.      **Respondents Misrepresent to Merchants the
Upfront Fees They Charge, the Amounts of Their
Advances, and the Amounts They Debit from
Merchants' Bank Accounts**

79.      Respondents falsely advertise to merchants that they charge "No
Upfront Costs," but in reality they charge merchants the upfront costs of an
"Origination Fee" and an "ACH Program Fee." These fees, when deducted from
Respondents' MCAs, leave merchants with smaller net cash advances than initially
indicated.

80.      Respondents misrepresent the amounts of both of these fees.

81.      Respondents state in an appendix that they will charge an ACH
Program Fee at either an express amount or a percentage – either 10% or 12% "of
the funded amount" – but they do not state in their agreement which of the two
forms of fee calculation will apply or how such a determination will be made.

82.      For example, Ram stated in an agreement with a merchant that it
would charge fees as follows:

<u>Origination Fee -</u>    $ <u>1999.00</u> to cover Underwriting and related expenses.

<u>ACH Program Fee</u> - $ <u>999.00</u> (or <u>10</u> % of the funded amount, depending on size of
advance) ACH's are labor intensive and are not an automated process, requiring us to
charge this fee to cover costs.

Ex.99 at RCLG000079117.

83.      By setting out express fee amounts, Respondents create the impression
that these are the amounts of the fees that will be charged. And, by failing to
disclose that they are in fact charging a percentage-based fee or disclose the amount

21

of such fee, Respondents make it impossible for merchants to determine how much in fees Respondents will actually charge.

84.    In any event, Respondents repeatedly charge merchants more than either the express amounts of their fees or the percentage-based amount of their ACH Program Fees, leaving merchants with significantly less cash than represented.

85.    For example, Viceroy represented to one merchant that it would provide an MCA of $200,000, minus express totaling $9,998, as reflected below:

**Origination Fee- $ 4,999.00** to cover Underwriting and related expenses.
**ACH Program Fee- $ 4,999.00** (or 12% of the funded amount, depending on size of advance) ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs.

Ex.163 at RCLG000043816.

86.    Despite this representation, Braun sent an email to Giardina, Gregg, and Reich instructing them to instead charge the merchant $39,998 in total fees, as shown below:

> PLEASE FUND - VICEROY - ***WIRE***
> 200K @ 299,800 - 4,999 DAILY - 4,999 PSF - 34,999 ACH
>
> NET TO MERCHANT -
> 160,002 - RECURRING 4,999

*Id.* at RCLG000043806.

87.    The $39,998 in fees was far more than either the $9,998 in express fees or "12% of the funded amount" of $200,000.  The result was a net cash advance of only $160,002, as shown in Braun's email above.

22

Case 1:22-cv-02170-ALC    Document 44-1    Filed 08/08/22    Page 23 of 53

88.     Instances identified by the NYAG in which Respondents have overcharged merchants on their fees are shown in the chart attached to the Figura Affirmation, filed herewith, as Exhibit B.

89.     Respondents also misrepresent the work they do that purportedly justifies the fees they charge.

90.     As shown above, *supra* ¶ 82, Respondents tell merchants that they deduct an ACH Program Fee because managing merchants' payments is "labor intensive and . . . not an automated process," but in fact the process is entirely automated; the fee is simply more profit for Respondents.

91.     Respondents tell merchants that they deduct an Origination Fee to "cover Underwriting and related expenses," *id.*, but in fact the fee is simply paid out as a commission to Respondents' brokers.

92.     Respondents also withhold funds from merchants' agreed-upon advances, calling the withheld amounts "reserves," and then keeping the money and failing to provide the "reserved" amounts.

93.     For example, Richmond agreed to provide a merchant an MCA of $10,000. Ex.190 at RCLG000023089. Richmond's agreement did not provide for them to keep any of the advance as a reserve. Nonetheless, Braun instructed Giardina, Reich, and Gregg to deduct a $4,000 "reserve" from the $10,000 cash advance – in addition to fees – leaving a net advance of only $4,601:

23

> PLEASE FUND - RCG - ***WIRE***
>
> 10K@14,990-299 DAILY - 500 PSF - 899 ACH - RESERVE 4K
>
> NET TO MERCHANT
> 4,601 - RECURRING 299

Ex.190 at RCLG000023081.

94.    Richmond did not subsequently pay the merchant the missing $4,000 it withheld as a "reserve."

95.    Respondents also misrepresent to merchants the amounts they will debit from their bank accounts.

96.    For example, Ram represented to a merchant that it would charge a daily payment of $699, as shown here:

Total Purchase Price: $25,000.00 ___ Specified Percentage: 10__% Specific DAILY Amount:$ 699.00 ___ Total Purchased Amount:$ 37,475.00 ___

Ex.99 at RCLG000079112.

97.    Braun then forwarded the signed agreement to Reich, Giardina, and Gregg and instructed that the merchant be charged not $699 a day but instead $999:

> PLEASE FUND - RAM - *WIRE*  (REICH WILL SEND ROB - REIMBURSE)
> 25K @ 37,475 - 999 DAILY - 4,498 ACH FEE
>
> NET TO MERCHANT
> 20,502 - RECURRING 999

Ex.192 at RCLG000079109; *see also* Ex.98 ¶ 19.

98.    This and other instances in which Respondents have charged merchants more for their daily debits than agreed to are shown in the chart attached to the Figura Affirmation, filed herewith, as Exhibit C.

99.     Respondents misrepresent in their agreements that they will debit merchants' bank accounts only on "business days."  *E.g.*, Ex.1 at RCLG000098909.

100.    In fact, Respondents debit merchants' bank accounts for holidays as well – following instructions from Giardina and Gregg to Respondents' payment processor, Actum Processing.  Respondents typically process such payments by double-debiting a merchant's bank account on the business day after a holiday.

101.    In doing so, Respondents debit merchants' accounts more often than promised and make it more likely that they will default due to insufficient bank funds.

102.    Respondents often increase the amounts of their fees – and decrease the amounts of their advances – after merchants have already signed Respondents' agreements and confessions of judgment.  At that point, merchants have little to no leverage to push back against Respondents' changes.

103.    Respondents regularly debit money from merchants' bank accounts even after the merchants have paid off their advances, resulting in overcharges of thousands of dollars.

### 2.     Respondents Misrepresent to Merchants the Fundamental Structure of Their Cash Advances

104.    Respondents misrepresent to merchants their fundamental practices in structuring MCAs.

105.    Respondents advertise that merchants can obtain a cash advance with no collateral and no personal guarantee.  For example, Richmond falsely advertises, "No Credit or Collateral Requirements," and states, "[W]e need no personal

25

guarantee of collateral from business owners seeking our merchant cash advances."

Ex.20 at 2.

106.    This is false.  In fact, Respondents' agreements expressly require both extensive collateral and a personal guarantee.  *Infra* ¶ 133.

107.    Respondents state in their marketing communications that they will provide merchants with flexible payment plans and will "work with" merchants that have difficulty making their daily payments.

108.    In its website, Ram falsely advertises, "Unlike traditional loans, merchant cash advances do not have fixed payment amounts each month with a final end payment date.  Instead, repayments are based in part by sales [sic], providing repayment flexibility to business owners."  Ex.21 at 2.

109.    Richmond advertises in its website "business loan alternatives . . . with no fixed repayment term."  Ex.20 at 2.

110.    Similarly, Respondents represent that they will reconcile merchants' payment amounts by calculating them before debiting them from merchants' bank accounts.  This clause (hereafter "Payment Calculation Clause") states, "[T]he way your advance is set up [Richmond or Ram or Viceroy] needs viewing access to your bank account each business day in order to calculate the amount of your daily payment."  *E.g.*, Ex.1 at RCLG000098919.

111.    Respondents also represent to merchants that they will reconcile payment amounts on a monthly basis, after the payments are made ("Monthly Reconciliation Clause").  This clause states:

26

INDEX NO. 451368/2020

RECEIVED NYSCEF: 01/09/2021

> [Richmond or Ram or Viceroy] will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage.

*E.g.*, *id.* at RCLG000098909.

112.   These representations are false.  In fact, Respondents debit merchants' accounts by fixed daily amounts that do not change from day to day, and that are not reconciled, either before or after the payments are debited from merchants' bank accounts.

113.   Respondents state in their agreements that a merchant "would not owe anything" if it is unable to make payments due to a business slowdown.

114.   This is false.  When a merchant is unable to pay its fixed daily amount, due to a business slowdown or any other reason, Respondents either push the merchant to refinance its existing cash advance or declare default on the merchant and obtain court judgment against it.

115.   Respondents state in their agreements that they will file merchants' confessions of judgments only in certain specific circumstances, such as when a merchant obstructs customers' payments from being deposited into its bank account to be debited by Respondents.  *E.g.*, Ex.148 at RCLG000043371 § 1.10 ("Protection 3").

116.   This is also false.  In fact, Respondents file merchants' confessions of judgment based on any purported default, including even a few missed payments by the merchant.

117.    Respondents maximize merchants' debt in pursuit of either of two possible outcomes.  First, when a merchant is unable to pay its fixed daily amount, Respondents push the merchant to take out yet another cash advance, with much of the principal of the new advance being used to refinance the prior advance and to pay additional fees.  The remainder is wired to the merchant.  The merchant is then stuck with a daily payment amount even higher than the prior daily payment it was already struggling to meet.

118.    Second, when a merchant is unable to make its daily payment and does not refinance its loan, Respondents declare default and file the merchant's confession of judgment in New York State Supreme Court to obtain judgment against the merchant.  Respondents then use the judgment, with the assistance of the New York City Marshals, to seize the full repayment amount of the loan from any bank account they can trace to the merchant or its guarantor.

**F.      Respondents Abuse the Process of Filing Confessions
of Judgment and Use Confessions and False Affidavits
to Fraudulently Obtain Judgments Against Merchants**

119.    Central to Respondents' business is their practice of obtaining court judgments against merchants by filing confessions of judgment.  This practice provides Respondents with immense leverage, which they abuse freely.

**1.      Respondents Use Confessions of Judgment to
Obtain Immediate Judgments with No Notice,
No Proof of Default, and No Judicial Review**

120.    Respondents regularly file merchants' confessions in New York State Supreme Court in order to obtain judgment against the merchants pursuant to

28

CPLR 3218.  They file for judgment in New York courts even though many of the merchants they loan money to are in other states, such as Texas or California.

121.   For Respondents, the process of obtaining judgments is nearly instantaneous.  Respondents file confessions and their own affidavits with no notice to the merchant, no other documentary proof of default or of money owed, and no judicial review.  The clerk of each court then typically issues judgments in Respondents' favor, often the same day that Respondents file their papers.

122.   Using this technique, Respondents have obtained judgments against, on information and belief, more than 400 merchants immediately upon determining that a merchant has defaulted on an agreement – and in some cases, just days after the merchant has signed its Merchant Agreement and confession.

### 2.   Respondents Engage in Fraud by Obtaining Court Judgments Based on False Affidavits

123.   Respondents engage in fraud by filing false affidavits in New York State Supreme Court along with merchants' confessions of judgment.

124.   Respondents' affidavits, which are executed by Giardina or Gregg, misrepresent the usurious nature of their cash advances by disguising Respondents' practices in calculating merchants' payment amounts.  In them, Giardina and Gregg have repeatedly testified that merchants have made (or have failed to make) "Specified Percentage Payments" to Respondents.

125.   For example, Gregg testified as follows in an affidavit filed in New York State Supreme Court:

> Pursuant to the Agreement, [the merchant] authorized [Ram] to debit from its bank account, by means of an online ACH debit, ten

29

percent (10%) of WCI's accounts receivable collections (the "Specified Percentage"), until the purchased amount of receivables – $59,600.00 – was paid in full.

. . .

[The merchant] initially made Specified Percentage Payments of $10,984.00 through automatic debits . . . .

Ex. 60 at 1-2 ¶ 4, 3 ¶ 11.

126.    This testimony is false.  In fact, Respondents collect payments set to fixed daily amounts that are not reconciled based on any "Specified Percentage."

127.    By falsely testifying that Respondents collect "Specified Percentage Payments," Giardina and Gregg conceal from courts that Respondents' MCAs are not purchases of receivables but are in fact usurious loans.

128.    Respondents also file false affidavits that misrepresent to courts the facts of purported defaults and the amounts paid by merchants and the amounts still owed, as has already been found in one New York State Supreme Court decision, *Richmond Capital Group LLC v Megivern*, No. 151406/2018, 2018 WL 6674300, at *3-4 (Sup. Ct. Richmond Cnty. Nov. 28, 2018) (Ex. 204).  In *Megivern*, Justice Orlando Marrazzo found and ruled as follows:

> The record is replete with evidence that Plaintiff [Richmond] made false statements and misrepresentations to the Court which necessitate the vacatur of the Judgement [sic].  In the Affidavits of Ms. Gregg and Ms. Rabinovich [counsel for Richmond], both stated that Defendants had not paid one dollar under the agreement, while in fact Defendants had paid $2,990 as of June 1, 2018 . . . .
>
> . . .
>
> The Court finds that Plaintiff's actions in making false statements to the Court were meant to undermine the truth-seeking function of the judicial system and essentially made the Court an unwilling participant in its fraud . . . .  Defendants have proven by clear

30

and convincing evidence that the Plaintiff acted knowingly to try and hinder the Court's adjudication of the case and the Defendants' defense. Plaintiff repeatedly made false, sworn statements to the Court that resulted in the Court entering a Judgment for an inflated amount . . . . Therefore, based on the fraud committed on this Court by Plaintiff, the Judgement and Confession by Judgment are hereby vacated. Any lesser sanctions would not suffice to correct the offending behavior since Plaintiff's fraud was central to the substantive issues in the case and Plaintiff's lack of scruples in this case warrant this heavy sanction.

*Id.*

129.    The facts of *Megivern* are not unique. Respondents have repeatedly obtained orders of judgment against merchants by filing affidavits that falsely state the facts of purported defaults and misrepresent to courts the amounts the merchants have paid and the amounts still due.

## G.    Respondents Cause Merchants to Enter Unconscionable Contracts

130.    Respondents engage in fraud by obtaining merchants' signatures on the agreements through procedurally unconscionable means and filling their agreements with substantively unconscionable provisions. In doing so Respondents violate Section 63(12), which defines "fraud" to include "any . . . unconscionable contractual provisions."

131.    Respondents use numerous procedurally unconscionable tactics, including the following:

- Respondents take advantage of merchants' desperate financial conditions by preying upon merchants that need immediate funding to keep their businesses afloat;

- Respondents misrepresent to merchants, *inter alia*, (a) that their cash advances are purchases of receivables and not loans, (b) that they will offer flexible repayment plans and will reconcile payments; (c) the amounts of their cash advances, their fees, and their debits from

31

merchants' bank accounts; and (d) the circumstances under which they will file merchants' confessions of judgment;

- Respondents modify the amounts of their cash advances and fees after merchants have already signed Respondents' agreements and forms, at which point merchants have little leverage to resist the late changes; and

- Respondents and the brokers they work with urge merchants to sign Respondents' agreements as quickly as possible, leaving them little time to consult with professionals.

132. Respondents' agreements include substantively unconscionable clauses, including their clauses providing for interest at triple- and even quadruple-digit rates.

133. Respondents also include substantively unconscionable clauses that, applied together, enable them to immediately obtain and execute judgments against merchants and guarantors, including the following:

- Clauses requiring merchants and guarantors to execute confessions of judgment, which Respondents may file in New York court in case of purported default, with no notice, in order to obtain immediate judgments against them, *e.g.*, Ex.1 at RCLG000098911 § 1.10 ("Protection 3");

- Acceleration clauses causing, in the event of certain defaults, all interest that would eventually be paid over time to be immediately due, *e.g.*, *id.* ("Protection 1");

- Clauses requiring each cash advance to be guaranteed and to be secured by, *inter alia*, "all accounts" and "all proceeds" of the merchant, *e.g.*, *id.* at RCLG000098914;

- Clauses stating that Respondents hold secured interests pursuant to the UCC, *e.g.*, *id.*; and

- Clauses providing that any interruption or termination of a merchant's business, including those resulting from bankruptcy, constitutes default and triggers the acceleration clause, *e.g.*, *id.* at RCLG000098911 § 1.10(d); *see also*, *e.g.*, Ex.183 at RCLG000104543 §

32

3.1(a) (expressly stating that a bankruptcy filing constituted an event of default).

134.    In addition, Respondents' agreements also include the following unconscionable provisions:

- Clauses requiring merchants to pay Respondents annual interest in the triple and even quadruple digits, *supra* ¶¶ 70-76;

- Clauses requiring merchants to provide Respondents their bank account passwords and all other information necessary to log into their bank accounts, *e.g.*, Ex.1 at RCLG000098910 § 1.1, RCLG000098919;

- Clauses prohibiting merchants from interrupting, moving, selling, or transferring their businesses without Respondents' consent, *id.* at RCLG000098911 § 1.10(d);

- Clauses providing that merchants must pay Respondents' attorneys' fees in the event of litigation in which Respondents are successful, but not requiring Respondents to pay merchants' attorneys' fees if Respondents lose, *id.* at RCLG000098911 § 1.10 ("Protection 5");

- Refinancing terms requiring that when a merchant obtains a new cash advance to refinance a prior cash advance, the total repayment amount of the prior advance is deducted from the principal of the new advance, including all interest that would have been paid over time, *see id.* at RCLG000098920; and

- Power-of-attorney clauses providing that Respondents may serve as merchants' agent and attorney-in-fact, with the power to collect money, endorse checks, sign merchants' names on invoices, and file any claims Respondents deem necessary, *id.* at RCLG000098911 § 1.10 ("Protection 8").

**H.    Respondents Harass and Threaten Merchants in Order to Force Them to Repay Their Loans**

135.    Respondents have subjected merchants to a torrent of harassment, insults, abuse, and threats, typically delivered by Braun by telephone, when merchants contact them to request adjustments of their payments or when Respondents determine that merchants have defaulted.

33

136.    When one merchant's bank stopped payments to Richmond due to an unexplained $10,000 debit to the merchant's bank account, Braun repeatedly called the business's owner, demanding, "You owe me money.  Give me my money now." Braun warned the owner not to "fuck with" him and threatened to "destroy" the merchant and make his life a "living hell."  Braun threatened, "I know where you live.  I know where mother lives."  Braun said, "I will take your daughters from you," and, "You have no idea what I'm going to do." Ex.69 ¶¶ 24-26.

137.    Another merchant explained to Gregg that it was having difficulty making payments due in part to a lack of incoming receivables.  In response, the merchant's principal received not payment reconciliation from Respondents but instead a series of vivid threats in calls from Braun.  Braun threatened that he would come to the principal's synagogue in Brooklyn and "beat the shit out of" him and "publicly embarrass" him.  Braun warned the man, "I am going to make you bleed," and, "I will make you suffer for every penny." Ex.132 ¶¶ 30, 41.

138.    A recipient of an advance from Ram was unable to make payments during a business slowdown.  Ram filed the merchant's confession of judgment, and shortly afterward Braun called the merchant's principal and demanded, "Why don't you pay me, you redneck piece of shit?"  Braun told him, "I'm going to get my money one way or the other," and said, "Be thankful you're not in New York, because your family would find you floating in the Hudson." Ex.85 ¶¶ 44-45.

34

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 35 of 53

I.    **Merchants' and Guarantors' Businesses, Finances, and Credit Have Been Demolished as a Result of Respondents' Conduct**

Respondents inflict immense financial and personal harm upon the merchants they purport to help.  They pressure merchants into deceptive and lopsided agreements, loan money to them at triple- and quadruple-digit interest rates, wrongly seize large sums from their bank accounts, wrongly file judgments against them that ruin their credit, and force them into spirals of unending debt.

139.    Merchants have been forced to take desperate measures to deal with the debts owed to Respondents and the judgments that they obtained, including terminating employees and taking out further cash advances from other providers.

140.    The principal of one merchant attempted suicide as the result of a cycle of MCAs that started with an advance form Richmond.  Many merchants that have received cash advances from Respondents have shut their doors, filed for bankruptcy, or both.

J.    **Each Respondent Is Responsible for the Acts Set Forth Herein**

Each Respondent is responsible for the usurious, fraudulent, and illegal conduct set forth herein.

1.    **Richmond, Ram, and Viceroy Are Parties to the Agreements at Issue and Members of a Common Enterprise**

141.    Richmond, Ram, and Viceroy are parties to the usurious, fraudulent, and illegal agreements discussed herein.

35

142.    Each has, *inter alia*, (a) loaned money at interest rates far above those permissible under New York law; (b) promised flexible payment amounts and reconciliation of payments but instead charged merchants based on fixed daily amounts that do not change from day to day; (c) misrepresented that it would provide advances in certain amounts and at certain fees, then deviated from those amounts in practice; (d) caused merchants to agree to unconscionable agreements; and (e) obtained judgment from New York courts based on the filing of (i) false affidavits executed by Giardina and Gregg and (ii) confessions of judgment whose filing violated Respondents' promises to the merchants.

143.    Richmond, Ram, and Viceroy are also liable for Respondents' bad acts as members of a common enterprise.  The three companies maintain officers and/or employees in common, operate under common control, share offices, commingle funds, and share marketing and other resources.

### 2.    Robert Giardina Is a Principal Decision-Maker for Respondents and Directly Participates in Their Misdeeds

144.    Each individual Respondent is liable for the fraudulent and illegal conduct alleged herein.  Each is an officer or director of Richmond, Ram, and/or Viceroy and has participated in or had actual knowledge of their bad acts and has substantially assisted in the fraudulent and illegal acts of other Respondents.

145.    Giardina is responsible, with Braun, Reich, and Gregg, for supervising Respondents' marketing, issuance, and servicing of fraudulent, usurious loans and their collection of payments on those loans.

36

Case 1:22-cv-02170-ALC    Document 44-1    Filed 08/08/22    Page 37 of 53

146.    Giardina is Managing Partner of Richmond and holds direct supervisory control over Richmond's operations.

147.    Giardina is a principal of Viceroy and holds direct supervisory control over Viceroy's operations.

148.    Giardina is closely involved in managing Ram's MCA operations.

149.    Giardina is a hands-on supervisor.  He interacts closely with the individuals working with Respondents, including Braun, Reich, and Gregg, and is familiar with their acts.

150.    Giardina has worked in the same offices, at the same street addresses, as Braun, Reich, and Gregg, among other personnel of Richmond, Ram, and Viceroy.

151.    Giardina is personally responsible for the following acts of Respondents, among others:

- Causing Richmond to advertise MCAs as "loans" and falsely advertise flexible payment plans (among other misrepresentations) on Richmond's website, which Giardina supervises;

- Supervising Richmond's and Viceroy's MCA operations;

- Reviewing new applications for MCAs and instructing colleagues to draft new cash advance agreements;

- Planning for MCAs to be administered according to finite repayment terms;

- Supervising Respondents' relationship with Actum Processing, which is responsible for debiting money in fixed daily amounts from merchants' bank accounts;

- Causing Respondents to double-debit merchants' bank accounts for the days after holidays, even though Respondents represent that they will debit only for "business days"; and

37

- Executing affidavits in which he has falsely testified that merchants have made "Specified Percentage Payments" to Respondents when in fact all such payments are based on fixed daily amounts.

152.   Giardina is well aware that Respondents' MCAs are usurious loans. He regularly receives emails from his colleagues in which they discuss plans to administer MCAs at amounts and finite terms indicating interest rates far in excess of those permissible for loans under New York law.

153.   Giardina is well aware that Respondents short-change merchants on their advances and overcharge them on fees and payments.  He has regularly received emails from Braun including amounts different from those the merchants have agreed to, and Giardina is solely responsible for issuing cash advances to merchants from Richmond's bank account.

### 3.   Jonathan Braun Is a Principal Decision-Maker for Respondents and Directly Participates in Their Misdeeds

154.   Braun is or has been a principal decision-maker for Richmond, Ram, and Viceroy with influence far beyond his title of "Senior Funding Manager."

155.   Braun is personally responsible for the following acts of Respondents, among others:

- Marketing cash advances to merchants by telephone as "loans," subject to finite repayment terms;

- Instructing that MCAs be administered at amounts indicating interest rates in the triple and quadruple digits, far above the rates permissible for loans under New York law;

- Instructing that MCAs be subject to finite repayment terms, such as "10 PAYMENTS" or "50 days";

- Instructing that MCAs be administered at amounts different from those set forth in Respondents' signed agreements;

38

- Determining when merchants have defaulted on their agreements and instructing colleagues to file confessions of judgment;

- Falsely promising to merchants that Respondents will be flexible and will "work with" merchants who have difficulty with their daily payments;

- Participating in underwriting conversations in which Respondents discuss only such factors as merchants' credit and bank balances, not their actual receivables; and

- Calling merchants by telephone and harassing them, threatening to seize and destroy their property and businesses, and threatening violence to them and their families.

### 4. Tzvi "Steve" Reich Is a Principal Decision-Maker for Respondents and Directly Participates in Their Misdeeds

156. Reich owns Ram and is its principal decision-maker.

157. Reich is closely involved in decision-making for MCAs issued by Richmond and Viceroy.

158. Reich is personally responsible for the following acts of Respondents, among others:

- Causing Ram to advertise itself as a "lender" and MCAs as "loans" and falsely advertising flexible payment plans (among other misrepresentations) on Ram's website, which Reich supervises;

- Communicating to merchants that cash advances are subject to fixed daily payments and finite repayment terms;

- Participating in underwriting conversations in which Respondents discuss only such factors as merchants' credit and bank balances, not their receivables;

- Falsely promising to merchants that Ram will honor merchants' refusal to pay fees, then causing Ram to collect fees in excess of those the merchant agreed to;

- Planning for MCAs to be administered according to finite repayment terms;

39

INDEX NO. 451368/2020
RECEIVED NYSCEF: 01/09/2021

- Causing Ram to collect fees from merchants in excess of the amounts indicated in Ram's agreements;

- Causing Ram to wire money to merchants for their cash advances in amounts different from those represented in Ram's agreements; and

- Causing Ram to debit merchants' bank accounts at higher daily amounts than those shown in Ram's agreements.

159.   Reich is well aware that Respondents' MCAs are usurious loans.  He regularly receives emails from his colleagues in which they discuss plans to administer MCAs at amounts and finite terms indicating interest rates far in excess of those permissible for loans under New York law.

160.   Reich is well aware that Respondents short-change merchants on their advances and overcharge them on fees and payments.  He has regularly received emails from Braun including amounts different from those the merchants have agreed to.

### 5. Michelle Gregg Is a Principal Decision-Maker for Respondents and Directly Participates in Their Misdeeds

161.   Respondent Gregg is a decision-maker for Respondents and serves as Managing Director and Director of Finance for both Richmond and Viceroy.  Gregg has also been closely involved in managing Ram's MCA operations.

162.   Gregg is personally responsible for the following acts of Respondents, among others:

- Managing Respondents' collection of payments from merchants and their debiting of merchants' bank accounts;

- Causing MCAs to be repaid through daily debits at fixed amounts over finite terms and at interest rates far in excess of those permissible for loans under New York law;

40

- Causing payments to be debited from merchants' bank accounts at fixed daily amounts higher than those disclosed in Respondents' signed agreements;

- Causing Respondents to double-debit merchants' bank accounts for the days after holidays, even though Respondents represent that they will debit only for "business days";

- Collecting payments for Respondents by contacting merchants by telephone;

- Executing affidavits in which she has falsely testified concerning the amounts that merchants have paid on their cash advances and the amounts still due; and

- Executing affidavits in which she has falsely testified that merchants have made "Specified Percentage Payments" to Respondents, when in fact all such payments are based on fixed daily amounts, which Respondents do not reconcile.

163.    Gregg is well aware that Respondents' MCAs are usurious loans.  She regularly receives emails from her colleagues in which they discuss plans to administer cash advances at amounts and finite terms indicating interest rates far in excess of those permissible for loans under New York law.

164.    Gregg is also well aware that Respondents short-change merchants on their advances and overcharge them on fees and payments.  She has regularly received emails from Braun including amounts different from those the merchants have agreed to.

### FIRST CAUSE OF ACTION BY THE PEOPLE AGAINST ALL RESPONDENTS PURSUANT TO EXECUTIVE LAW § 63(12):

### ILLEGAL ACTS IN THE FORM OF USURY

165.    The People repeat and re-allege paragraphs 1 through 164 as if fully set forth herein.

41

166.     Executive Law § 63(12) provides for relief upon petition by the NYAG "whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

167.     As set forth above, Respondents have engaged in usury in violation of General Obligation Law § 5-501(1) by repeatedly and persistently charging, taking, or receiving money as interest on the loan of money at rates in the triple and quadruple digits, far exceeding the maximum permissible rate of 16% prescribed in Banking Law § 14-a(1).

168.     Accordingly, Respondents have engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

**SECOND CAUSE OF ACTION BY THE PEOPLE AGAINST ALL RESPONDENTS PURSUANT TO EXECUTIVE LAW § 63(12):**

**ILLEGAL ACTS IN THE FORM OF CRIMINAL USURY**

169.     The People repeat and re-allege paragraphs 1 through 168 as if fully set forth herein.

170.     Executive Law § 63(12) provides for relief upon petition by the NYAG "whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

171.     As set forth above, Respondents have engaged in criminal usury in violation of Penal Law § 190.40 by, without being authorized or permitted by law to do so, repeatedly, persistently, and knowingly charging, taking, or receiving money

42

as interest on loans at annual rates exceeding 25% or the equivalent rate for a longer or shorter period. Accordingly, Respondents have engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

**THIRD CAUSE OF ACTION BY THE PEOPLE AGAINST ALL
RESPONDENTS PURSUANT TO EXECUTIVE LAW § 63(12):**

**ILLEGAL ACTS IN THE FORM OF ENGAGING IN
THE BUSINESS OF MAKING HIGH-INTEREST LOANS AND
CHARGING EXCESSIVE INTEREST WITHOUT A LICENSE
IN VIOLATION OF BANKING LAW §§ 340 AND 356**

172. The People repeat and re-allege paragraphs 1 through 171 as if fully set forth herein.

173. Executive Law § 63(12) provides for relief upon petition by the NYAG "whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

174. Under Banking Law § 340 it is unlawful for a person or entity to "engage in the business of making loans . . . in a principal amount of fifty thousand dollars or less for business and commercial loans, and charge . . . a greater rate of interest than the lender would be permitted by law to charge if [it] were not a licensee hereunder except as authorized by [Banking Law Article IX] and without first obtaining a license from the superintendent."

175. Under Banking Law § 356 it is unlawful for a person or entity, "other than a licensee under [Banking Law Article IX]," to "charge . . . interest . . . greater than [it] would be permitted by law to charge if it were not a licensee hereunder

43

upon a loan not exceeding the maximum amounts prescribed" in Banking Law §
340.

176.    As set forth herein, Respondents have repeatedly and persistently
engaged in the business of making business and commercial loans in New York in
principal amounts of fifty thousand dollars or less.

177.    In making such loans, Respondents have charged interest at rates
above the maximum interest rate a lender is permitted to charge without a license,
which is 16% pursuant to General Obligations Law § 5-501(1) and Banking Law §
14-a(1).

178.    Respondents have engaged in the business of making high-interest
loans and have charged excessive interest without obtaining the requisite licenses
from the Department of Financial Services or the Superintendent of Banking.

179.    Accordingly, Respondents have engaged in repeated and persistent
illegality in violation of Executive Law § 63(12).

**FOURTH CAUSE OF ACTION BY THE PEOPLE AGAINST ALL
RESPONDENTS PURSUANT TO EXECUTIVE LAW § 63(12):**

**<u>FRAUD</u>**

180.    The People repeat and re-allege paragraphs 1 through 179 as if fully
set forth herein.

181.    Executive Law § 63(12) provides for relief upon petition by the NYAG
"whenever any person shall engage in repeated fraudulent or illegal acts or
otherwise demonstrate persistent fraud or illegality in the carrying on, conducting
or transaction of business."

44

INDEX NO. 451368/2020
RECEIVED NYSCEF: 01/09/2021

182.    Executive Law § 63(12) defines "fraud" and "fraudulent" to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, [or] false promise."

183.    As set forth above, Respondents have repeatedly and persistently engaged in fraud by, *inter alia*:

- Misrepresenting the nature of their cash advances;

- Misrepresenting that their merchant agreements are enforceable when in fact they are usurious loans, and thus void under New York law;

- Falsely advertising that Richmond's MCAs require no collateral and no personal guarantee;

- Falsely advertising flexible repayment plans on their websites;

- Falsely representing to merchants that they will recalculate their payment amounts and reconcile their accounts;

- Falsely advertising that Richmond's MCAs have no upfront costs;

- Short-changing merchants on their cash advances and overcharging them on fees deducted from the advances;

- Misrepresenting the basis of the fees they deduct from MCAs;

- Falsely representing to merchants that they will provide cash advances at certain amounts, then changing those amounts after obtaining merchants' signatures on Respondents' agreements and confessions of judgment;

- Subjecting merchants' principals to harassment, insults, and threats in order to pressure them to pay money to Respondents;

- Falsely representing to merchants that Respondents will file merchants' confessions of judgment in court only in certain limited circumstances, when in practice Respondents file confessions based on any purported default, or even no default at all;

- Declaring merchants in default on false pretenses;

45

INDEX NO. 451368/2020

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 46 of 53

RECEIVED NYSCEF: 01/09/2021

- Obtaining judgments in New York State Supreme Court based on false affidavits that misrepresent merchants' payment histories and amounts due; and

- Obtaining judgments in New York State Supreme Court based on affidavits that falsely state that Respondents collect "Specified Percentage Payments," thereby concealing from courts the fact that their MCAs are in fact usurious loans.

184. Accordingly, Respondents have engaged in repeated and persistent fraud in violation of Executive Law § 63(12).

## FIFTH CAUSE OF ACTION AGAINST ALL RESPONDENTS PURSUANT TO EXECUTIVE LAW 63(12):

### FRAUD IN THE FORM OF UNCONSCIONABILITY

185. The People repeat and re-allege paragraphs 1 through 184 as if fully set forth herein.

186. Executive Law § 63(12) provides for relief upon petition by the NYAG "whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

187. Executive Law § 63(12) defines "fraud" and "fraudulent" to include "any . . . unconscionable contractual provisions."

188. Respondents have repeatedly and persistently used procedurally unconscionable tactics in obtaining merchants' signatures on their agreements, as set forth above.

189. Respondents have repeatedly and persistently caused merchants to agree to substantively unconscionable contract provisions, as set forth above.

46

190.   Accordingly, Respondents have engaged in repeated and persistent fraud in the form of unconscionability in violation of Executive Law § 63(12).

### SIXTH CAUSE OF ACTION AGAINST BRAUN, RICHMOND, AND RAM PURSUANT TO EXECUTIVE LAW 63(12):

### ILLEGALITY IN THE FORM OF HARASSMENT IN THE SECOND DEGREE AND AGGRAVATED HARASSMENT IN THE SECOND DEGREE

191.   The People repeat and re-allege paragraphs 1 through 190 as if fully set forth herein.

192.   Executive Law § 63(12) provides for relief upon petition by the NYAG "whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

193.   Braun, Richmond, and Ram have repeatedly and persistently committed the illegal acts of harassment in the second degree and aggravated harassment in the second degree in violation of New York law.

194.   A person is guilty of harassment in the second degree, a criminal violation, when, "with intent to harass, annoy or alarm another person," the person, *inter alia*, "subjects such other person to physical contact . . . or threatens to do the same," Penal Law § 240.26(1), or "engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose," Penal Law § 240.26(3).

195.   A person is guilty of aggravated harassment in the second degree, a misdemeanor, when, "with intent to harass another person," the person, *inter alia*,

47

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 48 of 53

"communicates . . . by telephone . . . a threat to cause physical harm to, or unlawful harm to the property of, such person, or a member of such person's same family or household . . . and the actor knows or reasonably should know that such communication will cause such person to reasonably fear" such harm, Penal Law § 240.30(1), or when the person, "[w]ith intent to harass or threaten another person . . . makes a telephone call . . . with no purpose of legitimate communication," Penal Law § 240.30(2).

196.   Respondents have repeatedly and persistently committed the illegal acts of harassment in the second degree and aggravated harassment in the second degree by telephoning merchants' principals and guarantors and, *inter alia*, insulting and berating them, threatening to take or destroy their businesses and their property, threatening to come to their homes and businesses, and threatening to do violence to them and to their families.

197.   Respondents have threatened merchants' principals and guarantors with physical contact.

198.   Respondents have threatened physical harm to merchants' principals and guarantors and to members of their families and households.

199.   Respondents have threatened unlawful harm to the property of merchants' principals and guarantors.

200.   Such acts of Respondent constitute a course of conduct.

201.   Respondents have engaged in such acts with the intent to harass, annoy, and alarm merchants' principals and guarantors.

48

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 49 of 53

202.    Respondents have engaged in such communications knowing, or while they reasonably should have known, that they would cause merchants' principals and guarantors to reasonably fear harm to their physical safety and unlawful harm to their property and would reasonably fear such harms to members of their families and households.

203.    Such acts have seriously alarmed or annoyed the debtors who received the communications.

204.    Such acts serve no legitimate purpose and have no purpose of legitimate communication.

205.    Accordingly, Respondents have engaged in repeated and persistent illegality through harassment in the second degree and aggravated harassment in the second degree in violation of Executive Law § 63(12).

## **PRAYER FOR RELIEF**

WHEREFORE, the People of the State of New York respectfully request that the Court issue an order and judgment:

a.    Permanently enjoining Respondents; their agents, trustees, employees, successors, heirs, and assigns; and any other person under their direction or control, whether acting individually or in concert with others, or through any corporate or other entity or device through which one or more of them may now or hereafter act or conduct business, from engaging in the fraudulent and illegal practices alleged herein;

b.    Ordering Respondents to cease all collection of payments or other moneys related to MCAs;

49

Case 1:22-cv-02170-ALC   Document 44-1   Filed 08/08/22   Page 50 of 53

c.      Ordering the rescission of each agreement entered into between Respondents and any merchant in connection with a MCA, including each Merchant Agreement; Security Agreement and Guaranty; Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits); "Appendix A:  The Fee Structure"; Addendum to Secured Purchase and Sale of Future Receivables Agreement; and form providing Respondents with access to merchants' bank accounts;

d.      Ordering Respondents to apply for vacatur of all confessions of judgment filed by them and all judgments issued in their favor based on such filings, by all courts of this State that have issued such judgments, in papers acceptable to the NYAG;

e.      Ordering Respondents to file papers sufficient to terminate all liens or security interests related to their MCAs;

f.      Staying all marshals and/or sheriffs who hold executions under such judgments from executing or collecting upon them;

g.      Ordering Respondents to provide an accounting to the NYAG of the names and addresses of each merchant from whom Respondents collected or received monies since February 8, 2013 in connection with MCAs and a complete history, including dates, amounts, and sources, of all monies collected or received by Respondents from all such merchants (whether through daily payments, execution of judgments, or any other avenue), and all moneys provided by Respondents to such merchants;

50

NYSCEF DOC. NO. 426
RECEIVED NYSCEF: 01/09/2021

h.      Ordering Respondents to pay full restitution and damages to the NYAG as to all merchants that have entered into agreements with Respondents for MCAs, including those not identified at the time of the order, with such an award providing for (1) the refund of all amounts taken by Respondents from merchants or their guarantors in connection with MCAs, whether directly by Respondents or through intermediaries; (2) damages for losses caused by Respondents' conduct; and (3) such affirmative action as may be necessary to ensure that the monetary relief is effectively delivered to such merchants and guarantors;

i.      Ordering Respondents to disgorge all profits from the fraudulent and illegal practices alleged herein;

j.      Awarding to the NYAG, pursuant to New York Civil Practice Law and Rules § 8303(a)(6), costs in the amount of $2,000 against each Respondent; and

k.      Granting such other and further relief as the Court deems just and proper.

51

Dated: January 8, 2020

                     Respectfully submitted,

                     LETITIA JAMES
                     Attorney General of the State of New York
                     Attorney for Petitioners

By: _____

                     John P. Figura
                     Assistant Attorney General
                     Bureau of Consumer Frauds and
                     Protection
                     28 Liberty Street
                     New York, New York 10005

Jane M. Azia
Bureau Chief

Laura J. Levine
Deputy Bureau Chief

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF KINGS            )

John P. Figura, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York, and I am duly authorized to make this verification.

I have read the foregoing petition and know the contents thereof, which are to my knowledge true, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true. The grounds for my beliefs as to all matters stated upon information and belief are investigatory materials contained in the files of the Bureau of Consumer Frauds and Protection in the New York State Office of the Attorney General.

The reason this verification is not made by the petitioner is that the petitioner is a body politic. The Attorney General is their duly authorized representative.

John P. Figura

Sworn to before me this
8th day of January, 2021

NOTARY PUBLIC

LILLIAN M. MARQUEZ
Notary Public - State of New York
No. 02MA6312349
Qualified in Kings County
Commission Expires 9/29/2022

53