UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LATERAL RECOVERY LLC, et al.,

                           Plaintiffs,

           -against-

FUNDERZ.NET, LLC, d/b/a HOP CAPITAL
and d/b/a BUSINESS MERCHANT
FUNDING, et al.,

                        Defendants.

Case No. 1:22-cv-02170 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") and Focus Wireless, LLC ("Focus Wireless") (collectively, "Plaintiffs") bring this action against Funderz.net, LLC d/b/a Hop Capital and d/b/a Business Merchant Funding ("Funderz"), Joseph Yitzchakov a.k.a. Joseph Isaacov ("Joe"), and Gavriel Yitzchakov a.k.a. Gabe Isaacov ("Gabe") (collectively, "Defendants").  *See* ECF No. 44 ("Am. Compl." or the "Amended Complaint"); *see also* ECF Nos. 60 ("Gabe Ans.") and 61 ("Funderz Ans." or the "Funderz Answer").[1]  Plaintiffs also sued unnamed "John and Jane Doe Investors." Am. Compl. ¶¶ 20, 170.

Joe and Funderz (the "Funderz Defendants") have filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure ("Rule") 12(c), ECF No. 91 ("Funderz Br."), as has Gabe, ECF No. 90 ("Gabe Br.").  For the reasons set forth below, Defendants' motions for judgment on the pleadings are DENIED.

---

[1] The Funderz Answer was filed on behalf of Funderz and Joe.

BACKGROUND[2]

I.      **The Parties**

    A.      **Plaintiffs**

FTE Networks was a Nevada corporation with its principal place of business in Florida. Am. Compl. ¶ 9.  FTE Networks was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.  *Id.*  Benchmark was a New York corporation with its principal place of business in New York.  *Id.* ¶ 10.  Jus-Com was an Indiana limited liability company with its principal place of business in Florida.  *Id.* ¶ 11.  Focus Wireless was a Florida limited liability company with its principal place of business in Florida. *Id.* ¶ 12.  Lateral is a Delaware limited liability company with its principal place of business in California.  *Id.* ¶ 13.

During the period material to this case, FTE Networks and its wholly owned subsidiaries Benchmark, Jus-Com, and Focus Wireless (collectively, "FTE") provided technology-oriented solutions for smart platforms, network infrastructures, and buildings.  *Id.* ¶ 60.  FTE Networks's operations were generally divided into three sections – construction, telecommunication design and solutions, and wireless-equipment installation – with each section managed by Benchmark, Jus-Com, or Focus Wireless.  *Id*.

On October 28, 2016, Lateral, as an administrative agent for lenders, entered into a credit agreement with Jus-Com, FTE Networks, and Benchmark as borrowers, and Focus Wireless and other FTE Networks subsidiaries as guarantors (the "Credit Agreement").  *Id.* ¶ 64.  Pursuant to the Credit Agreement, lenders agreed to extend loans and other financial accommodations up to

---

[2] The following facts are taken from the pleadings and the documents incorporated therein, which form the basis for the motions for judgment on the pleadings, and are undisputed unless otherwise noted.

a maximum amount, as amended from time to time.  *Id.*  As of July 2019, that maximum amount

was approximately $50 million.  *Id.*  "FTE's obligations were secured by the grant of a security

interest in substantially all of FTE's assets," *id.* ¶ 65, and Lateral perfected its interests in the

collateral by making appropriate and timely Uniform Commercial Code ("UCC") filings in the

relevant jurisdictions, *id.* ¶ 66.

In July 2019, FTE defaulted under the terms of the Credit Agreement.  *Id.* ¶ 67.

Thereafter, Lateral declared a default pursuant to a Surrender of Collateral and Strict Foreclosure

dated as of October 10, 2019.  *Id.* ¶ 68.  FTE agreed to surrender and turn over its interest in the

collateral, including, without limitation, the claims asserted herein.  *Id.*

### B.    Defendants

Funderz is a New York limited liability company.  Funderz Ans. ¶ 15.  Joe and Gabe are

individuals who reside in Florida.  *Id.* ¶ 18; Gabe Ans. ¶ 18.  The unnamed "John and Jane Doe

Investors" are "citizen(s) of New York or New Jersey."  Am. Compl. ¶ 20.

Plaintiffs allege the existence of the "Enterprise," defined by Plaintiffs and herein as

Funderz, the "Isaacovs," and the unnamed John and Jane Doe Investors.  *Id.* ¶ 138.  Plaintiffs

define "the Isaacovs" as four brothers, "Joe, Ben, Gabe and Simon," *id.* ¶ 129, but name only Joe

and Gabe as defendants here, *id.* ¶ 1; *see also id.* ¶ 28 ("The Isaacovs own Funderz.net LLC and

operate an illegal loansharking enterprise through assumed names with [each] brother operating

an aspect of the enterprise through a distinct d/b/a.").  Plaintiffs allege that the Enterprise

members "are associated-in-fact and through relations of ownership for the common purpose of

carrying on an ongoing unlawful enterprise."  *Id.* ¶ 139.  Specifically, Plaintiffs allege that the

Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious

loans that charge interest at more than twice the enforceable rate under New York law.  *Id.*

Plaintiffs allege that, "[s]ince at least 2017 and continuing through the present, the members of

the Enterprise have had ongoing relations with each other through common control/ownership,

shared personnel and/or one or more contracts or agreements relating to . . . unlawful debt issued

by the Enterprise to small businesses throughout the United States." *Id.* ¶ 140.  During this

period, "the members of the Enterprise would assume various trade names to do business

under . . . to ensure that [the Enterprise members] were as insulated as possible from liability

under the usurious Agreements." *Id.* ¶ 141.  Plaintiffs allege that the Isaacovs orchestrated the

Enterprise's use of alter-ego names for its members.  *Id.* ¶ 143.  Plaintiffs further allege that,

through the Defendants' close coordination and frequent communications, each Defendant knew

the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each

Defendant's individual role.  *Id.* ¶ 182.

Plaintiffs allege that the Isaacovs are "persons" within the meaning of sections 1961(3)

and 1962(c) of Title 18.  *Id.* at ¶ 129.  At all relevant times, Joe was the chief executive officer of

Funderz.  Funderz Ans. ¶ 29.  Funderz formerly operated under the assumed name of HOP

Capital ("HOP").  *Id.*  Gabe held himself out as the chief executive officer of BMF Capital

("BMF").  Am. Compl. ¶ 31; Gabe Ans. ¶ 31.  Plaintiffs allege that Joe and Gabe are responsible

for creating, approving, and implementing the policies, practices, and instrumentalities used by

the Enterprise to accomplish its common goals and purposes, including: (i) the form of merchant

agreements used by the Enterprise to disguise the loans as receivable purchase agreements to

avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the

method of collecting the daily payments via automated clearing house ("ACH") withdrawals;

and (iii) the form of affidavits of confession used by the Enterprise to collect upon the unlawful

debt if the borrower defaults upon its obligations.  Am. Compl. ¶¶ 151, 155.  Plaintiffs further

allege that Joe and Gabe have final say on all financial decisions of the Enterprise, including the

details of the loans' funding and ultimate terms, *id.*, and that they directed other members of the Enterprise to take actions necessary to accomplish its goals, such as collecting upon unlawful debts, *id.* ¶¶ 152, 156.

Plaintiffs allege that the unnamed John and Jane Doe Investors (the "John and Jane Doe Investors") are a "group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members." *Id.* ¶ 169. The John and Jane Doe Investors allegedly are "responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans . . . and approv[ing] and ratify[ing] the Enterprise's efforts to collect upon the unlawful debts." *Id.* ¶ 170.

## II.  The MCA Agreements

The Isaacovs offered merchant cash advance ("MCA") agreements, described by Defendants as revenue purchase agreements; FTE entered into six such agreements with Funderz (the "Agreements"). *Id.* ¶¶ 70, 92. Central to this dispute is whether the Agreements are properly characterized as loans, such that the interest rates associated with them exceed the rates permitted by usury laws. *See id.* ¶ 2. The six transactions are detailed below, followed by further description of the Agreements generally.

### A.  The BMF Transactions

Over a three-week period between October 15, 2018, and November 9, 2018, FTE entered into three transactions with the Isaacovs through BMF. *Id.* ¶ 70.

The first transaction was dated October 15, 2018; the advance amount was $400,000, and the amount to be repaid was $729,000. *Id.* ¶¶ 71-72. The advance was to be repaid through fixed daily ACH withdrawals in the amount of $9,999, which Plaintiffs allege was "disguised as a purported good-faith estimate of 10% of FTE's daily receivables." *Id.* ¶ 73. Plaintiffs allege that the term of repayment was 73 business days and the interest rate exceeded 345%. *Id.* ¶ 74.

In addition, FTE was required to pay a $50,000 "Service Fee" as further consideration for the advance. *Id.* ¶ 75.

The second transaction was dated October 25, 2018; the advance amount was $1,000,000, and the amount to be repaid was $1,499,000. *Id.* ¶¶ 76-78. The advance was to be repaid through fixed daily ACH withdrawals in the amount of $14,999, which Plaintiffs allege was "disguised as a purported good-faith estimate of 10% of FTE's daily receivables." *Id.* ¶ 79. Plaintiffs allege that the term of repayment was 100 business days, and the interest rate exceeded 150%. *Id.* ¶ 80. In addition, FTE was required to pay a $100,000 "Service Fee" as further consideration for the advance. *Id.* ¶ 81. As a further requirement of this second BMF transaction, FTE was required to repay the full amount of the balance on the prior transaction with proceeds of the second. *Id.* ¶ 82.

The third transaction was dated November 8, 2018; the advance amount was $1,550,000 and the amount to be repaid was $2,323,450. *Id.* ¶¶ 84-86. The advance was to be repaid through fixed daily ACH withdrawals in the amount of $38,724, which Plaintiffs allege was "disguised as a purported good-faith estimate of 10% of FTE's daily receivables." *Id.* ¶ 87. Plaintiffs allege that the term of repayment was 60 business days and the interest rate exceeded 250%. *Id.* ¶ 88. In addition, FTE was required to pay a $155,000 "Service Fee" as further consideration for the advance. *Id.* ¶ 89. As a further requirement of this third BMF transaction, FTE was required to repay the full amount of the balance on the second transaction with proceeds of the third. *Id.* ¶ 90.

### B.    The HOP Transactions

Over a three-week period between October 16, 2018, and November 9, 2018, FTE also entered into three transactions with the Isaacovs through HOP. *Id.* ¶ 92.

The first transaction was dated October 16, 2018; the advance amount was $1,000,000 and the amount to be repaid was $1,459,000. *Id.* ¶¶ 93-94.  The advance was to be repaid through fixed daily ACH withdrawals in the amount of $29,999, which Plaintiffs allege was "disguised as a purported good-faith estimate of 10% of FTE's daily receivables." *Id.* ¶ 95. Plaintiffs allege that the term of repayment was 49 business days. *Id.* ¶ 96.  In addition, FTE was required to pay a $350,000 "Service Fee" as further consideration for the advance. *Id.* ¶ 97.

The second transaction was dated October 25, 2018; the advance amount was $1,750,000 and the amount to be repaid was $2,623,250. *Id.* ¶¶ 98-100.  The advance was to be repaid through fixed daily ACH withdrawals in the amount of $39,999. *Id.* ¶ 101.  Plaintiffs allege that as to this transaction, this amount was not disguised as a purported good-faith estimate of 10% of FTE's daily receivables, but instead "was just a Daily Payment unilaterally dictated by BMF and the Isaacovs." *Id.*  Plaintiffs allege that the term of repayment was 65 business days. *Id.* ¶ 102. In addition, FTE was required to pay $100,000 as a purported "Service Fee" as further consideration for the advance. *Id.* ¶ 103.  As a further requirement of this second HOP transaction, FTE was required to repay the full amount of the balance of the prior transaction with proceeds of the second. *Id.* ¶ 104.

The third transaction was dated November 9, 2018; the advance amount was $2,750,000 and the amount to be prepaid was $4,122,250. *Id.* ¶¶ 106-108.  The advance was to be repaid through fixed daily ACH withdrawals in the amount of $69,999, which Plaintiffs allege was "disguised as a purported good faith-estimate of 10% of FTE's daily receivables." *Id.* ¶ 109. Plaintiffs allege that the term of repayment was 59 business days. *Id.* ¶ 110.  In addition, FTE was required to pay a $200,000 "Service Fee" as further consideration for the advance. *Id.*

¶ 111.  As a further requirement of this third HOP transaction, FTE was also required to repay the full amount of the balance on the second transaction with proceeds of the third.  *Id.* ¶ 112.

### C.    Form of the Agreements

The parties offer competing characterizations of the Agreements.  As described by Gabe, under the Agreements, Defendants paid an upfront purchase price in exchange for a specific percentage of FTE's total future accounts receivable up to a certain sum.  *See* Gabe Br. at 9.  Then, FTE agreed to remit the purchased amount to Defendants via daily ACH debits in designated amounts that were intended to represent a good-faith estimate of the purchased percentage of FTE's daily receivables.  *See id.* at 10.  Meanwhile, Plaintiffs allege that the Agreements are "unconscionable contracts of adhesion that are not negotiated at arms-length," Am. Compl. ¶ 38, and "contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans," *id.* ¶ 39.  The Amended Complaint describes several "one-sided terms" in the Agreements:

> (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) [sic] moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit

8

> card processor to make payment to [Defendants]," and (15) a
> power of attorney authorizing the MCA company "to take any
> action or execute any instrument or document to settle all
> obligations due . . . ."

*Id.* ¶ 40 (ellipsis in original).  Plaintiffs also allege that the Agreements contain a number of

knowingly false statements, including that: "(1) the transaction is not a loan, (2) the daily

payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for

the merchant's convenience, [and] (4) . . .  the automated ACH program is labor intensive and is

not an automated process, requiring the MCA company to charge an exorbitant Underwriting Fee

or Origination Fee." *Id.* ¶ 41.  Plaintiffs allege that the Agreements are designed to result in

default.  *Id.* ¶ 42.

Plaintiffs further allege that the Agreements contain "numerous improper penalties that

violate New York's strong public policy," including that the Agreements: "(1) require the

merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys'

fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys'

fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of

Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just

one fixed daily payment." *Id.* ¶ 43.

As explained in more detail herein, certain of the Agreements contain reconciliation

provisions, which Plaintiffs allege are "sham" provisions used to give the appearance that the

Agreements do not have a definite term in order to evade state usury laws. *Id.* ¶ 44.  Plaintiffs

allege that "[i]n order to ensure that a merchant can never use their sham reconciliation

provision, . . . the Enterprise falsely represents that the fixed daily payment amount is a good-

faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures

that if sales decrease, the required fixed daily payments remain the same." *Id.* ¶ 47.

### D.   Defendants' Treatment of the Agreements

Plaintiffs allege that usurious intent underlying the Agreements "can be discerned from internal negotiations, practices, and underwriting practices of the Isaacovs, which determine the payback based on the number of days in which the Isaacovs want to be paid back," but that the number of days for payback has no relation to the timing of the percentage of receivables that Defendants were purporting to purchase.  *Id.* ¶ 52.  Plaintiffs allege that, instead of being provided with reconciliation, "troubled merchants, like FTE . . . , are presented with the opportunity to refinance the loan into a new loan," through which the merchant pays "interest upon interest—resulting in interest rates in the many thousands of percent."  *Id.* ¶ 53.

Plaintiffs allege that the Isaacovs consistently described their products as "loans," described themselves as "lenders," and referred to the merchants as "borrowing" funds.  *Id.* ¶ 55.  Plaintiffs also allege that the Isaacovs use underwriting practices that indicate the Agreements are loans, not purchases of accounts receivable.  *Id.* ¶ 56.  When underwriting new transactions, the Isaacovs – if they perform due diligence at all – do not evaluate the merchants' receivables, but instead focus on other factors such as a merchant's credit ratings and bank balances.  *Id.*  This process contrasts with the extensive due diligence into the credit worthiness of potential debtors undertaken by banks and other institutions that often purchase accounts receivable.  *Id.*

Plaintiffs also allege that the Isaacovs treat the Agreements like loans when they collect upon them, including by requiring that the merchant make fixed daily payments and by granting security interests to ensure that the daily payments are made.  *Id.* ¶ 57.  Plaintiffs allege that the Isaacovs also require the merchants to execute confessions of judgment that can be filed if the merchant fails to make as few as two daily payments under the Agreements.  *Id.* ¶ 58.

Finally, Plaintiffs allege that the Isaacovs engage in other unscrupulous behavior towards their merchants, such as failing to advance merchants the full amounts provided for in the

Agreements, and charging exorbitant fees for services that are never provided and costs that are never incurred.  *Id.* ¶ 59.  Plaintiffs also allege that, on at least one occasion, Ben Isaacov used threats (including antisemitic slurs) when a merchant would not pay.  *Id.* ¶ 35 (citing ECF No. 44-10).

### III.     Procedural History

Plaintiffs filed this lawsuit on March 16, 2022.  ECF No. 1.  After Defendants moved to dismiss, *see* ECF Nos. 35, 40, Plaintiffs filed the operative complaint on August 8, 2022, bringing two causes of action: (1) against Joe and Gabe, for a substantive violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(c); and (2) against all Defendants, for participating in a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), Am. Compl. ¶¶ 115-189; *id.* at 34.

Defendants moved to dismiss the Amended Complaint on September 22, 2022, but subsequently withdrew their motions.  ECF Nos. 47, 49, 57-58.  On December 29, 2022, Gabe and the Funderz Defendants separately answered the Amended Complaint.  Gabe Ans.; Funderz Ans.  On January 25, 2023, the case was reassigned to the undersigned.  ECF No. 66.

On March 24, 2023, Gabe and the Funderz Defendants moved separately for judgment on the pleadings.  Gabe Br.; Funderz Br.  Plaintiffs opposed both motions on April 24, 2023.  ECF No. 94 ("Opp.").  Gabe and the Funderz Defendants replied separately in further support of their motions on May 8, 2023.  ECF Nos. 99 ("Gabe Reply"), 98 ("Funderz Reply").[3]

---

[3] The Funderz Defendants request oral argument via notations on the first pages of their briefs. Funderz Br.; Funderz Reply.  The Court declines to hold oral argument because the parties' briefing was sufficient and oral argument would not materially assist the Court.  *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) (A "district court acts well within its discretion in deciding dispositive motions on the parties' written submissions without oral argument.").

On June 8, 2023, Plaintiffs filed a notice of supplemental authority, containing a recent Second Circuit summary order.  ECF No. 111 (attaching *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885, 2023 WL 3882697 (2d Cir. June 8, 2023) ("*Fleetwood III*") (summary order), *aff'g sub nom. Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-cv-05120 (LJL), 2021 WL 1987320 (S.D.N.Y. May 18, 2021) ("*Fleetwood I*"), *and* No. 20-cv-05120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022) ("*Fleetwood II*")).  On September 18, 2023, Plaintiffs filed a second notice of supplemental authority, containing a recent decision from the New York Supreme Court, County of New York.  ECF No. 124 (attaching *People ex rel. James v. Richmond Cap. Grp. LLC*, 195 N.Y.S.3d 637, 2023 WL 6053768 (Sup. Ct. Sept. 15, 2023) (unpublished table decision)).  On October 5, 2023, the Funderz Defendants filed a notice of supplemental authority, containing a recent decision from the New York Supreme Court, County of Nassau.  ECF No. 125 (attaching *Singh v. LCF Grp., Inc.*, No. 601297-23, 2023 WL 5760139 (N.Y. Sup. Ct. July 25, 2023)).

## LEGAL STANDARD

Under Rule 12(c), after the pleadings have closed, "but early enough not to delay trial," a party may move for judgment on the pleadings.  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (quoting Fed. R. Civ. P. 12(c)).  "To survive a Rule 12(c) motion, the plaintiff's complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (alterations adopted) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).  "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim."  *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  "The assessment of whether a complaint's factual allegations plausibly give rise to an

entitlement to relief . . . calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quotation marks and citation omitted).

"In assessing a Rule 12(c) motion, the court may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice." *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (further quotation marks omitted) (quoting *Lively*, 6 F.4th at 306). However, if a pleading is contradicted by a document either attached to that pleading or otherwise "made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *Wells Fargo*, 127 F. Supp. 3d at 167 (alteration in original) (quoting *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)).

## DISCUSSION

The Amended Complaint alleges a substantive RICO violation and a RICO conspiracy claim based on the collection of an unlawful debt and a pattern of racketeering activity including wire fraud.  Am. Compl. ¶¶ 115-189.  Defendants seek dismissal of these claims, asserting a variety of arguments that at times overlap.  The Court will consider the motions together, as Plaintiffs did in their opposition.

### I.    Sections 1962(c)-(d) of Title 18

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

To establish a substantive RICO violation under section 1962(c) through a pattern of racketeering activity, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 520 (2d Cir. 1994)).

A RICO offense may also be predicated on a "single instance of collection of unlawful debt" instead of on a pattern of racketeering activity. *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). An "unlawful debt" is a debt that (1) "is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;" and (2) "was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6); *see Lateral Recovery LLC v. Queen Funding, LLC*, 21-cv-09607 (LGS), 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022) ("*Queen Funding*").

Under New York law, "[w]hen determining whether a transaction is a loan, substance – not form – controls." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 621-22 (N.Y. 2021). Courts examine whether the funder "is absolutely entitled to repayment under all circumstances" and the "principal sum advanced is repayable absolutely." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dep't 2020) (citation omitted). "Put differently, when determining whether a transaction was a true sale of receivables or a loan, 'the root of the analysis is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor.'" *Queen Funding*, 2022 WL 2829913, at *4 (alterations

14

adopted) (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995)).  New York courts usually weigh three factors, often referred to as the *LG Funding* factors, in making that determination: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood III*, 2023 WL 3882697, at *2 (quoting *Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 326-27 (2d Dep't 2022)); *see also People ex rel. James*, 2023 WL 6053768, at *7 (same).  These factors "provide only a guide to analysis" for the courts to consider.  *Fleetwood II*, 2022 WL 1997207, at *9 (citing cases).

To establish a violation of section 1962(d), that is, a RICO civil conspiracy, a plaintiff must demonstrate that the alleged co-conspirators "knew about and agreed to facilitate the [RICO] scheme." *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)); *accord Black v. Ganieva*, 619 F. Supp. 3d 309, 329 (S.D.N.Y. 2022), *aff'd*, No. 22-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (summary order).  To plead such a conspiracy, a complaint must allege that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity or the collection of unlawful debt.  18 U.S.C. § 1962(c); *see United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008); *Fleetwood II*, 2022 WL 1997207, at *18; *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013).  As the Second Circuit has stated, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).  Further, where a RICO conspiracy claim does not adequately plead such an agreement that, if completed, would satisfy the elements of

the substantive RICO statute, "the conspiracy claim under § 1962(d) also fails." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 363 (S.D.N.Y. 2014).

## II. Applicable Pleading Standard

Before proceeding, the Court will address the applicable pleading standard. Defendants point to Rule 9(b)'s heightened pleading standard. *See* Funderz Br. at 13-16; Gabe Br. at 20-25. In opposition, Plaintiffs urge the Court to apply the general pleading standard of Rule 8, Opp. at 10-11, which requires just "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a). Both parties are correct.

As noted above, "RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of racketeering activity." *Grote*, 961 F.3d at 119. "[W]here the predicate acts upon which a RICO claim is based do not sound in fraud, a court does not apply the heightened pleading standards of Rule 9(b)." *Fleetwood I*, 2021 WL 1987320, at *3. Therefore, "[t]he standards of Rule 9(b) are not applicable" to allegations of "the unlawful collection of debt." *Id.* A RICO claim based on a pattern of racketeering activity of wire fraud, however, would require pleading with specificity. *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (summary order) ("The heightened pleading requirements of Rule 9(b) 'apply only to claims of fraud or mistake.'" (alterations adopted) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992))).

Plaintiffs bring a RICO claim based on both the collection of unlawful debt and a pattern of wire fraud racketeering. Am. Compl. ¶¶ 144, 148. Rule 8 applies to the former, *see Fleetwood I*, 2021 WL 1987320, at *3, and Rule 9(b) to the latter, *see D. Penguin Bros.*, 587 F. App'x at 666.

### III.     Collection of Unlawful Debt

Defendants assert that they are entitled to judgment on the pleadings as to Plaintiffs'

substantive RICO claim based on the collection of unlawful debt because Plaintiffs have not

adequately alleged: (1) that the Agreements were usurious loans, (2) that Defendants acted with

the requisite scienter, and (3) Defendants' individualized conduct and the distinct element of a

RICO enterprise.  The Court will address each argument in turn.

### A.     Whether the Agreements Were Usurious Loans

The first and central aspect in determining whether Plaintiffs have pleaded the alleged

collection of unlawful debt is whether they have alleged a collection of debt – or a loan – that is

usurious, rather than, as Defendants claim, the sale of future receivables.  As explained above,

whether a funding agreement constitutes a loan or the sale of future receivables under New York

law is usually guided by analysis of the three *LG Funding* factors, which help the Court to assess

whether repayment is absolute or contingent: "(1) whether there is a reconciliation provision in

the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse

should the merchant declare bankruptcy."  *Fleetwood III*, 2023 WL 3882697, at *2 (quoting

*Principis Cap.*, 160 N.Y.S.3d at 326-27).  "The three factors provide only a guide to [the]

analysis," "[t]hey do not dictate the conclusion," and they operate in tandem.  *Fleetwood II*, 2022

WL 1997207, at *9.  The Court must look to the substance of the agreement overall, not simply

the form.  *Adar Bays*, 179 N.E.3d at 621-22.  The Court "judges the agreement 'by its real

character, to determine whether it constitutes a loan.'"  *Lateral Recovery, LLC v. Cap. Merch.

Servs.*, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022) ("*CMS*") (quoting *Fleetwood II*, 2022 WL

1997207, at *9).  The "essential question under New York law is whether the contracting party is

absolutely entitled to repayment under all circumstances."  *Id.* (citation omitted).  The "root of

the analysis is the transfer of risk." *Queen Funding*, 2022 WL 2829913, at *4 (alterations

adopted and citation omitted).

Gabe argues, with the Funderz Defendants joining (Funderz Reply at 9 n.10), that

Plaintiffs have not adequately alleged that the Agreements were usurious loans, and that

therefore, there was no collection of an unlawful debt.  Gabe Br. at 13.  Specifically, Gabe argues

that Plaintiffs have not plausibly alleged that the Agreements are usurious loans because: (1) the

Agreements have reconciliation provisions (or other adjustment provisions); (2) the terms of the

transactions were not finite; and (3) certain of the Agreements do not make FTE's filing for

bankruptcy an event of default.  *Id.* at 13-15; Gabe Reply at 4 n.9.  Gabe adds that "these factors

must be considered with the presumption *against* a finding of usury."  Gabe Br. at 16 (citing

*Giventer v. Arnow*, 333 N.E.2d 366, 369 (N.Y. 1975)).

### 1.  *Reconciliation Provision*

The Court first examines, under *LG Funding*, whether the Agreements contained

operative reconciliation provisions.  Two of the Agreements do not have reconciliation

provisions.  *See* ECF Nos. 50-4, 50-5.  The lack of a reconciliation provision indicates that the

risk of loss remains on the merchants, and not Funderz, suggesting that the transaction is a loan

rather than a purchase of receivables.  *Cf. Queen Funding*, 2022 WL 2829913, at *5 ("[T]he

presence of [a reconciliation] provision would suggest that the transaction is not a loan, but

rather a purchase where [the purchaser] bears the risk of loss if receivables are not paid.").

Gabe argues on Reply that although two Agreements do not have reconciliation

provisions, they have *adjustment* provisions that allow the merchant to "request" an adjustment

to their daily payment due.  Gabe Reply at 4; ECF No. 50-4 § 1.4 ("Merchant may give notice to

[Funderz] to request a decrease in the Remittance."); ECF No. 50-5 § 1.4 (same).  However,

assuming these adjustment provisions are akin to reconciliation provisions, they are completely discretionary.  ECF No. 50-4 § 1.4; ECF No. 50-5 § 1.4.

The four other Agreements contained reconciliation provisions that are discretionary as well.  The four other Agreements state: "At the Merchant's option, within five (5) business [days] following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby [Funderz] *may* ensure that the cumulative amount remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage."  *See* ECF Nos. 50-1 at 9, 50-2 at 9, 50-3 at 9 (emphasis added).[4]  The four Agreements further provide that "[t]he Merchant specifically acknowledges that: (i) the Daily Payment and the potential reconciliation discussed above are being provided to the Merchant *as a courtesy*, and that [the Funderz entity] is under *no obligation* to provide same."  *Id.* (emphases added).  Thus, even though the four Agreements contained nominal reconciliation provisions, they were expressly discretionary and Funderz was explicitly entitled to reject any reconciliation requests.  Accordingly, the reconciliation provisions (and the adjustment provisions) "d[o] not, in fact, relieve [the merchant] of its obligation to pay [Funderz] the daily amount due under the Agreement."  *Fleetwood III*, 2023 WL 3882697, at *2 (MCA agreement was loan in part because nominal reconciliation provision was subject to the defendant's "sole discretion").  The lack of an enforceable reconciliation or adjustment provision indicates that the risk of loss remains on the

---

[4] The Court notes that "[a]t this pre-discovery stage, neither party has located the October 15, 2018 BMF MCA Agreement."  Opp. at 4 n.1.  According to Plaintiffs, "[u]pon information and belief, its terms are consistent with the October 16, 2018 HOP MCA Agreement."  *Id.* Defendants do not appear to dispute this assertion.  The Court therefore assumes for the purposes of this motion that the October 15, 2018 BMF MCA Agreement has substantially similar terms to the October 16, 2018 HOP MCA Agreement.

merchants, not Funderz, suggesting that the transactions are loans rather than purchases of receivables.

Defendants argue that "Plaintiffs do not allege that *they* ever requested a reconciliation or adjustment under a contract and were denied" so "Plaintiffs cannot be heard to now speculate that [Funderz] would have rejected such a request." Gabe Br. at 21; *see also* Funderz Br. at 21 (similar). However, Plaintiffs *do* allege that "the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision." Am. Compl. ¶ 50. Taking Plaintiffs' plausible factual allegations as true, and in light of the fact that the text of the reconciliation provisions and adjustment provisions provide Funderz with complete discretion not to fulfill a reconciliation or adjustment request, the Court concludes that Plaintiffs have adequately alleged that the reconciliation or adjustment provisions were illusory. *See New Y-Capp. v. Arch Cap. Funding, LLC*, No. 18-cv-03223 (ALC), 2022 WL 4813962, at *12 (S.D.N.Y. Sept. 30, 2022) (MCA agreements were adequately pleaded as loans where "the reconciliation clauses provide that reconciliations will occur at the funders' 'sole discretion'"); *CMS*, 632 F. Supp. 3d at 456 (finding similar reconciliation provision in MCA agreements illusory).

The discretionary reconciliation/adjustment provisions in the six Agreements here contrast with those evaluated in other cases. For example, in *Singh*, supplemental authority provided by Funderz, the reconciliation provision "[wa]s not discretionary." 2023 WL 5760139, at *12-13. Similarly, in *US Information Group LLC v. EBF Holdings, LLC*, No. 22-cv-06661 (PKC), 2023 WL 6198803, at *7 (S.D.N.Y. Sept. 22, 2023), unlike here, the court found that MCA agreements were not adequately pleaded as loans where "the Complaint makes no

allegation about the Agreements' reconciliation provisions," and the plaintiffs "d[id] not allege

that the Agreements' reconciliation process was unduly onerous or had a sham quality."

In sum, as to all six Agreements, the first *LG Funding* factor suggests that the

Agreements were loans rather than the purchase of receivables.

### 2. *Indefinite Term*

The Court next analyzes under the second *LG Funding* factor whether there is a finite

term for payment.  The existence of a "fixed term is typical of a loan, while an indefinite term of

receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk

associated with the receivables not being collectable."  *Queen Funding*, 2022 WL 2829913, at

*6.  Here, a de facto fixed term plausibly exists for all the Agreements.

Regarding the two Agreements that lack reconciliation provisions, the terms of the

Agreements are necessarily fixed to the number of days that it would take for the fixed daily

payment owed to pay off the amount owed.  *See Haymount*, 609 F. Supp. 3d at 248 n.5 ("While

none of the MCA agreements have definite terms spelled out in the texts of those contracts, the

expected duration of the repayment period is readily calculable, since the merchant's total

repayment amount due is known, as is the daily remittance amount.").

Even considering the adjustment provisions in those two Agreements, like the

reconciliation provisions in the other four Agreements, Plaintiffs have plausibly pleaded that

these provisions are illusory.  *See supra* Discussion § III.A.1.  "[W]ithout a mandatory

reconciliation provision . . . , the term of the agreement is fixed to the number of days that it

would take for the fixed daily sum to pay off the Purchased Amount."  *CMS*, 632 F. Supp. 3d at

457-58.  The Court therefore finds that with respect to each Agreement, there is a de facto finite

term alleged.  *See id.* (finding that MCA agreement with a de facto finite term was

indistinguishable from a loan); *Queen Funding*, 2022 WL 2829913, at *6 (finding complaint

alleged plausible factual allegations that MCA agreement was loan when reconciliation provision was illusory, resulting in a de facto definite term for repayment).

In sum, each of the Agreements has a de facto fixed term, suggesting that the Agreements are loans rather than purchases of receivables.

### 3. Recourse in the Event of Bankruptcy

The Court next examines under the third *LG Funding* factor: whether the lender has recourse if the merchant declares bankruptcy. "If the merchant's bankruptcy triggers a default, this factor would weigh in favor of finding the agreement to be a loan because it would suggest that the lender has not assumed the risk of loss of not collecting on the receivables but instead is relying on the creditworthiness of the borrower to be repaid." *Queen Funding*, 2022 WL 2829913, at *6.

Four of the Agreements expressly make bankruptcy an event of default. ECF No. 50-1 § 3.1; ECF No. 50-2 § 3.1; ECF No. 50-3 § 3.1.[5] Because the merchant's bankruptcy triggers a default on the loan, the Agreements did not transfer the risk to Funderz. *See id.*; *Fleetwood II*, 2022 WL 1997207, at *9. For these four Agreements, this factor suggests that the Agreements are loans.

Two of the Agreements do not expressly make bankruptcy an event of default, but still provide that Funderz can recover in the event of bankruptcy. *See* ECF No. 50-4 at 6 ("In the event that [Funderz] must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this

---

[5] As explained above, the Court assumes for the purposes of this motion that the October 15, 2018 BMF MCA Agreement has substantially similar terms to the October 16, 2018 HOP MCA Agreement.

Agreement shall include that amount."); ECF No. 50-5 at 7 (same).  This factor also therefore indicates that Funderz has not assumed the risk of loss, and thus further suggests that the Agreements are loans.  *See CMS*, 632 F. Supp. 3d at 456 (finding that MCA agreements were loans where those agreements provided that merchant's obligations were due when "any proceeding [was] instituted by or against the [m]erchant seeking to adjudicate it bankrupt or insolvent" (emphasis omitted)); *id.* at 461-62 (declining to dismiss complaint where certain MCA agreements were allegedly usurious loans, even though bankruptcy was expressly *not* an event of default); *Haymount*, 609 F. Supp. 3d at 247-48 (finding that MCA agreements had more characteristics of loans than of purchases of receivables, despite not having bankruptcy as an event of default).

### 4.  *Other Factors Affecting the Ultimate Transfer of Risk*

As explained above, the *LG Funding* factors "provide only a guide to analysis" for the Court to consider.  *Fleetwood II*, 2022 WL 1997207, at *9.  In addition to the factors examined above, the Court also finds persuasive the fact that the daily payments owed under the Agreements vary widely from one another, despite purportedly being based on good-faith estimates of FTE's receivables.  The Court finds illustrative the below chart, reflecting the six Agreements, the daily payment owed under each Agreement, the percentage of FTE's receivables to which that the daily payment(s) purportedly corresponds, and the estimated total of FTE's daily receivables:

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables |
|---|---|---|---|
| 10/15/18 BMF Agreement | $9,999 | 10% | $99,999/day |
| 10/16/18 HOP Agreement | $29,999 | 10% | $299,990/day |
| 10/25/18 BMF Agreement | $14,999 | 10% | $149,990/day |

| 10/25/18 HOP Agreement | $39,999 | 10% | $399,990/day |
| 11/8/18 BMF Agreement | $38,724 | 10% | $387,240/day |
| 11/9/18 HOP Agreement | $69,999 | 10% | $699,990/day |

Opp. at 7; Am. Compl. ¶¶ 70-114.  The fact that Funderz's supposed good-faith estimate of

FTE's daily receivables varied so widely, even when the Agreements were executed on back-to-

back days or even on the same day, indicates to the Court that the Agreements were not based on

good-faith estimates of receivables.  *See Davis v. Richmond Cap. Grp., LLC*, 150 N.Y.S.3d 2, 4

(1st Dep't 2021) (among other things, "the selection of daily payment rates that did not appear to

represent a good faith estimate of receivables" indicated that agreements were loans).  This

further supports the plausibility of Plaintiffs' allegations that the transactions were loans and not

purchases of estimated future receivables.

*          *          *

In sum, based on the Court's analysis of the substance, rather than the form, of the

Agreements, the Court finds that Plaintiffs have adequately alleged that the Agreements were

loans rather than purchases of receivables.

### 5.  *Usury*

Under RICO, an unlawful debt is a debt that "is unenforceable under State or Federal

law . . . because of the laws relating to usury," and "where the usurious rate is at least twice the

enforceable rate."  18 U.S.C. § 1961(6).  Under New York law, a loan is criminally usurious

when it bears an interest rate "exceeding twenty-five per centum per annum or the equivalent

rate for a longer or shorter period."  N.Y. Penal Law § 190.40.  Here, the effective interest rates

of the Agreements are alleged to be between 250% and more than 1,000%.  Am. Compl. ¶¶ 88,

113.  These rates far exceed the limit contained in New York's criminal usury law.  The Court

therefore finds that the usury element of the collection of an unlawful debt is also adequately pleaded.

### B.    Scienter

Next, Defendants assert that Plaintiffs have not adequately alleged that Defendants acted with the requisite scienter because at the time the Agreements were executed, New York courts held that other MCA agreements were not usurious, and because RICO requires "proof" that the defendant acted with specific knowledge that his conduct was unlawful.  Funderz Br. at 19-22; Gabe Br. at 16-24.  Plaintiffs do not appear to take issue with the scienter standard as articulated by Defendants, and instead assert that they have adequately pleaded that Defendants "intentionally and knowingly collected on unlawful debt," Opp. at 22, and that they included "specific allegations directly implicating Defendants' knowledge that their conduct is unlawful," *id.* at 23.

The standard for scienter in a civil RICO action based on the collection of unlawful debt under New York law is somewhat unclear.  *Grote*, 961 F.3d at 118 (noting inconsistency with prior Second Circuit precedent stating that criminal RICO collection of unlawful debt claim required that defendant acted "knowingly, willfully and unlawfully," while also holding that "RICO imposes no mental state requirement beyond that required by the predicate state statute" (examining *United States v. Biasucci*, 786 F.2d 504, 512-13 (2d Cir. 1986))); *Moseley*, 980 F.3d at 19 (noting same and declining to identify the requisite mental state for a criminal unlawful debt RICO violation); *see also Grote*, 961 F.3d at 118 n.4 ("[P]recedent ma[kes] clear that 'knowingly' [under New York's usury statute] [i]s satisfied by knowledge that the interest rate exceeded 25%, regardless of whether the defendant was aware that such rate was unlawful.").

In any event, Plaintiffs have adequately alleged here that Defendants acted with intent and knowledge of the unlawful nature of their lending scheme.  Specifically, the Amended

Complaint alleges that "the intent of the Isaacov Enterprise is to issue fixed-term loans using a sham reconciliation provision to disguise the loans," Am. Compl. at 9 (further capitalization omitted), that "usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Isaacovs, which determine the payback based on the number of days in which the Isaacovs want to be paid back," *id.* at ¶ 52, and that "Funderz.Net LLC, through the Isaacovs and its assumed names, knowingly and intentionally . . . collected upon the unlawful debt," *id.* at ¶ 168.  The Amended Complaint further alleges that Defendants "consistently describe their products as 'loans' . . . and describe themselves as 'lenders' and the merchants as 'borrowing' funds," *id.* ¶ 55, that Defendants employed a variety of trade names to "better obscure the identities of the entities involved in their criminal enterprise," *id.* ¶¶ 16; *see also id.* ¶¶ 29-31, that Defendants threaten and intimidate merchants, *id.* ¶¶ 35-37, that Defendants utilize a "sham reconciliation provision" "[i]n order to evade state usury laws," *id.* ¶ 44, and that the Agreements had interest rates that far exceeded those permissible under New York state law, *see id.* ¶¶ 74-114.

  The Court is not persuaded by the Funderz Defendants' argument that because Joe would appear in court to enforce these types of agreements, he cannot be shown to have usurious intent.  Funderz Br. at 21-22.  The fact that one defendant attempted to enforce other MCA agreements does not overcome the deference that the Court must give to Plaintiffs' plausible factual allegations on a Rule 12(c) motion regarding intent here.  Similarly, Defendants' claim that they did not act with the requisite intent because other courts held that different MCA agreements were not loans in 2018 does not, at this juncture, warrant judgment in their favor as a matter of law.  Whatever Defendants knew and understood about the nature of the Agreements and their business will be explored in discovery, but at the pleading stage, the Court must accept

Plaintiffs' plausible allegations regarding scienter, which have been extensively pleaded. *See Chavez v. Occidental Chem. Corp.*, 933 F.3d 186, 195 (2d Cir. 2019) (on a Rule 12(c) motion, a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor"); *see also Queen Funding*, 2022 WL 2829913, at *6 (in context of civil RICO claim regarding MCA agreements, denying motion to dismiss based on lack of intent given that "[u]surious intent . . . is usually a question of fact for the jury").[6]

Overall, taking the Plaintiffs' plausible allegations as true, as the Court must at this stage, Plaintiffs have plausibly alleged Defendants' requisite mental state.

### C.    Individual Conduct and the Distinct RICO Enterprise

#### 1.    *Whether the RICO Enterprise Is Distinct from the Persons*

The Funderz Defendants next argue that Plaintiffs have not adequately pleaded a RICO enterprise. They claim that Plaintiffs fail to allege the existence of two distinct entities – (1) a person, and (2) an enterprise – as required under section 1962(c), because the Isaacovs are principals of Funderz and "an employee and his or her employer cannot be both the 'person' and the 'enterprise' for purposes of a RICO claim." Funderz Br. at 7. This argument is not persuasive.

The Funderz Defendants are correct that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). "A 'person' is defined as 'any individual or entity

---

[6] The cases cited by Defendants in support of their argument on this point are distinguishable. *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 70 n.20 (2007) and *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), did not examine the adequacy of pleadings but rather evaluated evidence of intent on summary judgment.

capable of holding a legal or beneficial interest in property,'" while an "'enterprise' is defined as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *Cruz v. FX DirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation omitted).  "The two cannot be one and the same; a 'person' is not liable under Section 1962(c) for participating in that same person's 'affairs through a pattern of racketeering activity.'"  *CMS*, 632 F. Supp. 3d at 463.

Plaintiffs' allegations are sufficient here.  Plaintiffs allege an association-in-fact enterprise consisting of Funderz, the four Isaacov brothers, and the John and Jane Doe investors. Am. Compl. ¶ 138.  Plaintiffs allege that the culpable RICO "persons" are "Joe, Ben, Gabe and Simon."  *Id.* ¶ 129.  Hence, as pleaded, the culpable RICO "persons" are distinct from the "enterprise."

Even if the "persons" alleged here, the Isaacov brothers, are principals of Funderz, a corporation that is part of the Enterprise, *Cedric Kushner* teaches that a distinct enterprise is still pleaded.  In *Cedric Kushner*, the Supreme Court held that a "president and sole shareholder" of a "closely held corporation" was a "person" distinct from the enterprise consisting of that corporation.  533 U.S. at 160.  The Court reasoned that, as a matter of law, a natural person "is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  *Id.* at 163.

*U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199 (2d Cir. 2017), and *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994), upon which the Funderz Defendants principally rely in support of their argument, are distinguishable, *see* Funderz Br. at 7-8; Funderz Reply at 1-3.  As explained by another court in this District, "[i]n those cases, the plaintiff named, as the RICO person, the same *company* that – along with the company's

employees and agents – was also alleged to be the RICO enterprise." *CMS*, 632 F. Supp. 3d at

464 (emphasis added).  Here, in contrast, "Plaintiffs do not seek to hold a corporation liable as a

RICO person by virtue of the acts of the corporation and those acting on its behalf." *Id.* at 465.

Rather, Plaintiffs bring their substantive RICO claim against only natural persons Joe and Gabe,

who are distinct "persons" from the alleged Enterprise consisting of them, Funderz, and the John

and Jane Doe Investors.  Am. Compl. at 34; *see also Queen Funding*, 2022 WL 2829913, at *7

(holding that RICO enterprise was distinct from RICO culpable persons, pursuant to the

standards set forth in *Cedric Kushner*, where "Queen Funding is a legal entity that falls within

the definition of a RICO enterprise and is distinct from Klein, a natural person"); *Fleetwood II*,

2022 WL 1997207, at *19 (finding distinctiveness in RICO claims against natural person who

was founder and sole managing member of enterprise, a business that advanced funds through

MCAs).  Plaintiffs have therefore adequately alleged distinct RICO persons and an enterprise.

### 2.  *Whether the RICO Enterprise Is Distinct from the Racketeering Activity*

The Funderz Defendants next argue that Plaintiffs fail "to allege an enterprise with a

purpose distinct from the alleged racketeering."  Funderz Br. at 10 (capitalization omitted).  They

assert that "Plaintiffs allege that the 'enterprise' had no purpose other than racketeering or

collection of unlawful debts" because "Plaintiffs allege that the 'enterprise' existed 'for the

common goal of soliciting, funding, servicing and collecting upon usurious loans.'"  *Id.* at 12

(quoting Am. Compl. ¶ 139); *see also id.* ("In fact, Plaintiffs refer to the enterprise as a purely

'criminal enterprise.'" (quoting Am. Compl. ¶ 16)).  The alleged enterprise, the Funderz

Defendants argue, "is not cognizable because it would fail to exist once the predicate acts are

removed from the equation."  Funderz Reply at 3 (quotation marks and citation omitted). The

Court rejects this argument.

The Supreme Court in *United States v. Turkette* expressly rejected the argument that RICO does not apply to an enterprise that performs only illegal acts.  452 U.S. 576, 580 (1981).  Similarly, in *Boyle v. United States*, the Supreme Court recognized a RICO enterprise that consisted entirely of a group of people who participated in racketeering through a series of bank thefts in the 1990s.  556 U.S. 938, 940-41 (2009); *see id.* at 942, 945 (finding no error in jury instruction that included that a RICO enterprise may be formed "solely for the purpose of carrying out a pattern of racketeering acts").

A plaintiff bringing a RICO claim must plead and prove the separate elements of the enterprise and the racketeering/collection of unlawful debt.  "The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit," while the latter is proved by evidence of a requisite pattern of racketeering acts or collection of unlawful debt.  *Turkette*, 452 U.S. at 583.  Plaintiffs have fulfilled these requirements as they exist at the pleadings stage.  Plaintiffs have sufficiently alleged the existence of a RICO enterprise consisting of the company Funderz, the Isaacovs, and the John and Jane Doe Investors, and have alleged at least the collection of unlawful debt.  As the Second Circuit has explained, even if the Amended Complaint alleges that the Enterprise was "formed for the sole purpose of carrying out a pattern of racketeering," it can still constitute a RICO enterprise, "so long as it is in fact an enterprise as defined in the statute."  *Pavlov v. Bank of N.Y. Co.*, 25 F. App'x 70, 71 (2d Cir. 2002) (summary order) (reversing dismissal of civil RICO claim where Plaintiffs had pleaded the existence of a RICO enterprise that existed solely to conduct a pattern of racketeering activity).[7]

---

[7] The cases cited by the Funderz Defendants are distinguishable.  For example, in *Allen v. New World Coffee, Inc.*, No. 00-cv-02610 (AGS), 2001 WL 293683, at *8 (S.D.N.Y. Mar. 27, 2001),

Accepting as true all plausible factual allegations, the Court finds that the Amended Complaint adequately pleads the existence of a RICO enterprise, even if the Enterprise conducts solely criminal activity.  *See, e.g.*, *Fleetwood II*, 2022 WL 1997207, at *19 (finding enterprise solely engaged in MCA transactions to be an enterprise under RICO); *Haymount*, 609 F. Supp. 3d at 248-52 (same); *Queen Funding*, 2022 WL 2829913, at *7 (same).

### 3.  *Individual Conduct*

A civil RICO plaintiff must allege that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs."  18 U.S.C. § 1962(c).  "[T]he RICO defendant must have participated in the operation or management of the enterprise."  *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 224 (E.D.N.Y. 2014) (quotation marks and citation omitted).  This requires that "the defendant must have had *some* part in directing the enterprise's affairs," *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (brackets, quotation marks, and citation omitted; emphasis added), and "has proven to be a relatively low hurdle for plaintiffs to clear," *id.*  "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise."  *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).

The Funderz Defendants argue that "Plaintiffs fail to allege the racketeering activity of each Defendant within the alleged RICO enterprise."  Funderz Br. at 18 (further capitalization omitted).  Gabe similarly argues that Plaintiffs "have not pled that Gabe participated in" two

---

the plaintiff attempted to allege an "illusory enterprise" called "the Racket" when its corporate enterprise was found to be insufficiently distinct from the alleged persons.

predicate acts to establish a pattern of racketeering activity.  Gabe Br. at 24-27 (further capitalization omitted).

Accepting the plausible factual allegations as true, the Amended Complaint adequately alleges the role of each Defendant within the alleged RICO enterprise and the collection of unlawful debt.  Plaintiffs allege that Joe and Gabe are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) the form of affidavits of confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  Am. Compl. ¶¶ 151, 155.  Plaintiffs further allege that Joe and Gabe have final say on all financial decisions of the Enterprise including those on the details of the funding of loans and the ultimate terms of those loans, *id.*, and that they directed other members of the Enterprise to take actions necessary to accomplish its goals, including directing members to collect upon unlawful debts, *id.* ¶¶ 152, 156.  Further, Plaintiffs allege that "Joe holds himself out as the CEO of HOP Capital," *id.* ¶ 29, that "Gabe holds himself out as the CEO of BMF Capital," *id.* ¶ 31, and that "each maintain separate books and records from each other," *id.* ¶ 33. Plaintiffs further allege that "Joe purports to be the 'Manager' of 'HOP Capital' for the purpose of appearing in Court to collect on the usurious loans HOP issues," *id.* ¶ 132, and that "Gabe purports to be the 'Manager' of Business Merchant Funding . . . [and] appears in court as 'Manager' of Business Merchant Funding for the purpose of collecting on the usurious loans BMF or Business Merchant Funding issue," *id.* ¶ 134.  The Amended Complaint also alleges that

Funderz, through the fictitious names of HOP and BMF, entered into six usurious loans with Plaintiffs.  *Id.* ¶¶ 70-114.  Additionally, the John and Jane Doe Investors are alleged to "provid[e] the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts."  *Id.* ¶ 170.

In *CMS*, the court found that the complaint adequately alleged racketeering activity of each defendant based on similar allegations.  632 F. Supp. 3d at 466-67.  There, the complaint alleged that one defendant was an "owner and mastermind" who had "final say on all financial decisions of the Enterprise," had "disseminated financial information," had "authority to increase" or "lower . . . funding," and was "responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals."  *Id.* at 466.  The *CMS* found that those allegations were sufficient to meet the "low hurdle" that a person had participated in a RICO enterprise with requisite intent.  *Id.* at 467.

In sum, accepting the plausible factual allegations as true, the Court finds that Plaintiffs have adequately alleged that each Defendant has adequately participated in the RICO enterprise.

## IV.    The RICO Claim Based on Predicate Acts of Wire Fraud

In addition to its claim that Defendants engaged in the collection of unlawful debt, the Amended Complaint alleges a violation of RICO based on a pattern of racketeering activity of wire fraud.  Defendants argue that Plaintiffs fail to adequately allege a RICO claim based on a pattern of racketeering with predicate acts of wire fraud, because the acts constituting wire fraud have not been alleged with sufficient particularity.  Funderz Br. at 12-16; Gabe Br. at 24-26.  The Court need not determine whether the additional wire fraud predicate acts have been adequately pleaded because Plaintiffs have sufficiently pleaded a RICO violation based on the collection of unlawful debt.  *See CMS*, 632 F. Supp. 3d at 463 (same); *see also Angermeir v. Cohen*, 14 F.

33

Supp. 3d 134, 153-54 (S.D.N.Y. 2014) (declining to examine adequacy of pleading with respect

to a particular theory of predicate acts after determining that separate theory of predicate acts

was sufficiently pleaded); *Serin v. N. Leasing Sys., Inc.*, No. 06-cv-01625 (JSG), 2009 WL

7823216, at *9 (S.D.N.Y. Dec. 18, 2009) (same).

## V.      The Conspiracy Claim

Defendants argue that Plaintiffs' RICO conspiracy claims fail as a matter of law because

the underlying RICO violations fail.  Gabe Br. at 28; Funderz Br. at 22-23.  Because the Court

has found that the underlying RICO violations were adequately pleaded, this argument is

unavailing.

The Funderz Defendants also argue that Plaintiffs' RICO conspiracy claims fail because,

under the intracorporate conspiracy doctrine, "a company cannot conspire with its own

employees or owners."  Funderz Br. at 23.  This argument also fails.

The alleged Enterprise pleaded here does not consist of a company and its employees or

owners.  Rather, the alleged Enterprise consists of "Funderz.Net LLC, the Is[a]acovs and the

John and Jane Doe Investors."  Am. Compl. ¶ 138.  The John and Jane Doe Investors[8] are

alleged to be "a group of individual investors who maintain separate officers, books, records, and

bank accounts" who "provid[e] the Enterprise with all or a portion of the pooled funds necessary

to fund the usurious loans, including the agreements, and . . . approve and ratify the Enterprise's

---

[8] The Court notes that "[t]hough it is true that, as a general rule, the use of 'John Doe' to identify
a defendant is not favored, the Second Circuit has explained that courts have rejected the
dismissal of suits against unnamed defendants . . . identified only as John Doe's, until the
plaintiff has had some opportunity for discovery."  *Gov't Emps. Ins. Co. v. Hollis Med. Care,
P.C.*, No. 10-cv-04341 (ILG), 2011 WL 5507426, at *11 (E.D.N.Y. Nov. 9, 2011).  Here, too,
accepting Plaintiffs' plausible factual allegations as true, the Court will not dismiss the case
simply because the John and Jane Doe Investors were yet to be identified when the Amended
Complaint was filed.  *See Queen Funding*, 2022 WL 2829913, at *1 (denying motion to dismiss
in RICO case against John and Jane Doe Investors).

efforts to collect upon the unlawful debts." *Id.* ¶¶ 169-170.  There are no allegations indicating that the John and Jane Doe Investors were employees or officers of Funderz.  Contrary to Defendants' assertions, it is also not true that the Amended Complaint "has no factual allegations that the unnamed investors conspired to engage in any of the alleged racketeering activity." Funderz Reply at 2.  On the contrary, the Amended Complaint alleges that in addition to providing the funds for the allegedly usurious advances, the John and Jane Doe Investors took actions to ratify and approve the transactions.  Am. Compl. ¶ 170.

Therefore, accepting Plaintiffs' plausible factual allegations as true, Plaintiffs have sufficiently pleaded a conspiracy under RICO.[9]

## VI.   Leave to Amend

The Funderz Defendants argue that "leave to amend should be denied as futile."  Funderz Br. at 23 (capitalization omitted).  The Court has determined that the Amended Complaint was adequately pleaded, and therefore need not reach this issue.

## CONCLUSION

For the foregoing reasons, the motions for judgment on the pleadings are DENIED.  The

---

[9] The cases cited by the Funderz Defendants are distinguishable based on the facts as currently pleaded.  Unlike here, in *Little v. City of New York*, the plaintiff alleged an enterprise consisting wholly of police officers employed by the same entity, the City of New York.  487 F. Supp. 2d 426, 442 (S.D.N.Y. 2007).  Similarly, in *Kriss v. Bayrock Group LLC*, the plaintiff alleged an enterprise consisting entirely of a corporation and its officers.  No. 10-cv-03959 (LGS), 2016 WL 7046816, at *2-6 (S.D.N.Y. Dec. 2, 2016).

It bears noting that even if the John and Jane Doe Investors were not alleged to be part of the Enterprise, there "is a circuit split on whether the [intracorporate conspiracy] doctrine – which the Supreme Court first adopted in the antitrust context – applies to RICO conspiracy claims.  The Second Circuit has not yet addressed the issue."  *Alix v. McKinsey & Co.*, No. 18-cv-04141 (JMF), 2023 WL 5344892, at *22 (S.D.N.Y. Aug. 18, 2023) (internal citations omitted); *see id.* at *23 (agreeing with the Seventh, Ninth, and Eleventh Circuits in holding that "the intracorporate conspiracy doctrine does not apply to RICO").  The Court need not reach this question given the facts alleged in the Amended Complaint.

Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 87 and 89.

Dated: January 19, 2024
         New York, New York

                              SO ORDERED.


                              _____
                              JENNIFER L. ROCHON
                              United States District Judge