**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LATERAL RECOVERY LLC, BENCHMARK BUILDERS, INC., FTE NETWORKS, INC., JUS-COM LLC, and FOCUS WIRELESS, LLC, | Civ. A. No.: 1:22-cv-02170-MMG |
| Plaintiffs, | |
| v. | |
| FUNDERZ.NET, LLC d/b/a HOP CAPITAL and d/b/a BUSINESS MERCHANT FUNDING, JOSEPH YITZCHAKOV a/k/a JOSEPH ISAACOV, GAVRIEL YITZCHAKOV a/k/a GABE ISAACOV, and JOHN and JANE DOE INVESTORS, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York  10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................5

    A.    The Undisputable Facts Show Joe Created Funderz To Issue Usurious Loans ........................................................................................................................5

    B.    Defendants Admit Their MCAs Are Loans And Destroyed Evidence ...................6

    C.    The Undisputable Facts Show That The MCAs Are Usurious Loans ....................8

STANDARD ..........................................................................................................................11

ARGUMENT .........................................................................................................................11

I.      THE MCA'S ARE LOANS AS A MATTER OF LAW ...................................................11

    A.    Defendants Had The Requisite Scienter .............................................................11

    B.    The MCAs Are Usurious Loans .........................................................................16

II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST JOE ON THE RICO CLAIM ..............................................................................................21

    A.    Joe is a culpable person under RICO. .................................................................21

    B.    Funderz is a RICO Enterprise. ...........................................................................22

    C.    The Enterprises' affairs affect interstate commerce. ..........................................22

    D.    Joe conducted the affairs of the RICO enterprise to collect of unlawful debt. ...................................................................................................................23

    E.    The debt was unenforceable in whole under New York usury law. .....................24

    F.    The debt was incurred in connection with "the business of lending money." ...................................................................................................................24

    G.    The interest rate was at least twice the applicable rate. .........................................24

    H.    FTE was injured in its business or property ..........................................................25

III.   LATERAL IS ENTITLED TO SUMMARY JUDGMENT AS ASSIGNEE. ..................25

CONCLUSION ......................................................................................................................25

32235821v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
  37 N.Y.3d 320 (2021) ...........................................................................................23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..............................................................................................11

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ...........................................................................................1, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .........................................................................................10, 11

*City of New York v. Cyco.Net, Inc.*,
  383 F.Supp.2d 526 (S.D.N.Y. 2005) ....................................................................22

*Collins v. Walmart Stores East, LP*,
  19-CV-1691, 2022 U.S. Dist. LEXIS 113057 (E.D.N.Y. June 27, 2022) ...............14

*Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*,
  220 A.D.3d 745 (2d Dep't 2023) ..........................................................................18

*Davis v. Richmond Capital Group*,
  194 A.D.3d 516 (1st Dep't 2021) ...............................................................17, 19, 20

*Defalco v. Bernas*,
  244 F.3d 286 (2d Cir. 2001).................................................................................22

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
  755 F.2d 239 (2d Cir. 1985)............................................................................20, 23

*Elonis v. United States*,
  575 U.S. 723 (2008)..............................................................................................11

*Fid. Nat'l Title Ins. Co. v. Castle*,
  No. C11-00896 SI, 2011 U.S. Dist. LEXIS 141297 (N.D. Ca. Dec. 8, 2021)..........22

*Fleetwood Servs., LLC v. Ram Capital Funding LLC*,
  20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 148032 (S.D.N.Y. Aug. 17, 2022) .......24

*Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*,
  2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023) ...................1, 13, 16, 18, 20

*Freitas v. Geddes S&L Ass'n,*
 63 N.Y. 254 (N.Y. 1984) ...............................................................................12, 23

*Haggiag v. Brown,*
 728 F.Supp. 286 (S.D.N.Y. 1990) ...........................................................................22

*Haymount Urgent Care PC v. GoFund Advance, LLC,*
 609 F. Supp. 3d 237 (S.D.N.Y. 2022)...............................................17, 18, 19, 20

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.,*
 559 U.S. 573 (2010)...................................................................................................12

*Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.,*
 632 F. Supp. 3d 402 (S.D.N.Y. 2022)....................................................................17

*Lateral Recovery LLC v. Queen Funding LLC,*
 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022) ........................17, 18, 20

*LG Funding, LLC v. United Senior Properties of Olathe, LLC,*
 181 A.D.3d 664 (2d Dep't 2020) ...............................................................16, 17, 19

*Mail v. Fed. Ins. Co.,*
 720 F.3d 387 (2d. Cir. 2013).....................................................................................14

*New Y-Capp v. Arch Cap. Funding LLC,*
 2022 U.S. Dist LEXIS 180309 (S.D.N.Y. Sept. 30, 2022)....................................17

*People v. Richmond Capital Group LLC,*
 80 Misc. 3d 1213(A), (N.Y. Sup. Ct. 2023)....................................................13, 15

*Reves v. Ernst & Young,*
 507 U.S. 170 (1993)....................................................................................................23

*Staples v. United States,*
 511 U.S. 600 (1994)....................................................................................................12

*U.S. v. Grote,*
 961 F.3d 105 (2d Cir. 2020)...........................................................................2, 11, 12

*United States v. Garcia,*
 143 F.Supp.2d 791 (E.D. Mich. 2000).....................................................................22

*United States v. Robertson,*
 514 U.S. 669 (1995)....................................................................................................22

**STATUTES**

RICO ...........................................................................................................................*Passim*

RICO 18 U.S.C. § 1962 ........................................................................................................1, 21

RICO, 18 U.S.C. § 1964(c) ........................................................................................................24

**OTHER AUTHORITIES**

Fed.R.Civ.P. Rule 17(a) ............................................................................................................24

Fed.R.Civ.P. Rule 56 ................................................................................................................10

32235821v.1

Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc., FTE Networks, Inc., Jus-Com LLC, and Focus Wireless, LLC  (collectively "Plaintiffs", without Lateral, "FTE") respectfully submit this Memo of Law in support of their Motion for Summary Judgment on their First Cause of Action for violation of RICO 18 U.S.C. § 1962 against Defendant Joseph Yitzchakov ("Joe") through the collection of unlawful debt.

## PRELIMINARY STATEMENT

This motion is simple and straightforward:  The RICO statute "applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner -- whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001).  For purposes of separateness: "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id.* at 163.

Here, it is undisputed that Joe is a natural person and that Funderz is legally distinct corporation.  It is further undisputed that Joe "conducts the affairs of the corporation of which he is the sole owner."  The culpable person and enterprise here is on all fours with the Second Circuit's decision in *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023)*, which consisted of Girardina as the culpable person, and Richmond Capital as the corporation he controlled.  It is also on all fours with the Supreme Court's holding in *Kushner*, consisting of Don King and the company he controlled.  There is no dispute that Joe is the sole owner of Funderz, and that he had all decision-making authority, including as to which MCAs to fund, their terms, their form, their performance, and their collection.

Discovery has also proven that no factual dispute exists as to every substantive element necessary to prove a RICO claim for the collection of an unlawful debt.  On the element of usurious

intent, Joe's own bank application admits that he formed Funderz for the explicit purpose of funding "loans." Joe also created at least eighteen D/B/A entity names for Funderz, many of which operated websites between 2017 and 2018 (and through today) where these DBA's identify themselves as "lenders" offering "business loans." Funderz testified that its MCA products, or "loans" as Joe described them, are "absolutely repayable." Finally, before entering into the six MCA Agreements at issue, Funderz' own underwriting confirmed that FTE had no actual receivables to purchase. Rather, the bank statements and other records FTE provided to Funderz showed that FTE had numerous other MCAs that had already purported to purchase FTE's receivables and that FTE's bank account was in the red. It is axiomatic that one cannot purchase what has already been sold to another.

In his defense, Joe says, that he could not have had usurious intent based on precedent dating back to 2018. This defense does not even get out of the gate. The only concern the Second Circuit had in *U.S. v. Grote*, 961 F.3d 105 (2d Cir. 2020) was whether the defendant knew of the offending state's usury statute—not whether the conduct constituted a violation that statute. By at least December 19, 2017, Defendants knew their MCA agreements were potentially usurious under New York law because the issue was directly raised on a contested motion to vacate a confession of judgment ("COJ") filed by Funderz. The affidavit in support of that COJ was *signed by Joe.* In the subsequent decision, the New York State Court expressly held that substance over form controlled and thus required a plenary action to determine the merits. That is game, set, match.

But even if Joe had read the decisions cited by counsel—*involving other MCAs*, it would only further prove usurious intent. Most fatally, reading those decisions would only cement Defendants' knowledge of New York's usury statute. But in addition, Joe would also have known that his conduct substantively violated the statute because his MCAs fail all three factors stated in

-2-

those decisions, namely whether there is: (1) recourse in the event of bankruptcy; (2) a valid, non-discretionary reconciliation provision; and (3) a finite term. Funderz' own 30(b)(6) admitted, not once, but twice, that the reconciliation provision was discretionary and that the agreements were "absolutely repayable."  Even worse, Joe himself admitted that missing or lowering payment was an event of default. These admissions render the term fixed and absolute from day one. But Joe took it even a step further. Joe admitted that even when the form of his agreements changed, it was "business as usual."  What is more, the system Joe created to manage the MCA Agreements at issue all explicitly provided fixed terms for each of the six MCA Agreements at issue.

Finally, usurious intent is overwhelming established by Defendants' own undisputed pay runs—which indicate that Funderz made at least 43 unauthorized debits of FTE's bank account above and beyond the amount allowed under the MCAs, to the tune of more than $2 million. In an attempt to deny the undeniable, Joe speculates that FTE may have requested to repay early—a premise that only makes sense if the MCAs are really loans. But even this self-serving speculation was an intentional untruth. The contemporaneous documentary evidence proves that FTE did, in fact, protest the over-debiting. In response, Funderz acknowledged the over-debiting but attempted to excuse it as punishment for FTE having other MCA deals. But even after getting caught over-debiting—*and promising to stop*—Funderz continued to over-debit. Thus, these 43 or more over-debits only further establish Defendants' usurious intent because Funderz purposely accelerated repayment, even after promising Funderz would stop doing so on December 3, 2018, in order to ensure "absolute repayment," as Funderz characterized its MCA Agreements.

The MCAs themselves are six additional nails in the coffin because they have all the legal hallmarks of a loan under long-established New York law. First, all six give Funderz recourse in the event of bankruptcy, whether as an explicit event of default or through the personal guarantee.

Second, as confirmed by Funderz's own internal business records and simple math, all of the MCAs had pre-established fixed terms ranging from 49 to 65 business days. Third, two of the MCAs lacked a reconciliation provision and the four that did were *discretionary*. Fourth, the "good-faith" estimates of receivables across the six MCAs fluctuated wildly, even for MCAs entered on the same day; the only consistent trend is that the daily payments increased to correspond with the loan amount. Fifth, the MCAs fail to identify any specific receivables Funderz purportedly purchased. Sixth, it was always FTE's obligation to collect the receivables, rather than Funderz, who purportedly purchased them. Seventh, FTE would be in default if it missed as little as one or two fixed daily payments under the MCA's plain terms.  To further emphasize how Funderz treated these MCAs as "absolutely repayable," Joe would instruct his brother Ben Isaacov to threaten delinquent merchants, including resorting to antisemitic death threats against one particularly unfortunate merchant victim. *See* Amended Complaint Ex. 12 [DE 44-12].

Importantly, all of these loan-like features were confirmed by Defendants' testimony. No Defendant could identify a single instance where Defendants granted a reconciliation request and both Joe and Funderz admitted that reconciliation was discretionary and that simply missing a payment was an event of default.  Defendants also testified that their underwriting procedure was nothing more than a review of FTE's bank statements—which showed its receivables were already encumbered by other MCA lenders—and that the only credit check that was performed was on FTE, not its account debtors.  Thus, all evidence demonstrates that Defendants intentionally issued six usurious loans to FTE and collected millions of dollars of unlawful debt.

The indisputable amount collected over principal is $5,872,177. Notably, trebling this amount under RICO would not even do justice.  FTE received less than two million dollars from Defendants and paid back nearly *six million dollars in interest*—over just three months. In contrast,

Defendants have now had use of this nearly *six million dollars* for the past four years.  In other words, trebling the damages four years later pales in comparison to what Joe fleeced from FTE over just a three-month span. Imagine how many times Joe multiplied that money by engaging in the same scheme through other victims. It is respectfully time to pay the piper.

## STATEMENT OF FACTS

### A.    The Undisputable Facts Show Joe Created Funderz To Issue Usurious Loans

Funderz' articles of incorporation provide that Joe incorporated it as an LLC with New York State on March 19, 2015 as its sole "Member" and gave an address for Funderz of 1022 Avenue M, Brooklyn, New York 11230.  Plaintiffs' Statement of Material Facts ("SMF") ¶ 1. Over the next three years, Funderz registered 18 d/b/a names for itself, first Empire Funding, then HOP, and others including Merchant Capital (i.e., BMF), Panthers Funding, and WG Capital.  *Id*. ¶ 4.  Funderz later set up websites for many of these d/b/as, including HOP, Panthers Funding, Empire Funding, and WG Capital where their MCA businesses and products were explicitly described as "direct lenders" and "loans."  *Id* ¶¶ 5-25.  While several of these websites have since been taken down, Panthers Capital, run by Joe's brother Ben Isaacov, still has its website up where it describes itself as a "direct lending firm."  *See* www.pantherscapital.com; SMF ¶ 23.  Even one of Funderz's d/b/as has the word "LENDING" right in its title.  *Id*. ¶ 26.

Joe even called Funderz' MCA products loans multiple times during his deposition.  *Id*. ¶ 29.  Joe also gave conflicting testimony on several topics. For instance, Defendants' own pay runs show that on the last two MCA Agreements at issue, dated November 8, 2018 with HOP and BMF, Funderz made **43** extra debits exceeding $2 million in total.  *Id*. ¶¶ 75-79.  Notably, this is not allowed in any of MCA Agreements, which all provide that daily remittances would be debited once "Monday – Friday" and "[i]f any payment date falls on a weekend or holiday, . . . that payment may be executed the next business day."  *Id*. ¶ 75.  Funderz's form MCA agreements were also

challenged as usurious loans in New York State Court as early as December 2017, well before the MCA Agreements here were executed, and Joe had personal knowledge of that argument because he filed an affidavit in support in that lawsuit. *Id*. ¶¶ 30-31.

When pressed for a justification, neither Joe nor Funderz could do anything but speculate—while admitting they had no documents to support their speculation—that FTE authorized these two to four extra debits on random days to speed up repaying the MCA Agreement. *Id*. ¶¶ 85-86. What is more, this testimony is demonstrably false as FTE emailed Gabe on December 3, 2018 notifying him that FTE caught the double debits and demanded them to cease. *Id*. ¶ 87.  In response, Gabe explained that the double debits were punishment for FTE because "our deal got stacked by other **lenders** when u said u won't do that . . . if you like us to stop the double pulls we need a Refi done here." *Id*. ¶¶ 87-91.  The "lenders" Gabe is referring to are other MCA companies, thereby further demonstrating Defendants' usurious intent. *Id*.  Moreover, Gabe's explanation for punishing FTE with overdraws is false; FTE confirmed with Funderz both in express emails to Gabe and in their bank account disclosures that they had already entered into MCA agreements the week before the MCA Agreements at issue were first executed. *Id*. ¶¶ 93-94.  Even still, Gabe recognized this impropriety and promised FTE that Defendants would stop the double debits, stating: "[a]s of Wednesday double pulls won't come out." *Id*. ¶ 91. Nevertheless, Defendants continued and *accelerated* their double or more pulls of FTE *after* promising to stop. *Id*. ¶¶ 75-79, 92.

### B.    Defendants Admit Their MCAs Are Loans And Destroyed Evidence

Both Funderz's D/B/A HOP and Empire Funding stated on their websites while Funderz was operating that they offered "loan" products as "direct lenders," which is entirely consistent with how Joe described Funderz's business as "loans" in his 2016 application to open up a Funderz d/b/a HOP account with IBD Bank. *Id*. ¶¶ 3-18.  Nevertheless, HOP and Empire Funding have

filed confessions of judgment against MCA merchants in New York State Court with Joe providing affidavits that the transactions are purchases of receivables. *Id*. ¶ 5-21. And Joe is not alone. Gabe and Ben Isaacov have also given dozens of affidavits in support of confessions of judgment filed against Funderz's merchants who did business with Funderz's d/b/as such as Empire Funding, HOP, Regional Capital, and Panthers Capital, each alleging that the transaction alleged to be breached was a purchase and sale of receivables. *Id*. ¶¶ 23-24, 147. Funderz's d/b/a Panthers Capital continues to advertise itself as a "direct lender" just as HOP and Empire Funding did in the past. *Id*. ¶ 23. These affidavits filed by the Isaacov brothers Joe, Gabe and Ben or others have resulted in the 18 Funderz's D/B/As collecting over 1,500 judgments in New York alone against its merchant victims all across the country. *Id*. ¶¶ 147-148.

Next, Plaintiffs alleged that certain John and Jane Joe Investors were part of the Enterprise as they were knowing participants in funding Funderz's MCA deals including the six MCA Agreements at issue. Amended Complaint [DE 44] ¶¶ 169-171. Defendants have vehemently denied this allegation through both Joe's testimony saying all of Funderz's deals are self-funded and both Defendants provided verified interrogatory responses stating that no one other than Joe provided funds for the MCA Agreements at issue. SMF ¶¶ 38-41. After Joe testified and after Defendants submitted their interrogatory responses, however, on August 11, 2023, Defendants made a supplemental production, which include numerous emails about the very MCA Agreements at issue between Joe, Gabe and individuals identified as "syndicators" for the MCA Agreements at issue, with specific dollar amounts assigned for each syndicator's contribution to the MCA Agreement's principal. *Id*. ¶¶ 42-47. Gabe also testified he syndicated deals for Funderz, including several of the MCA Agreements at issue. *Id*. ¶ 48. Defendants have consistently denied their existence in their initial disclosures, interrogatory responses, and testimony. *Id.* ¶¶ 38-41.

Defendants also spoliated documents.  According to Joe, after Funderz purportedly shut down in March 2020, the company switched servers and lost access to most of its emails.  *Id.* ¶ 66-67.  Funderz, in contrast, testified that its servers and emails were lost "early 2019," which would have been around the time FTE notified Defendants they had over-collected on an MCA Agreement at issue.  *Id.* ¶¶ 68-69.  Despite purportedly losing access to these emails, Funderz's D/B/As like HOP and BMF continued to file lawsuits in 2019, 2020 and 2021.  *Id.* ¶¶ 140-44, 177-178.  Funderz admits receiving a document preservation notice from FTE in September 2019, but also testified that it had not bothered to review it until well into 2023.  *Id.* ¶ X.  On top of the contradictory dates the Defendants testified to, no Defendant could recall why the servers were purportedly lost.  *Id.* ¶ 176.  Nevertheless, Defendants continued using Funderz email account through August 2022 and produced some documents from 2018.  *Id.* ¶¶ 42-47, 73-74, 144.

### C.    The Undisputable Facts Show That The MCAs Are Usurious Loans

All six MCA Agreements provide that New York law applies and Funderz is a New York limited liability company with Joe as its sole member.  *Id.* ¶ 195.  Each MCA Agreement purported to purchase 10% of all of FTE's future receipts, broadly defined to include virtually anything of future value, while failing to identify any specific receivables being purchased.  *Id.* ¶¶ 196-97, 224-25.  The underwriting for each of the MCA Agreements consisted of reviewing FTE's bank account records in the months prior to entering the first loan on October 12, 2018.  *Id.* ¶¶ 199-200.  FTE's bank accounts for October 1, 2018, to October 15, 2018, showed that (a) FTE's bank account was six-figures in the red by mid-October; and (b) FTE had already sold its receivables to various other MCA lenders who were making several daily debits already from the account.  *Id.* ¶ 200.  Funderz also had an October 15, 2018 email exchange with FTE whereby FTE provided, at Funderz' asking, copies of several MCA Agreements FTE had entered into the week *before* the first MCA Agreement was entered to here.  *Id.* ¶ 201.  Thus, Defendants knew FTE's receivables

-8-

were negative and already sold to other MCA lenders before entering into the MCA Agreements at issue. *Id*. ¶ 202. This put FTE in breach on day one because Funderz required FTE to provide a warranty that its receivables were unencumbered, something Defendants knew was not the case when financing the loans but nevertheless included it as an event of default. *Id*. ¶ 203. Finally, all six MCA Agreements required FTE to collect these already encumbered receipts for Funderz to draw upon, despite other MCA lenders having already purchased the receipts. *Id*. ¶¶ 196-227.

Funderz's own copy of its deal tracking software spreadsheet FundersLink identified that each MCA Agreement had a designed and contemplated term between 49 and 65 business days, which is consistent with simply dividing the Purchased Amount by the MCA Agreements' respective fixed daily remittances. *Id*. ¶¶ 208-209.

The first four MCA Agreements contained discretionary reconciliation provisions, which provided that "the potential reconciliation discussed above are being provided to the Merchant **as a courtesy, and that Business Funding Merchant is under no obligation to provide the same**." *Id*. ¶ 211 (emphasis added). This Court has already found that the last two MCA Agreements <u>did not even contain a reconciliation provision</u>. *Id*. ¶ 214. Notably, Funderz confirmed in testimony that reconciliation was discretionary and not one of the Defendants could recall ever granting a reconciliation request or Funderz even having a reconciliation department. *Id*. ¶¶ 163-68. Indeed, when FTE requested the monies Funderz's over-collected be returned in January 2019, Funderz dragged their feet and tried ignoring FTE for over six months. *Id*. ¶ 216. Joe and Funderz also confirmed that there are other outstanding over-collections from FTE on the MCA Agreements beyond that raised in the January 2019 email chain that have not been returned to FTE. *Id*. ¶ 95, 175. Funderz did confirm, however, that these over-collections would go to itself and its owner Joe. *Id*. ¶ 173.

The first four MCA Agreements also contain bankruptcy as an explicit event of default, while the last two provide bankruptcy recourse to Funderz through the MCA Agreements' guaranties which all provide that Funderz may recover from the guarantor any amounts owed but unrecovered due to FTE's bankruptcy. *Id.* ¶¶ 217-18. Regardless, Joe further testified that he treats all MCA Agreements the same regardless of language changes. *Id.* ¶ 219.

The first four MCA Agreements made just two missed daily payments an event of default, whereas the last two made just <u>one</u> missed payment a default. *Id.* ¶¶ 220-21. Funderz confirmed that a missed payment or two would constitute a default, and **Joe testified that "[i]t's a default also to just miss a payment … or to lower payment is also a default."** *Id.* ¶¶ 137, 222.

Finally, each MCA Agreement stated that the 10% Specified Percentage of FTE's future receivables was a "good-faith approximation of" FTE's receipts. *Id.* ¶¶ 224-25. Joe testified, however, that the fixed daily payments were tied to the size of the loan, not receivables. *Id.* ¶ 228. As a result, when compared to one-another, the MCA Agreements' facial terms demonstrate that the daily remittance rates were selected based on the loan size, not the Specified Percentage:

| MCA Agreement | Daily Payment | Specified Percentage | Defendants' Estimation of FTE Receivables | Repayment Amount |
|---|---|---|---|---|
| 10/12/18 BMF | $14,999 | 10% | $149,999/day | $729,500 |
| 10/16/18 HOP | $29,999 | 10% | $299,990/day | $1,459,000 |
| 10/25/18 BMF | $24,999[1] | 10% | $249,990/day | $1,499,000 |
| 10/25/18 HOP | $39,999 | 10% | $399,990/day | $2,623,250 |
| 11/8/18 BMF | $38,724 | 10% | $387,240/day | $2,323,450 |
| 11/9/18 HOP | $69,999 | 10% | $699,990/day | $4,122,250 |

*Id.* ¶ 227. While the principals on these MCA Agreements on paper would suggest that FTE was at least receiving millions in return for repaying millions more in a matter of weeks, reality was entirely different. Funderz' production revealed that every MCA Agreement had hundreds of

---

[1] Note that the fixed daily remittances is blank in the October 25, 2018 BMF agreement, Heskin Decl. Ex. 3 at 10, but the pay run Defendants produced for this deal show that daily withdrawals were typically $24,999 with a balloon payment of $969,250 on November 9, 2018. *Id.* Ex. 9

thousands of fees assessed and that in total on all six MCA Agreements FTE only received a total of $1,989,688, confirmed by FTE's own bank account records and consistent with Defendants' own chart of the six MCA Agreements.  *Id*. ¶ 267; Heskin Decl. Ex. 19.

When properly viewed as loans, which was always Defendants' intention for its MCA Agreements, each MCA Agreement assessed an interest rate multiple times greater than the 25% criminal usury interest rate limit imposed by New York law, which were between 254% and **excess of 5,000%**.  SMF ¶¶ 235-64.  Based on FTE's bank records, Funderz deposited $1,989,688 in principal for these six loans, and within a few months extracted $7,861,865 from FTE.  *Id*. ¶ 267.

## STANDARD

Rule 56 mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  In the face of insufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessary renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.

## ARGUMENT

## I.     THE MCA'S ARE LOANS AS A MATTER OF LAW

### A.     Defendants Had The Requisite Scienter

In *U.S. v. Grote*, 961 F.3d 105 (2d Cir. 2020), the Second Circuit noted that "RICO imposes no mental state requirement beyond that required by the predicate statute" and that under the New York's usury statute, *mens rea* is established "by knowledge that the interest rate exceeded 25%,

regardless of whether the defendant was aware that such rate was unlawful." *Id.* at 118, n.4. The crux of this dicta concerned whether a person could be found guilty of a *federal crime* even if they were not aware of a *state statute* that did not require scienter. *See id.* ("The *Biasucci* formulation would, under certain circumstances, authorize conviction under RICO of a defendant who *neither knew the rate of interest charged nor that the rate charged was illegal.*") (emphasis added).

The concerns raised by *Grote* have no application here. First, the concern relates to criminal liability, not civil liability. Second, ignorance of the law has never been a defense to a crime. It is certainly not a defense to civil liability. *See Elonis v. United States*, 575 U.S. 723, 734-35 (2008) ("This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim 'ignorance of the law is no excuse' typically holds true. Instead, our cases have explained that a defendant generally must 'know the facts that make his conduct fit the definition of the offense, even if he does not know that those acts give rise to a crime.'") (citing *Staples v. United States*, 511 U.S. 600, 608 (1994)). Indeed, where Congress has intended to carve out an ignorance of the law defense, it has expressly done so within the statute itself. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 583 (2010) ("Likely for this reason, when Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly than here.").

Third, even if these concerns did apply (which they do not), Defendants were aware of New York's usury laws and potential violation thereof by at least December 17, 2017.  SMF ¶¶ 30-31.

Fourth, if Joe did read the decisions cited by his lawyers, he undisputedly knew of New York's usury cap of 25% because that is the entire premise of every one of those decisions. Thus,

the only concern in *Grote*, i.e., that a defendant be aware of the law, is proven by Joe's own contention that he was aware of and relied upon the pre-2018 decisions.

Fifth, the MCA agreements are loans on their face, and New York law presumes that one reads their own contracts. *See Freitas v. Geddes S&L Ass'n*, 63 N.Y. 254, 262 (N.Y. 1984) (intent conclusively presumed if usurious rate is clear from the face of the agreement).

Finally, usurious intent is established by the undisputed extrinsic facts. On May 3, 2016, Joe as Funderz's sole member and owner, opened up a bank account for Funderz's d/b/a HOP in which he explicitly wrote that the nature of Funderz's business was to "Provide small **business loans** to companies requiring funding.  **Loan amounts** range from $10,000 up to a maximum of $40,000."  SMF ¶ 3.  Thus, both Joe and Funderz always understood their MCA Agreements were loans.  What is more, Joe described Funderz as a lender and its products as loans in his own testimony, and Gabe made similar statements in emails to FTE.  *Id*. ¶¶ 27-29, 88-94.

Funderz also created 18 assumed names for itself shortly after its incorporation, of which BMF and HOP are just two.  *Id*. ¶ 4.  One of these D/B/As, MMLendingGroup, puts Defendants' *mens rea* on display in the name itself.  *Id*. ¶ 26.  Others, like HOP, Panthers Capital, WG Capital and Empire Funding, all had websites which explicitly marketed their MCA agreements as "loans" or themselves as "direct lenders."  *Id*. ¶¶ 3-25.  New York courts have held that such advertisements renders MCAs legal lenders for usury purposes.  *People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A), at *20 (N.Y. Sup. Ct. 2023) (finding MCA agreements to be usurious loans were the "Predatory Lenders advertised themselves as lenders").

Defendants also knew they were not purchasing FTE's receivables. Defendants testified that their underwriting process consists of reviewing bank statements, SMF ¶ 199, yet FTE's bank statement immediately prior to the first MCA Agreement showed a negative balance of ($185,209)

-13-

as of October 15, 2018, and, more importantly, that FTE had already sold its receivables to various other MCA lenders that appeared on these bank statements, such as Queen Funding, GTR Source LLC, Green Capital, and Influx Capital.  *Id*. ¶ 200.  There is no way Defendants missed this fact because Funderz e-mailed FTE on October 15, 2018 asking FTE to provide copies of the three MCA agreements FTE entered into with other "**lenders.**" *Id*. ¶¶ 88-94.  In this way, Defendants ensured FTE was in default of the MCAs on day one, because Defendants also required FTE to execute a warranty (which they knew was already violated per above) that "Merchant has good, complete and marketable title to all Receipts[.]" *Id*. ¶ 203. New Your courts have found this conduct renders the MCAs usurious loans.  *Richmond*, at *7 (finding MCAs usurious loans where the "Predatory Lenders made sure that their Borrowers were in default on Day 1 of the MCAs by requiring the Borrowers falsely represent that the collateral (*i.e.*, the accounts receivable) were free and clear of other loans and that they would not pledge those assets to others.  The Predatory Lenders knew this was false").

But to the extent a disputed question still existed in the face of these undisputed facts (which it does not), Plaintiffs would be entitled to an adverse inference. Defendants have consistently tried to defend their practices by arguing in pleadings, motions and testimony that they relied on lawyers to ensure their MCA Agreements were not loans.  For instance, Joe testified that "[e]verything we do [i.e., Funderz] you know, goes through legal, and we always have legal advising us.... We've worked with a number of different attorneys."  *Id*. ¶ 141.  However, Defendants' privilege log discloses **zero** communications between Defendants and any counsel regarding the draft of Funderz's MCA forms. *Id*.  Rather, all communications are with Defendants' current counsel from May 2023.  *Id*.  Joe and Funderz also gave inconsistent dates on when Funderz's allegedly lost its servers. Either way, both timelines admit that Funderz lost its servers

-14-

without explanation shortly **after** FTE first raised a dispute with Defendants concerning their over-collection on January 14, 2019.  *Id*. ¶ 66-72. Funderz also testified that it received a copy of FTE's September 2019 document preservation notice, but did not bother looking at this until a few days before its deposition.  *Id*. ¶ 176.

"On summary judgment, an adverse inference may be warranted based on spoliation of evidence.  Such an inference is warranted if the Plaintiff can establish: (1) the evidence at issue existed; (2) the evidence was in the exclusive possession of the non-moving party; and (3) the non-production of the evidence has not been satisfactorily explained."  *Collins v. Walmart Stores East, LP*, 19-CV-1691, 2022 U.S. Dist. LEXIS 113057, at *22-23 (E.D.N.Y. June 27, 2022); *see also*, *Mail v. Fed. Ins. Co.*, 720 F.3d 387, 391-93 (2d. Cir. 2013) (similar).  Here, Defendants have testified the documents between them and their attorneys discussing the MCA Agreements existed and these would have been on Funderz's servers, SMF ¶ 140-41, 193, but no such documents were produced nor appeared in their privilege log.  Heskin Decl. Ex. 58.  Both Funderz and Joe admitted the servers were lost *after* FTE first raised a dispute with Defendants regarding over-collection.  *Id*. ¶¶ 69-72.  Joe admits the servers were lost sometime after March 2020, well *after* Funderz received document preservation notices from FTE.  *Id*. ¶ 139, 174.  Funderz' 30(b)(6) witness testified the servers were lost right after FTE put Defendants on notice on January 14, 2019, that there was a dispute regarding over-collections, and that Funderz received but ignored FTE's preservation notice.  *Id*. ¶¶ 175-76.  When asked "Why did Funderz.net and Funderslink change servers in early 2019?" Funderz testified "I don't know."  *Id*. ¶ 86.  Nevertheless, Joe and Funderz emails were used through August 2022 and Funderz was able to produce selected emails from 2018 and early 2019.  *Id*. ¶¶ 42-46, 74.  Consequently, Defendants have failed to explain why they have failed to produce documents or a privilege log to substantiate their claim that they had

-15-

discussions with lawyers during the relevant time period about the legality of their MCA Agreements while simultaneously and repeatedly claiming these documents and communications exist and occurred. Therefore, Plaintiffs are entitled to an adverse inference that Defendants <u>did not</u> rely upon the advice of counsel.

Finally, Defendants operate their business to ensure their MCA Agreements are absolutely repayable because Defendants accept no risk of loss and treat them as having fixed terms.  For instance, Defendants have filed hundreds of lawsuits in New York state against merchants who defaulted under what Defendants admit are "loans" but nevertheless submit affidavits to obtain judgments in which they describe their products as legitimate purchases of receivables.  SMF ¶¶ 3-31.[2]  Defendants also demonstrated they unlawfully over-debit merchants to accelerate the term. *Id.* ¶¶ 75-79.  Moreover, Joe's brother, Ben Isaacov—who holds himself out as CEO of and files affidavits on behalf of Panthers Capital—a D/B/A of Funderz—resorts to threatening merchants with antisemitic harassment if they fall behind on payments.  *Id*. ¶ 182-84.

Thus, all evidence shows that (i) Defendants advertised and described their MCAs as "loans"; (ii) Defendants knew they were not purchasing FTE's receivables when entering into the MCAs; and (iii) Defendants engage in a variety of unlawful behavior to ensure their loans are absolutely repayable.  *Mens rea* for RICO violations premised on the collection of unlawful debt—to the extent it is even required—has been overwhelmingly established by the undisputed facts.

## B.      The MCAs Are Usurious Loans

All evidence involving the negotiation and underwriting of the MCAs demonstrate they were loans. Defendants internally and in external marketing materials described their MCAs as

---

[2] The New York Attorney General has recently obtained a judgment ordering the vacatur of similar judgments where the MCA fraudulently misrepresented to the Clerk of New York that the MCAs were legitimate sales of receivables when they were in actuality criminally usurious loans. *People v. Richmond,*  at *38.

"loans." SMF ¶¶ 3-25.  Defendants "underwriting" revealed that FTE had already sold its purported receivables to other MCAs that Defendants described as other "lenders."  *Id.* ¶¶ 88-93. Defendants accelerated repayment by making more than 43 unauthorized extra debits of FTE's account.  *Id.* ¶¶ 75-79.  Defendants use confessions of judgment to enforce their loans and use heinous threats to merchants to ensure their loans are repayable.  *Id.* ¶¶ 6-9, 56, 65, 179-84.  The MCA's terms only further solidify they are loans with interest rates greatly exceeding New York's criminal usury limit of 25%.

Under recent Second Circuit authority, to determine whether MCAs are really loans, courts consider at least three, non-exhaustive factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC,* *2023 U.S. App. LEXIS 14241, \*3 (2d Cir. June 8, 2023).*  Other non-exhaustive factors courts applying New York law consider in evaluating whether MCAs are loans include: (4) whether the agreements identify particular revenue or accounts that were supposedly purchased; (5) whether the merchant is responsible for collecting the future receipts; (6) whether default is declared after just a few missed payments; and (7) whether the daily payment rates appear to be good faith estimates of merchant's receivables. *See* [DE 140] at 17-24 (This Court's ruling embracing these factors in denying Joe's and Funderz's motion to dismiss the Amended Complaint on the pleadings); *LG Funding, LLC v. United Senior Properties of Olathe, LLC,* 181 A.D.3d 664, 666 (2d Dep't 2020); *Davis v. Richmond Capital Group,* 194 A.D.3d 516, 517 (1st Dep't 2021); *Haymount Urgent Care PC v. GoFund Advance, LLC,* 609 F. Supp. 3d 237 (S.D.N.Y. 2022); *Lateral Recovery LLC v. Queen Funding LLC,* 2022 U.S. Dist. LEXIS 129032, \*12-13 (S.D.N.Y. July 20, 2022); *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.,* 632 F. Supp. 3d 402 (S.D.N.Y.

-17-

2022). Applying these factors to the MCAs and undisputed facts lead to the unavoidable conclusion that they are usurious loans both in form and in substance.

First, the MCAs provide recourse to Funderz in the event of FTE's bankruptcy.  The first four MCAs have bankruptcy as an explicit even of default, SMF ¶ 217, which weighs heavily in favor them being construed as loans.  *LG Funding*, at 666.  The last two MCAs also provide Funderz bankruptcy recourse by holding FTE's guarantors liable to Funderz for any loan amounts FTE failed to pay due to bankruptcy.  SMF ¶ 218.  Bankruptcy recourse through enforcement of personal guarantees is a well-recognized factor making MCAs loans. *See LG Funding*, at 666; *CMS*, at 456; *New Y-Capp v. Arch Cap. Funding LLC*, 2022 U.S. Dist LEXIS 180309, *13 (S.D.N.Y. Sept. 30, 2022)* ("And other provisions 'worked to ensure while bankruptcy may no longer have been an express default under the revised standard form of MCA Agreement, the guarantor continued to be absolutely liable for repayment in the event of a bankruptcy filing."). Moreover, Joe testified that even if there were small changes to the form MCA Agreements—such as changing bankruptcy from an event of default to a recourse in the guaranty—"everything was done the same, same order of business."  SMF ¶ 219.

Second, as confirmed by their production, Defendants intended that the MCAs have finite term between 49-65 business days.  *Id.* ¶ 208.  Uncoincidentally, the terms listed in Funders own records for the MCAs are identical to the outcome of simply dividing the loans' repayment about by the fixed daily payments. *Id*. ¶¶ 236-260. Even without the benefit of Funderz spelling out the definite terms clearly in their own records, courts applying New York law have found this sufficient to show the MCAs have finite terms.  *Queen*, at *16 ("a de facto term plausibly exists. The period of payment can be easily calculated by dividing the amount FTE owes by the amount of daily payments"); *Haymount*, at 248 n. 5 (similar). Since the loan repayment amount and fixed

-18-

loan terms are known, simple math demonstrates that each of the MCAs here had annual interest rates of as 254%, on the low end, and in **excess of 5,000%** on the high end.  SMF ¶ 235-64.

Third, the MCAs either lack a reconciliation provision entirely, or have a discretionary one that is illusory.  *Id.* ¶¶ 211-15.  Specifically, the four MCAs that have reconciliation provisions provide that "reconciliation discussed above are being provided to the Merchant as a courtesy, and that [Funderz] is under no obligation to provide same" and further provides that reconciliation can be denied in Funderz's "sole discretion" should merchant fail to provide any and all documentation it may request.  *Id.* ¶ 211.  This Court and numerous others, including the Second Circuit, have found nearly identical reconciliation provisions to be shams.  *Fleetwood*, at *4 (finding MCA Agreement to be a loan where "any adjustment to the daily amount was subject to Richmond's 'sole discretion'"); *Haymount*, at *21; *Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*, 220 A.D.3d 745, 746-747 (2d Dep't 2023) (finding MCA agreements loans where lender was "under no obligation" to reconcile payment).

Finally, discovery confirmed Funderz never performed reconciliations. No witness could confirm whether Funderz even had a reconciliation department, nor could Funderz confirm it had any policies governing reconciliation.  SMF ¶¶ 163-64.  Significantly, no witness could give a single example of Funderz granting a merchant's reconciliation request.  *Id.* ¶¶ 167-68.  Funderz did, notably, confirm that whether to grant reconciliation was discretionary and further testified that the MCAs "are absolutely repayable . . . they [the merchants] have to pay back."  *Id.* ¶¶ 165-69.  Thus, both on paper and in practice, Defendants never provided for reconciliation, which makes the MCAs loans.  *Davis*, at 517; *LG Funding*, at 666.

Fourth, none of the six MCAs identify any specific receivables Funderz was allegedly purchasing, *see generally* SMF Exs. 1-6, rather, they broadly described purchasing virtually every

theoretical thing FTE owned or could come to own.  *Id.*  Discovery had further demonstrated that Defendants **knew** they could not buy FTE's receivables because they had already been sold to other MCA "lenders" in Defendants' own words.  SMF ¶¶ 200.  The MCA's failure to identify the specific FTE receivables Defendants were purchasing—coupled with the fact Defendants knew FTE's receivables were negative and already purchased—demonstrates these were absolutely repayable loans.  *Haymount*, at 249 ("Nor does any MCA agreement identify particular revenues or accounts that were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer.'") (citations omitted).

Fifth, despite Funderz purportedly purchasing FTE's receivables, FTE remained responsible for collecting the receivables Funderz's allegedly purchased and depositing them into a bank account for Funderz to draw upon.  *See, e.g.*, Heskin Decl. Ex. 1 at 3 ("Merchant understands that it is responsible for ensuring that the specified percentage to be debited by BMF remains in the account and will be responsible for any fees incurred by BMF resulting from a rejected ACH attempt or an event of default").  This too further renders the MCAs loans.  *Haymount*, at 249 (ruling MCA agreements like loans where "the MCA agreements leave merchants with the responsibility to collect revenues from all their accounts").

Sixth, missing just one payment or even lowering payment constituted an event of default.  *See* SMF Exs. 1-6.  *CMS*, at 458 (finding MCA Agreement like a loan where the "merchant has to pay a fixed amount on a daily basis.  If it fails to do so just three times, a default is declared"); *Davis*, 517 (finding MCAs like a loan where there were "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default"); *Queen*, *18 (same); *Haymount*, at 249 (similar); *Richmond*,  at *7-8 (finding MCAs to be loans where default would occur after three missed payments).  Funderz testified that missing a payment constitutes a

default under the MCAs and that they are "absolutely repayable."  SMF ¶ 138, 222.  Joe testified

the same, stating that "[i]t's a default also to just miss a payment . . . or to lower payment is also a

default."  *Id*. ¶ 137.  Thus, this factor too mandates a finding that the MCAs are loans.

Seventh, and finally, while the MCAs represented that their fixed daily remittances were a

"good faith" estimate of the specific percentage of FTE's receivables Funderz purportedly

purchased, *see generally* Heskin Decl. Exs. 1-6, comparing the MCAs to one another disproves

this claim entirely, rendering the MCAs loans.  *Davis*, at 517.  Not only did Joe testify that the

fixed daily payments were based on what the merchant "can afford," the terms of the six MCAs

entered into in short order or *on the same day* provided wildly inconsistent estimations, with the

only discernable trend being the loan amount. SMF ¶¶ 135, 227-228.

## II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST JOE ON THE RICO CLAIM

Plaintiffs are entitled to summary judgment with respect to their RICO claim against Joe

because the undisputed facts establish each of the elements necessary to impose RICO liability:

(1)     Joe is a culpable person;
(2)     There was a RICO enterprise;
(3)     Its activities affected interstate commerce;
(4)     Joe conducted the affairs of the enterprise through collection of unlawful debt;
(5)     The debt was unenforceable because of state or federal laws relating to usury;
(6)     The debt was incurred in connection with "the business of lending money";
(7)     The usurious rate was at least twice the enforceable rate; and
(8)     FTE was injured in its business or property.

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985).

### A.      Joe is a culpable person under RICO.

A RICO claim requires a "person" who violated Section 1962(a), (b), or (c).  18 U.S.C. §

1962.  Section 1961(3) defines a "person" to include "any individual or entity capable of holding

a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  Plainly, Joe is a person under

RICO.  *See Kushner,* 533 U.S. at 163 (2001) (the sole shareholder of a corporation is a "person" who can be held liable for conducting the affairs of the corporation in violation of RICO).

### B.      Funderz is a RICO Enterprise.

A company, standing alone, can be a RICO enterprise. *Kushner,* 533 U.S. at 163. "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more "separateness" than that."  *Id.*  As the Supreme Court explained: "Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual . . . capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation." *Id.* (citing 18 U.S.C. §§ 161(3) and (4). Moreover, "the employee and the corporation are different "persons," even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Id.*

Funderz clearly exists as a separate and distinct legal entity from Joe.  Among other things, Funderz is a New York limited liability company, SMF ¶ 1; maintains its own bank accounts, *Id.* ¶¶ 2-3, 124; and regularly contracts with merchants, *Id.* ¶¶ 140-48.  Plainly, Funderz exists as a separate legal entity from Joe and can, itself, be a RICO enterprise. *Kushner,* 533 U.S. at 163.

### C.      The Enterprises' affairs affect interstate commerce.

A RICO enterprise is involved in "interstate commence" when it is itself "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce." *United States v. Garcia,* 143 F.Supp.2d 791, 806 (E.D. Mich. 2000) (quoting *United States v.*

_Robertson_, 514 U.S. 669, 672 (1995)).  The required interstate commerce nexus is "minimal."

_Defalco v. Bernas_, 244 F.3d 286, 309 (2d Cir. 2001). It is sufficient to show the use of interstate

commerce through the use of mail, interstate wires, or other instrumentalities of interstate

commerce. _See Haggiag v. Brown_, 728 F.Supp. 286, 295 (S.D.N.Y. 1990) (wire transfer of funds

to foreign corporation sufficient); _City of New York v. Cyco.Net, Inc._, 383 F. Supp. 2d 526, 524

(S.D.N.Y. 2005) (use the wires and mail to advertise, sell, and/or deliver their wares to other states,

thus their overall scheme has an effect on interstate commerce).

There can be no question that Plaintiffs have satisfied this requirement.  Funderz is a New

York company with a New York address.  SMF ¶ 1. Joe, however, is a Florida resident and citizen.

SMF ¶ 123.  All of the communications with FTE were made through email or telephone through

persons located in New York and Florida.  The Agreements were negotiated and solicited in New

York where Gabe was located and signed by FTE, a Nevada company, in Florida, while Funderz

was a New York company with a New York office.  _Id._ ¶¶ 229-34.  Funderz wired the advances

from a IDB Bank located in New York to FTE's bank in Bank of America account in Richmond,

Virginia and Funderz used an interstate payment process to affect the Daily Payments.  _Id._ ¶¶ 234.

Moreover, Funderz regularly contracted with merchants throughout the United States,

communicated with them through emails and used ACH withdrawals to withdraw funds from bank

accounts throughout the country.  _Id._ ¶¶ 148, 229-34, 265.  Thus, Joe and the Enterprise, was

involved in interstate commerce.  _Cyco_, 383 F. Supp. 2d at 524 (use of wires and mails constitutes

interstate commerce); _Fid. Nat'l Title Ins. Co. v. Castle_, No. C11-00896 SI, 2011 U.S. Dist. LEXIS

141297 (N.D. Cal. Dec. 8, 2021) (wire transfers between banks constitutes interstate commerce).

**D.      Joe conducted the affairs of the RICO enterprise to collect of unlawful debt.**

A person "conducts" the affairs of an enterprise when he "participates in the operation or

management of the enterprise itself." _Reves v. Ernst & Young_, 507 U.S. 170, 178-79 (1993).  A

-23-

person "participates in the operation or management of the enterprise" when he "directs" or has "some part in directing" the enterprise's affairs." *Id.* at 179. Here, Joe was the managing member and sole owner of Funderz, the RICO enterprise. SMF ¶¶ 120-22. He was also the sole signatory with respect to Funderz' bank accounts. *Id.* ¶¶ 120-126. Finally, he had final say with respect to all matters involving Funderz. *Id.* ¶ 127. In short, not only did Joe have "some part in directing" the Enterprise's affairs, he admittedly controlled the affairs of the entire Enterprise.

### E.     The debt was unenforceable in whole under New York usury law.

The MCAs are unenforceable in whole. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021) ("Thus, loans proved to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument.").

### F.     The debt was incurred in connection with "the business of lending money."

The requirement that loans be incurred in connection with the "business of making loans" is aimed at excluding "occasional usurious transactions" by one who is not in the business of lending. *Durante Bro. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1984). This not such a case. Funderz was in the business of advancing funds to merchants across the country under so-called merchant agreements that, in form and substance, were identical to the FTE Agreements. SMF ¶¶ 148-51. From the face of the Form Agreements, including the FTE Agreements, Joe knew that the MCA Agreements were not true-sales of future receivables but rather loans that charged usurious rates. *Freitas*, 63 N.Y. at 262 (intent conclusively presumed if usurious rate is clear from the face of the agreement). Plainly, Funderz was "in the business of lending" at usurious rates.

### G.     The interest rate was at least twice the applicable rate.

The interest rates under the MCA Agreements were all in excess of 50%. SMF ¶¶ 235-64.

### H.      FTE was injured in its business or property.

Plaintiffs suffered damages in the amount of $5,872,177. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 148032, at *17 (S.D.N.Y. Aug. 17, 2022) ("Fleetwood was damaged in the amount of $75,117, the sum that was debited from its account less the sum it received and was able to enjoy. It is entitled to have that sum trebled under RICO, 18 U.S.C. § 1964(c)."). Funderz deposited a total of $1,989,688 and FTE repaid $7,861,865. Heskin Decl. Exs. 35 & 70. Thus, Funderz collected $5,872,177 more from FTE than it advanced. The figure trebled is $17,616,531, not including Plaintiffs' reasonable attorneys' fees, which are also recoverable and ongoing. 18 U.S.C. § 1964(c).

## III.     LATERAL IS ENTITLED TO SUMMARY JUDGMENT AS ASSIGNEE.

On October 10, 2019, Lateral and certain FTE entities entered into a Collateral and Strict Foreclosure agreement ("Foreclosure Agreement"), whereby certain FTE entities assigned to Lateral the claims at issue by this motion. SMF ¶¶ 270-276; Heskin Decl. Ex. 73 at 2, § 2.1, § 3.1. The Foreclosure Agreement was an exercise of Lateral's rights due to FTE's preexisting debt to Lateral in excess of $50 million. *Id.* Lateral is therefore entitled to summary judgment as the lawful assignee of those claims. *See* Fed.R.Civ.P. Rule 17(a).

In the alternative, should this Court find that FTE's assignment of the claims set forth herein to Lateral are invalid—which Plaintiffs vehemently oppose—then judgment should be entered in favor of FTE, the original parties to the transactions at issue that imposed unlawful debt.

## CONCLUSION

For the reasons above, Plaintiffs are entitled to summary judgment on their First Cause of Action for RICO premised on the collection of unlawful debt against Defendant Joe Isaacov as there are not questions of fact or law that these MCA Agreements were usurious loans.

February 22, 2024

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
Alex D. Corey
7 Times Square, STE 29
New York, NY 10036
(215) 864-7000
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

32235821v.1