# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LATERAL RECOVERY LLC,
BENCHMARK BUILDERS, INC., FTE
NETWORKS, INC., JUS-COM LLC, and
FOCUS WIRELESS, LLC,

              Plaintiffs,

    v.

FUNDERZ.NET, LLC d/b/a HOP CAPITAL
and d/b/a BUSINESS MERCHANT
FUNDING, JOSEPH YITZCHAKOV a.k.a
JOSEPH ISAACOV, GAVRIEL
YITZCHAKOV a.k.a. GABE ISAACOV, and
JOHN AND JANE DOE INVESTORS,

              Defendants.

Case No.: 1:22-cv-02170-MMG

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF FUNDERZ.NET, LLC AND JOSEPH YITZCHAKOV'S MOTION FOR SUMMARY JUDGMENT

Hilda Piloto (admitted pro hac vice)
SAUL EWING LLP
701 Brickell Avenue, 17th Floor
Miami, FL 33131
(305) 428-4500
Hilda.Piloto@saul.com

Stephanie L. Denker
SAUL EWING LLP
1270 Avenue of Americas, Suite 2800
New York, New York 10020
Tel: (212) 980-7200
Fax: (212) 980-7209
Stephanie.Denker@saul.com

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

UNDISPUTED MATERIAL FACTS ....................................................................... 1

I.      FTE And Its Affiliates ..................................................................................... 1

II.     Lateral And Its Affiliates ................................................................................. 2

III.    Defendants ........................................................................................................ 3

IV.     The SMAs .......................................................................................................... 4

        A.      The Form Agreements ........................................................................... 5

        B.      Funderz's Underwriting For The SMAs .............................................. 7

        C.      Repayment Of The SMAs By FTE ...................................................... 7

V.      Plaintiffs' Claims ............................................................................................. 7

Legal Standard .............................................................................................................. 8

ARGUMENT ................................................................................................................. 8

I.      Defendants Are Entitled To Summary Judgment On Plaintiffs' Section 1962(c)
        RICO Claim ...................................................................................................... 8

        A.      Funderz, Joe, And Gabe Are Not Distinct RICO "Persons" And Cannot
                Form An "Enterprise" ........................................................................... 9

        B.      Plaintiffs Cannot Establish The Existence Of A RICO Enterprise Because
                The "Enterprise" And The Racketeering Activity Are One And The Same ....... 11

        C.      Plaintiffs Cannot Establish The Collection Of An "Unlawful Debt" .................. 12

                1.      The Third HOP Agreement Is Exempt From The Usury Laws
                        Because It Exceeds $2,500,000 ................................................. 13

                2.      The SMAs Are Not Loans ......................................................... 13

                        (a)     The SMAs Have Mandatory Provisions To Ensure That The
                                Merchant's Payments Are Consistent With Its Actual
                                Receipts ........................................................................... 15

                        (b)     The SMAs Have No Finite Term ................................... 16

        (c)    The Recourse In Form 1 If FTE Declared Bankruptcy Is Insufficient For Finding A Loan, And Bankruptcy Is Not A Specified Event Of Default In Form 2 ......................................... 17

      3.    Plaintiffs Cannot Establish Defendants Knew Their Conduct Was Illegal ........................................................................................................ 18

    D.    Plaintiffs Cannot Prove Predicate Acts Of Wire Fraud ....................................... 20

II.    Defendants Are Entitled to Summary Judgment On Plaintiffs' Section 1962(d) RICO Conspiracy Claim ...................................................................................................... 21

    A.    The RICO Conspiracy Claims Fail As A Matter of Law Because Plaintiffs Cannot Prove A Substantive RICO Violation ..................................................... 21

    B.    The RICO Conspiracy Claims Further Fails As A Matter of Law Because The Intracorporate Conspiracy Doctrine Bars the Claim .................................... 22

III.    Plaintiffs Do Not Have RICO Standing ................................................................................ 23

    A.    Lateral Should Be Dismissed Because It Is Not The Real Party In Interest ........ 23

    B.    FTE's Affiliates Were Not The Intended Target Of The Alleged Conduct, And Thus, Do Not Have The Requisite Standing To Bring RICO Claims .......... 25

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*,
　　645 F.3d 522 (2d Cir. 2011).................................................................13

*Banque Arabe Et Internationale D'Investissement v. Maryland Natl. Bank*,
　　57 F.3d 146 (2d Cir. 1995)..................................................................24

*Boneta v. Rolex Watch USA, Inc.*,
　　232 F. Supp. 3d 354 (S.D.N.Y. 2017)...................................................21

*Cohen v. Cohen*,
　　993 F. Supp. 2d 414 (S.D.N.Y. 2014)...................................................25

*Cruz v. FX Direct Dealer, L.L.C.*,
　　720 F.3d 115 (2d Cir. 2013)...............................................................9, 10

*D'Addario v. D'Addario*,
　　901 F.3d 80 (2d Cir. 2018).................................................................11

*Dae Hyuk Kwon v. Santander Consumer USA*,
　　742 F. App'x 537 (2d Cir. 2018) ........................................................12

*Demaree v. Castro*,
　　No. 22-CIV-8772-CM-SN, 2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023)...........9, 10

*Discon, Inc. v. NYNEX Corp.*,
　　93 F.3d 1055 (2d Cir. 1996)...............................................................10

*Elonis v. United States*,
　　575 U.S. 723 (2015)..........................................................................18

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*,
　　822 F.3d 620 (2d Cir. 2016)...............................................................8

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
　　385 F.3d 159 (2d Cir. 2004)...............................................................22

*First Nationwide Bank v. Gelt Funding Corp.*,
　　27 F.3d 763 (2d Cir. 1994).................................................................25

*Greenwald v. Hall*,
　　No. 01-Civ-5405-RO, 2003 WL 164279 (S.D.N.Y. Jan. 23, 2003) ............25

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
　　609 F. Supp. 3d 237 (S.D.N.Y. 2022)................................................13, 18

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
　No. 22-CV-1245 (JSR), 2023 WL 5521901 (S.D.N.Y. Aug. 28, 2023)..............................21

*Jeffreys v. City of New York*,
　426 F.3d 549 (2d Cir. 2005)................................................................................................8

*Katzman v. Victoria's Secret Catalogue*,
　167 F.R.D. 649 (S.D.N.Y. 1996) ........................................................................................8

*Kottler v. Deutsche Bank AG*,
　607 F. Supp. 2d 447 (S.D.N.Y. 2009).................................................................................11

*Kriss v. Bayrock Grp. LLC*,
　No. 10-CIV-3959-LGS, 2016 WL 7046816 (S.D.N.Y. Dec. 2, 2016)..................................22

*Little v. City of New York*,
　487 F. Supp. 2d 426 (S.D.N.Y. 2007).................................................................................22

*Lynn v. McCormick*, No.
　17-CV-1183-CS, 2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017)......................................10, 11

*Manson v. Stacescu*,
　11 F.3d 1127 (2d Cir. 1993)...............................................................................................25

*McKinney v. Moore*,
　No. 04-Civ-07926-RCC, 2007 WL 1149253 (S.D.N.Y. Apr. 16, 2007)..............................25

*NML Cap. v. Republic of Argentina*,
　621 F.3d 230 (2d Cir. 2010)...............................................................................................13

*Official Publications, Inc. v. Kable News Co.*,
　775 F. Supp. 631 (S.D.N.Y. 1991)........................................................................................9

*Paris Partners, L.P. v. Russo*,
　No. 94-CV-5684, 1995 WL 746585 (S.D.N.Y. Dec. 14, 1995) ...........................................25

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*,
　No. 2:16-CV-1545-DRH-GRB, 2019 WL 1473090 (E.D.N.Y. Apr. 3, 2019)................15, 17

*Reich v. Lopez*,
　858 F.3d 55 (2d Cir. 2017)..............................................................................................20, 21

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
　30 F.3d 339 (2d Cir. 1994).................................................................................................10

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
　84 F.3d 629 (2d Cir. 1996).................................................................................................20

*Star Funding, Inc. v. Vault Minerals, LLC*,
No. 15-cv-03026-GBD, 2017 WL 7791558 (S.D.N.Y. Aug. 10, 2017)................................13

*Streamlined Consultants, Inc. v. EBF Holdings LLC*,
No. 21-CV-9528-KMK, 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022)................................14

*Three Crown Ltd. P'ship v. Caxton Corp.*,
817 F. Supp. 1033 (S.D.N.Y. 1993)......................................................................................9

*U.S. v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989)...............................................................................................19

*U.S. v. Dupre*,
339 F. Supp. 2d 534 (S.D.N.Y. 2004)...................................................................................20

*U.S. v. Grote*,
961 F.3d 105 (2d Cir. 2020)..................................................................................................18

*U1it4less, Inc. v. FedEx Corp.*,
871 F.3d 199 (2d Cir. 2017)...............................................................................................9, 10

*US Info. Group LLC v. EBF Holdings, LLC*,
No. 22-CV-6661-PKC, 2023 WL 6198803 (S.D.N.Y. Sept. 22, 2023) ...............14, 15, 17, 18

*Wade Park Land Holdings, LLC v. Kalikow*,
589 F.Supp.3d 335 (S.D.N.Y. 2022).....................................................................................13

*Weir v. Cenlar FSB*,
No. 16-CV-8650-CS, 2018 WL 3443173 (S.D.N.Y. July 17, 2018)......................................11

*Williams v. Affinion Grp., LLC*,
889 F.3d 116 (2d Cir. 2018).................................................................................................22

*Williamson v. U.S.*,
207 U.S. 425 (1908)..............................................................................................................20

*Womack v. Cap. Stack, LLC*,
No. 18-cv-4192, 2019 WL 4142740 (S.D.N.Y. Aug. 30, 2019).......................................14, 19

STATE CASES

*Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*,
69 N.Y.S.3d 798 (1st Dep't 2018) .......................................................................................19

*IBIS Cap. Grp., LLC v. Four Paws Orlando LLC*,
No. 608586/16, 2017 WL 1065071 (N.Y. Sup. Ct. Mar. 10, 2017) ......................................15

*Justinian Capital SPC v. WestLB AG*,
28 N.Y.3d 160 (2016) .......................................................................................................23, 24

*K9 Bytes, Inc. v. Arch Cap. Funding, LLC*,
    56 Misc. 3d 807 (N.Y. Sup. Ct. 2017) ..................................................................17

*LG Funding LLC v. United Senior Properties of Olathe, LLC*,
    181 A.D.3d 664 (2d Dep't 2020) ........................................................................14

*Merch. Cash & Cap., LLC v. Transfer Int'l Inc.*,
    No. 605136/16, 2016 WL 7213444 (N.Y. Sup. Ct. Nov. 2, 2016) ...................18, 19

*Merch. Funding Servs., LLC v. Micromanos Corp.*,
    No. EF000598-2017 (N.Y. Sup. Ct. May 4, 2017) ..............................................19

*Singh v. BMT Cap. Grp.*,
    No. 600715-2023, Doc. No. 29 (N.Y. Sup. Ct. Nassau Cnty. Nov. 15, 2023) .......14

*Singh v. The LCF Grp., Inc.*,
    No. 601297-23, 2023 WL 5760139 (N.Y. Sup. Ct. July 25, 2023) ...........14, 15, 17

*Spin Cap., LLC v. Golden Foothill Ins. Services, LLC*,
    No. 595367/2022, 2023 WL 2265717 (N.Y. Sup. Ct. Feb. 28, 2023) ...................13

*Unique Funding Solutions LLC v. A-Z Imports Exports LLC*,
    183 N.Y.S.3d 727 (N.Y. Sup. Ct. 2023) ........................................................14, 17

*Yellowstone Cap. LLC v. Cent. USA Wireless LLC*,
    110 N.Y.S.3d 485 (N.Y. Sup. Ct. 2018) ............................................................19

*Yellowstone Cap. LLC v. Cent. USA Wireless LLC*,
    60 Misc. 3d 1220(A) (N.Y. Sup. Ct. 2018) ........................................................19

**FEDERAL STATUTES**

18 U.S.C. § 1961(6) ...............................................................................................13

18 U.S.C. § 1962(c) ........................................................................................... passim

18 U.S.C. § 1962(d) ........................................................................................... passim

Fed. R. Civ. P. 56(a) ................................................................................................8

**STATE STATUTES**

N.Y. GEN. OBLIG. LAW § 5-501(6)(b).....................................................................13

N.Y. Judicial Law § 489 ......................................................................................23, 24

N.Y. Penal Law § 190.40........................................................................................18

## PRELIMINARY STATEMENT

This case involves six Secured Merchant Agreements ("SMAs") entered into by FTE Networks, Inc. ("FTE") during a time when FTE was publicly traded on the New York Stock Exchange. FTE was ultimately delisted, and in July 2021, two of FTE's principals were sued by the SEC and criminally indicted for a scheme to defraud FTE's investors. Funderz.net, LLC d/b/a HOP Capital and Merchant Funding ("Funderz") was merely a pawn in FTE's principals' scheme. Nevertheless, FTE, three of its affiliates, and the alleged assignee of FTE's claims have brought this RICO action against Defendants under 18 U.S.C. §§ 1962(c) and (d).

Funderz and Joseph Isaacoff ("Joe" and collectively "Defendants") are entitled to summary judgment for the following reasons. ***First***, the Section 1962(c) claim fails as a matter of law because (a) the RICO "persons" cannot form a RICO "enterprise," (b) the RICO "enterprise" and the racketeering activity are one and the same, (c) there was no collection of unlawful debt, and (d) there was no wire fraud. ***Second***, the Section 1962(d) claim fails as a matter of law because there is no underlying substantive RICO violation and the intracorporate conspiracy doctrine bars the claim. ***Third***, neither Lateral nor FTE's affiliates have standing to bring RICO claims.

## UNDISPUTED MATERIAL FACTS[1]

### I.   FTE AND ITS AFFILIATES

FTE was a publicly traded "leading network infrastructure solutions company for Fortune 500 companies" and had "solid background in managing engineering and deployment teams, from contract negotiations to final product." [JSMF ¶¶ 30-34] In April 2017, FTE acquired Benchmark Builders, Inc. ("Benchmark") for $75 million. [SMF ¶ 1] Jus-Com LLC and Focus Wireless are

---

[1] For a complete statement of the material undisputed facts and underlying evidentiary support, Defendants respectfully refer the Court to the parties' Joint Local Rule 56.1 Statement of Material Facts ("JSMF") with accompanying exhibits and Defendants' Rule 56.1(a) Statement of Undisputed Material Facts ("SMF") with accompanying exhibits, all of which are incorporated herein by reference. Those facts are summarized herein.

also affiliated with FTE. [JSMF ¶ 25] Only FTE dealt with Defendants. [SMF ¶ 45]

At the relevant time, FTE's Chief Executive Officer was Michael Palleschi and its Chief Financial Officer was David Lethem. [JSMF ¶¶ 26-27] In July 2021, the SEC sued Palleschi and Lethem for conducting a "multi-year, multi-faceted accounting fraud" and engaging "in two schemes to fraudulently inflate FTE's revenues and paint a false picture of [FTE's] finances." [JSMF ¶ 36] Palleschi and Lethem were also criminally charged for their scheme to defraud FTE's investors by, among other things, inflating FTE's revenues for certain periods by as much as 108%, misappropriating millions for personal use, and concealing FTE's issuance of convertible notes. [JSMF ¶ 37] Both pled guilty. [JSMF ¶ 38] When pleading guilty, Palleschi admitted that while CEO, "[he] worked with others at FTE to misrepresent FTE's financial condition." [JSMF ¶ 39]

## II.   LATERAL AND ITS AFFILIATES

In October 2015, Lateral Juscom Feeder LLC ("Lateral Juscom") entered into a Credit Agreement with Jus-Com whereby "the lenders agreed to extend loans and other financial accommodations." [JSMF ¶ 141; Doc. 44 ¶ 64] After a default under the Credit Agreement in July 2019, Lateral Juscom foreclosed on certain assets and entered into "a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the 'Foreclosure Agreement')" with FTE. [JSMF ¶¶ 143-144] Through the Foreclosure Agreement, an approximate $55 million loan from Lateral U.S. Credit Opportunities Fund to FTE was extinguished in exchange for FTE's agreement to "turnover its interest in [certain] collateral including . . . the claims asserted" in this Lawsuit and all its equity interest in Benchmark.[2] [JSMF ¶¶ 144, 145, 149] The Foreclosure Agreement discloses no purchase price obligation. [SMF ¶ 4]

The rights to the claims brought in this Lawsuit were assigned to Plaintiff Lateral Recovery

---

[2] At the time of the foreclosure, Lateral-affiliated entities obtained a 50% equity interest in Benchmark, which was valued between $30 and $40 million, and cash. [JSMF ¶¶ 145, 154]

LLC ("Lateral") to "recoup some of" the losses caused by "[t]he fraud by Palleschi and Lethem." [JSMF ¶¶ 145, 150] Lateral was incorporated two days before the Foreclosure Agreement, and was organized "for the specific purpose of taking possession of and pursing certain commercial claims belonging to" FTE and its affiliates. [JSMF ¶¶ 146-147]

Several months after the foreclosure, FTE, under the control and management of Lateral-affiliated entities and persons, began searching for funding. [JSMF ¶¶ 155-158] On February 8, 2019, FTE entered into a Purchase Agreement with CFG Merchant Solutions ("CFG"), a merchant cash advance business in Lateral Investment Management's portfolio ("the CFG Agreement"). [JSMF ¶¶ 159-160; SMF ¶ 62] CFG purchased FTE's future receivables at a discount under strikingly similar terms as those set forth in the SMAs. [SMF ¶69] CFG purchased 35% of FTE's future receipts for a Purchase Price of $3,000,000 and an Amount Sold of $4,290,000. [JSMF ¶ 160] Despite the seller being FTE, CFG sent the funds to Benchmark. [JSMF ¶¶ 169-170]

In March 2021, FTE and the Lateral Parties (a defined term, which *did not* include Lateral) entered into a Modification and Settlement Agreement ("Modification Agreement"). [JSMF ¶ 151] Lateral—the owner of the Litigation Claims—was not a party to the Modification Agreement. [SMF ¶ 5] Nevertheless, pursuant to the Modification Agreement, the Lateral Parties agreed, among other things, to pay FTE "an amount equal to 50% of any amounts received from any such MCA Claim in excess of an annualized preferred return of 100% on any amounts invested or expended by the Lateral Parties in pursuing such MCA Claims." [JSMF ¶ 152]

III.   **DEFENDANTS**

Funderz was formed in March 2015. [JSMF ¶ 1] It operated under several assumed names including HOP Capital ("HOP") and Merchant Funding ("BMF"). [JSMF ¶ 2] Funderz was in the merchant cash advance ("MCA") business. [SMF ¶ 7] It advanced capital to businesses that were unable to obtain financing through other means. [SMF ¶ 7] In exchange for a lump sum of capital,

Funderz would purchase a percentage of a business's future sales at a discount. [SMF ¶ 21] Funderz would then withdraw funds from the merchant's bank account until the purchase amount was repaid. [SMF ¶ 22] This funding arrangement is not supported by collateral. [SMF ¶ 23] Funderz ceased providing capital to businesses in or around March 2020. [SMF ¶ 10]

Joe is the owner of Funderz. [SMF ¶ 11] Funderz operates through its agents and brokers. [SMF ¶ 15] At the relevant times, Gabriel Isaacoff ("Gabe") was an independent contractor for Funderz and operated as its representative. [SMF ¶ 16]

## IV.   **THE SMAS**

Despite there being an understanding that FTE should not enter into any MCA agreements and the fact that Lethem was not authorized to enter into them, he (and Michael Palleschi) entered into the SMAs with Funderz from October to November 2018. [JSMF ¶¶ 35, 51-52, 62-63, 74-75, 84-85, 92-93, 109-110] Three SMAs are between FTE and Funderz d/b/a BMF and are dated October 12, October 25, and November 8. [JSMF ¶¶ 51, 74, 92] The other three are between FTE and Funderz d/b/a HOP and are dated October 15, October 25, and November 8. [JSMF ¶¶ 62, 84, 109] As agreed to by FTE, a portion of the Purchase Price in each subsequent agreement was used to pay any amounts due and owing under the prior agreement. [SMF ¶¶ 43-44]

All SMAs were brokered by Gabe and signed by Lethem and Palleschi, as FTE's "owners" and as guarantors. [JSMF ¶¶ 48, 52, 63, 75, 85, 93, 110] Although Palleschi testified that it was not his signature, he asserted his Fifth Amendment right when asked if he "ever direct[ed] David Lethem, or anyone at FTE, to enter into an Agreement on behalf of FTE." [JSMF ¶¶ 40, 76, 111]

Notably, Michael Hess, FTE's assistant controller during the relevant time period, became aware of each SMA within one business day of it being entered. [JSMF ¶¶ 72-73] Likewise, FTE's in house general counsel became aware of the SMAs by the latest on October 25, 2018. [SMF ¶¶ 48-49]

A.      **The Form Agreements**

Funderz's used form agreements that were prepared and routinely modified by counsel. [SMF ¶ 37]. Of the six SMAs, the four October agreements are on one form ("Form 1") and the two Novembers agreements use another form ("Form 2" and collectively "Forms"). [SMF ¶ 38]Both Forms provide that Funderz would pay FTE a lump sum in exchange for the purchase of a portion of FTE's future receipts at a discount. [SMF ¶ 39] Funderz was to be repaid from daily payments that represented FTE's sworn good faith estimate of its receivables. [SMF ¶ 40] The SMAs on their face make clear that they are purchase agreements and not loans. [SMF ¶ 41] Specifically, the SMAs state FTE agrees that "the Purchase Price under this Agreements is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BMF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts." [JSMF ¶¶ 57, 67, 99, 119]

The Forms have some differences. For example, both Forms make reconciliation or adjustment of the remittances mandatory upon the merchant's request; however, the provision is worded differently. Form 1 states: "upon the Merchant's request and receipt of the Merchant's monthly bank statements, [Funderz] **shall** on or about the eighteenth day of each month reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage." [JSMF ¶¶ 56, 66] Whereas, Form 2 states:

> **Adjustments to the Remittance**. If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to [Funderz] to request a decrease in the Remittance. The amount **shall be** decreased if the amount received by [Funderz] was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance **shall be** modified to more closely reflect the Merchant's actual

receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide [Funderz] with viewing access to their bank account as well as all information reasonably requested by [Funderz] to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page l of this Agreement.

[JSMF ¶¶ 98, 117 (emphasis added)]

A second difference is Form 1 states that Funderz "may enforce the provisions of the Personal Guarantee of Performance" or "may enter [the] confession of judgment as a judgment with the Clerk of the Court and execute thereon" if "the Merchant files for bankruptcy protection or is placed under an involuntary filing." [*See, e.g.*, Ex. 20 § 2.8] Form 1 also states that an "Event of Default" occurs when "any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts." [JSMF ¶¶ 58, 68] While Form 2 states:

Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BMF is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and BMF assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give BMF a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount.

[JSMF ¶¶ 96, 115] Form 2 has twelve occurrences that constitute an "Event of Default;" none of which are bankruptcy. [JSMF ¶¶ 100, 120]

A third difference is that Form 2 specifically states "there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by" Funderz. [JSMF ¶¶ 96, 114] Form 1, on the other hand, states "[i]n no event shall the aggregate of all amounts be deemed as interest hereunder" and implies that the term is for successive one-year

terms until FTE repays the entire Purchased Amount. [*See, e.g.*, Ex. 20 §§ 1.2, 1.9] However, both Forms are consistent with Funderz's business model that repayment depended upon a crucial contingency: the continued collection of receipts by FTE. [Isaacoff Dec. ¶ 21 ]

### B.     Funderz's Underwriting For The SMAs

Funderz's underwriting for the subject agreements involved, among other things, reviewing bank statements from FTE and its affiliates, tax returns, and credit reports. [JSMF ¶ 42] The bank statements revealed that FTE received almost $3.5 million in deposits in August 2018 and more than $8 million in deposits in September 2018, FTE Holdings, LLC received more than $5.7 million in deposits in September 2018, Jus-Com received almost $2 million in deposits in September 2018, and Benchmark had a balance of almost $27 million as of October 12, 2018. [SMF ¶ 46] Notably, Palleschi asserted his Fifth Amendment right in response to whether he knew "if FTE accurately represented its receivables to" Funderz. [JSMF ¶ 41] This is the same underwriting that is typically done by other businesses in the MCA industry. [SMF ¶ 68]

### C.     Repayment Of The SMAs By FTE

FTE repaid BMF by January 2, 2019, and HOP by March 15, 2019. [JSMF ¶¶ 107, 123] The daily remittance to HOP was paused from January 22 to February 2, 2019, and the amount of each remittance varied during the course of repayment. [JSMF ¶¶ 124, 126] After FTE raised concerns of an alleged overpayment to BMF, the money was refunded to FTE. [JSMF ¶¶ 131-134] This was the only concern raised by FTE with respect to the SMAs. [SMF ¶¶ 56-58]

## V.     <u>PLAINTIFFS' CLAIMS</u>

Plaintiffs assert two causes of action: (1) a RICO violation under 18 U.S.C. § 1962(c) against Joe for allegedly seeking to collect an unlawful debt and for wire fraud; and (2) a conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) against Defendants. [Doc. 44] The alleged RICO "enterprise" of Funderz and its owners allegedly had "a common goal of soliciting,

funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states." [*Id*. ¶¶ 28, 138, 139] Plaintiffs' purported injuries were caused by the allegedly "improperly collected criminally usurious loan payments." [*Id*. ¶¶ 177, 187]

## LEGAL STANDARD

"A party may move for summary judgment" on any claim or defense or part thereof. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Id.* "A fact is material if it might affect the outcome of the case under governing law" and "[a] dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016). The court is to determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). To defeat summary judgment, the "nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* at 554. It is insufficient to show "that there is some metaphysical doubt as to the material facts." *Id*.

## ARGUMENT

I.   <u>DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
SECTION 1962(c) RICO CLAIM</u>

"Civil RICO is . . . the litigation equivalent of a thermonuclear device."   *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).  " The mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants." *Id*. "Courts generally approach RICO claims with caution and an understanding of Congress's goal in enacting the RICO statute: to prevent legitimate businesses from becoming infiltrated by organized

crime—though the statute's reach is not limited to mobsters." *Demaree v. Castro*, No. 22-CIV-8772-CM-SN, 2023 WL 6465881, at *5 (S.D.N.Y. Oct. 4, 2023).

It is "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). This section "clearly envisions that the enterprise and person are two different entities." *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1045 (S.D.N.Y. 1993).

### A.    Funderz, Joe, And Gabe Are Not Distinct RICO "Persons" And Cannot Form An "Enterprise"

"[T]o establish liability under § 1962(c), one must . . . prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (citing *Cedric Kushner Prods., Ltd. v. King*, 533 U.S. 158, 161 (2001)). When a corporate entity is named as the RICO "person," the Second Circuit has held:

> A corporation can act only through its employees, subsidiaries or agents. So, if a corporate defendant can be liable for participating in an enterprise comprised only of its agents-even if those agents are separately incorporated legal entities-then RICO will attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless. Accordingly, a plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying out the regular affairs of the defendant, that consists, in other words, of a corporate defendant corrupting itself.

*U1it4less, Inc.*, 871 F.3d at 205-06. Put simply, an employee and his or her employer cannot be both the RICO "person" and the "enterprise". *See Cruz v. FX Direct Dealer, L.L.C.,* 720 F.3d 115, 121 (2d Cir. 2013); *Official Publications, Inc. v. Kable News Co.*, 775 F. Supp. 631, 636 (S.D.N.Y. 1991) ("an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself.").

For example, in *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, the Second Circuit affirmed the dismissal of a complaint where the alleged enterprise consisted of the defendant bank and two of its loan officers. 30 F.3d 339, 343-44 (2d Cir. 1994) ("[W]here employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, . . . [they] *do not* form an enterprise distinct from the corporation." (emphasis added)). Similarly, in *Cruz*, the Second Circuit found the RICO enterprise could not consist of FXDirectDealer, its parent company, one of its former equity stakeholders, its chief operating officer, its managing director and corporate counsel, and others. 720 F.3d at 120-21; *see also Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds* (holding that legally separate entities that nonetheless act within the scope of a single corporate structure cannot form a RICO enterprise); *see, e.g.*, *Demaree*, 2023 WL 6465881, at *6 (finding no RICO enterprise where the individual defendants were employees and agents of the corporation); *Lynn v. McCormick*, No. 17-CV-1183-CS, 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18, 2017), *aff'd*, 760 F. App'x 51 (2d Cir. 2019) (finding plaintiffs failed to state a claim where the alleged enterprise was "comprised of Trustco and its employees and agents conducting Trustco's corporate business of collecting on its judgments against Plaintiffs").

Here, the "enterprise" is not distinct from the RICO persons. **First**, the alleged "enterprise" is comprised of Funderz, Gabe, and Joe. The "enterprise" is thus a collection of Funderz and its owners and agents acting on behalf of Funderz. However, a RICO enterprise cannot consist "merely of a corporate defendant associated with its own employees or agents carrying out the regular affairs of the defendant." *U1it4less, Inc.*, 871 F.3d at 205-06. **Second**, Joe and Gabe are allegedly the RICO "persons". Each RICO "person" is therefore alleged to be a member of the "enterprise" and also an agent or owner of Funderz, another member of the "enterprise." Plaintiffs

are thus seeking to hold a corporation (Funderz) liable by virtue of its acts and those allegedly acting on its behalf (Joe and Gabe). Because the "enterprise" is a collection of Funderz and its owners and agents carrying on its regular affairs, the distinctness requirement cannot be met.

**B.      Plaintiffs Cannot Establish The Existence Of A RICO Enterprise Because The "Enterprise" And The Racketeering Activity Are One And The Same**

Plaintiffs cannot demonstrate that the purported RICO "enterprise" has a purpose outside of the alleged predicate act of collecting usurious loans. A RICO enterprise is required to have an existence apart from the commission of the predicate acts. *Kottler v. Deutsche Bank AG,* 607 F. Supp. 2d 447, 458-59 (S.D.N.Y. 2009). "The existence of an 'enterprise'—one existing separate and apart from the pattern of activity in which it engages—is a necessary element of a section 1962(c) violation." *D'Addario v. D'Addario*, 901 F.3d 80, 99 (2d Cir. 2018).

For example, in *Kottler*, a group of taxpayers alleged defendants participated in a scheme to defraud them by selling tax products that were subsequently found to be an unlawful tax-avoidance scheme. *Kottler*, 607 F. Supp. 2d at 454. The court found plaintiffs "fail[ed] to allege an enterprise that is separate and distinct from the fraudulent tax shelter scheme allegedly engaged in by the Defendants and the co-conspirators." *Id.* at 458. The court explained:

> The enterprise and the pattern in this case are one and the same; Defendants and co-conspirators joined forces for the purpose of creating these allegedly fraudulent tax shelters . . . . The Defendants and co-conspirators did not exist as an association in fact separate and apart from the alleged RICO activity; rather they came together strictly for the purpose of creating these allegedly fraudulent tax shelters.

*Id.* at 458-59. Likewise, in *Weir v. Cenlar FSB*, the court dismissed the RICO claim where the defendants (home mortgage servicers) were allegedly engaged in a fraudulent scheme to charge various fees to borrowers. No. 16-CV-8650-CS, 2018 WL 3443173, at *8 (S.D.N.Y. July 17, 2018); *see also Lynn*, 2017 WL 6507112, at *5 (finding the enterprise and pattern to be "one and the same" where "Defendants came together for the purpose of engaging in the fraudulent activity

that forms the basis of the asserted pattern of racketeering activity").

Here, the alleged "enterprise" had no purpose other than the collection of unlawful debts. Specifically, Plaintiffs allege that "Funderz.Net [and] the Issacovs . . . are associated-in-fact and through relations of ownerships for the common purpose of carrying on an **ongoing unlawful enterprise**." [Doc. 44 ¶ 278 (emphasis added)] Plaintiffs further allege "the Enterprise has a common goal of **soliciting, funding, servicing and collecting upon usurious loans** . . ." [*Id.* (emphasis added)] Plaintiffs claim that Funderz is "an illegal loansharking enterprise." [*Id.* ¶ 44]

The undisputed record establishes that Funderz was in the MCA business and advanced capital to businesses that were unable to obtain financing through other means. Funderz had no other business. Funderz's advancements were memorialized in form agreements that were prepared and amended by its counsel. If those form agreements are found to be "usurious loans," then Funderz would exist solely for the purpose of "soliciting, funding, servicing and collecting upon usurious loans." Gabe and Joe acted on behalf of Funderz in "soliciting, funding, servicing and collecting upon usurious loans." This is the same purpose as the alleged "enterprise." Under such circumstances, Defendants did not exist separate and apart from the alleged RICO activity. This warrants summary judgment in Defendants' favor.

Moreover, to the extent an "enterprise" even existed, it is no longer in the MCA business. Indeed, Funderz has not entered into a secured merchant agreements since March 2020. The "enterprise" is therefore not an ongoing organization.

### C.   Plaintiffs Cannot Establish The Collection Of An "Unlawful Debt"

To state a RICO claim for collection of an unlawful debt, Plaintiffs must prove "that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) the debt was incurred in connection with the business of lending money at a usurious rate, and (3) the usurious rate was at least twice the enforceable rate." *Dae Hyuk Kwon v.*

*Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018); 18 U.S.C. § 1961(6). Plaintiffs must also prove that Defendants "acted knowingly, willfully, and unlawfully." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 246 (S.D.N.Y. 2022).

      1.    <u>The Third HOP Agreement Is Exempt From The Usury Laws Because It Exceeds $2,500,000</u>

New York's usury laws do not apply to agreements of $2,500,000 or more. N.Y. GEN. OBLIG. LAW § 5-501(6)(b); *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010) ("The usury laws are expressly inapplicable where the sum involved is equal to or greater than $2.5 million."); *Wade Park Land Holdings, LLC v. Kalikow*, 589 F.Supp.3d 335, 377 (S.D.N.Y. 2022) (dismissing RICO claim for collection of unlawful debt where the loan was in excess of $2,500,000). To determine whether an agreement is above the threshold, "the Court must look to the amount agreed upon not merely the new money advanced." *Spin Cap., LLC v. Golden Foothill Ins. Services, LLC*, No. 595367/2022, 2023 WL 2265717, at *1, 3 (N.Y. Sup. Ct. Feb. 28, 2023) (finding the amount includes any amount used to satisfy prior obligations and reasonable expenses). In other words, "in determining the loan amount, what matters is not the amount actually loaned, but instead the loan amount agreed to by the parties as set forth in" their agreement. *Star Funding, Inc. v. Vault Minerals, LLC*, No. 15-cv-03026-GBD, 2017 WL 7791558, at *5 (S.D.N.Y. Aug. 10, 2017). On its face, the Third HOP Agreement is for the principal amount of $2,750,000, and therefore, it is not subject to New York's usury laws.[3]

      2.    <u>The SMAs Are Not Loans</u>

Courts have overwhelmingly held that substantially similar contracts to the SMAs are

---

[3] Because the November agreements paid off the amounts due and owing under the October agreements, Defendants submit that the only relevant agreements are the two November agreements. *See, e.g.*, *Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522 (2d Cir. 2011) ("[i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract.") (citations omitted).

valid, legal, and non-usurious. *See Womack v. Cap. Stack, LLC*, No. 18-cv-4192, 2019 WL 4142740, at *7 n.9 (S.D.N.Y. Aug. 30, 2019) ("At least twenty-eight other recent decisions by State and Federal courts in New York found that similar MCA transactions were not loans subject to New York's usury laws.").[4] Further, as the SMAs were all entered in late 2018, the 28 cases cited by the *Womack* court negate any claim that Defendants intended to violate the usury laws of New York or the RICO statute, as more fully discussed below.

"[W]here there is no loan, there can be no usury, however unconscionable the contract may be." *LG Funding LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dep't 2020). An agreement is not a loan "[u]nless a principal sum advanced is repayable absolutely." *Id.* at 666; *see also Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528-KMK, 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022) (finding agreement was "not a loan because Defendant is not absolutely entitled to repayment under all circumstances"). In determining whether a transaction constitutes a usurious loan, the court must consider the transaction "in its totality and **judged by its real character**, rather than by the name, color, or form which the parties have seen fit to give it." *LG Funding LLC*, 181 A.D.3d at 665 (emphasis added). Courts balance three factors in determining whether repayment is absolute: "(1) whether there is a reconciliation provision; (2) whether the agreement has an indefinite term; and (3) whether the plaintiff has any recourse should the merchant declare bankruptcy." *Womack*, 2019 WL 4142740, at *5; *LG Funding LLC*, 181 A.D.3d at 666. These factors weigh in favor of finding the SMAs are not loans.

---

[4] Since *Womack*, there have been a number of cases finding agreements similar to the SMAs are valid purchases of receivables that are not subject to New York's usury laws. *See, e.g.*, *US Info. Group LLC v. EBF Holdings, LLC*, No. 22-CV-6661-PKC, 2023 WL 6198803, at *6-10 (S.D.N.Y. Sept. 22, 2023); *Singh v. BMT Cap. Grp.*, No. 600715-2023, Doc. No. 29 (N.Y. Sup. Ct. Nassau Cnty. Nov. 15, 2023); *Singh v. The LCF Grp., Inc.*, No. 601297-23, 2023 WL 5760139 (N.Y. Sup. Ct. July 25, 2023); *Unique Funding Solutions LLC v. A-Z Imports Exports LLC*, 183 N.Y.S.3d 727 (N.Y. Sup. Ct. 2023).

**(a)** **The SMAs Have Mandatory Provisions To Ensure That The Merchant's Payments Are Consistent With Its Actual Receipts**

"[A]n enforceable reconciliation provision, pursuant to which payment is to be adjusted according to the seller's actual receipts, is generally inconsistent with classification as a loan subject to the usury laws." *US Info. Grp. v. EBF Holdings, LLC*, No. 22-CV-6661-PKC, 2023 WL 6198803, at *8 (S.D.N.Y. Sept. 22, 2023) (dismissing RICO claim asserted against MCA company and its principals where the agreements provided mandatory reconciliation provisions); *see, e.g.*, *IBIS Cap. Grp., LLC v. Four Paws Orlando LLC*, No. 608586/16, 2017 WL 1065071, at *3 (N.Y. Sup. Ct. Mar. 10, 2017) (finding the transaction was not a loan where the agreement contained "mechanisms…to ensure the percentage of sales proceeds collected by [plaintiff] remain[ed] true to [defendant's] actual sales proceeds"); *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, No. 2:16-CV-1545-DRH-GRB, 2019 WL 1473090, at *5-6 (E.D.N.Y. Apr. 3, 2019).

In *Singh v. The LCF Group, Inc.*, the court concluded that the subject MCA agreements were not loans, and rejected the merchant's argument that a reconciliation provision which could only be exercised once a month was a "sham" because it did not reflect the economic reality that a company could suffer a mid-month decline in revenues. No. 601297-23, 2023 WL 5760139, at *8-10 (N.Y. Sup. Ct. July 25, 2023). The court acknowledged "that the time limitations in the Reconciliation Provision impose a hardship, but balances that portion of the provision against the fact that the Reconciliation Provision is not discretionary." *Id*. (citing *LG Funding, LLC*, 181 A.D.3d at 665; *Davis v. Richmond Cap. Grp., LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021)).

The SMAs each have a mandatory reconciliation or adjustment provision. These provisions (if invoked) required the adjustment of FTE's daily debit amount to more closely reflect its actual receipts, versus the estimated amount up front. Specifically, Form 1 required Funderz to reconcile FTE's "account by either crediting or debiting the difference between the amount debited and the

15

Specified Percentage" upon FTE's request and receipt of its monthly bank statements. Form 2 provided FTE with the right to demand an adjustment to the remittances based upon its actual sales and required Funderz to modify the remittances upon FTE's request to more closely reflect its actual receipts. Indeed, as shown on the pay history, the remittances for the November HOP Agreement (a Form 2 agreement) varied and were even paused for a period of two weeks. In addition, Funderz performed reconciliations upon the merchant's request. There is no evidence that FTE ever requested one. This factor thus weighs in favor of finding the SMAs are not loans.

**(b)    The SMAs Have No Finite Term**

The SMAs do not have a finite term, which is further support that they are not loans. Form 1 provides that the agreement is for one-year, which automatically renews for successive one-year terms. [*See, e.g.*, Ex. 20 § 1.2] It implies that the term is "until such time as [Funderz] received payment in full of the Purchased Amount." [*Id*. at p. 1] Form 2 expressly states "there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by" Funderz and the "Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by [Funderz] as per the terms of this Agreement." [*See, e.g.*, Ex. 29 at p. 1; § 1.2]

In addition, as explained above, the remittance amount can change upon the merchant's request and proof that actual receipts are less than the estimated receivables, which would impact the time it takes the merchant to repay the Purchased Amount. For example, with respect to the November HOP Agreement, despite the Agreement stating that the daily remittance would be $69,999, the daily remittance during the first few weeks was actually $49,999. [JSMF ¶ 126] This lengthened the amount of time it took FTE to repay the Purchase Amount compared to what was initially contemplated. Likewise, in late January 2019, the remittances were paused for two weeks, and after they resumed, they varied between $10,000 to $30,000, which caused the timeline for

repayment to vary. [JSMF ¶ 126] In other words, if the daily remittance was constant at $69,999, then FTE would have repaid the Purchased Amount in 59 days. However, FTE actually took 127 days to repay the Purchased Amount, which was more than double the time initially contemplated.

As demonstrated by the above, the term of the SMAs is directly impacted by the remittance amount. Since the remittance amount can change, there is no defined term. *See, e.g.*, *US Info. Grp.*, 2023 WL 6198803, at *8; *Power Up Lending Grp.*, 2019 WL 1473090, at *5 (finding the term indefinite because "every time [the merchant's] receipts change[,] the amount of time it will take for Plaintiff to be reimbursed will change, and there is no fixed end date by which Plaintiff must be paid"); *Unique Funding Solutions LLC*, 183 N.Y.S.3d at 727 ("As it appears that the amount of the monthly payments could change upon a proper request, the MCA is not a loan of finite duration"); *K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 56 Misc. 3d 807, 817-18 (N.Y. Sup. Ct. 2017) (acknowledging the term is indefinite when there is uncertainty in the length of the agreement due to the collection being contingent upon the merchant actually collecting revenue).

### (c) The Recourse In Form 1 If FTE Declared Bankruptcy Is Insufficient For Finding A Loan, And Bankruptcy Is Not A Specified Event Of Default In Form 2

Form 1 provides that Funderz *may* enforce the personal guaranty or enter the confession of judgment if FTE filed for bankruptcy or is placed under an involuntary filing. [*See, e.g.*, Ex. 20 §§ 2.8, 3.2] However, the protection of Funderz's "ultimate ability to collect its full entitlement is insufficient, alone, to establish that" the SMAs are actually a loan. *Power Up Lending Grp.*, 2019 WL 1473090, at *5.

Form 2 does not specify bankruptcy or insolvency as an Event of Default. [JSMF ¶¶ 100, 120] This weighs in favor of finding the SMAs are not loans. *See The LCF Grp., Inc.*, 2023 WL 5760139 at *9 ("interpreting the agreements to exclude bankruptcy as an event of default" which weighed against finding the agreement was a loan); *see also Unique Funding Solutions LLC*, 183

N.Y.S.3d at 727 (finding agreement was not a loan where, *inter alia*, the events of default included suspension, dissolution, or termination, but specifically excluded bankruptcy); *US Info. Grp. LLC*, 2023 WL 6198803, at *6 (citing *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dep't 2022) which "concluded that an agreement was not a loan when it contemplated monthly adjustments to payments, meaning that 'the term of the agreement was not finite,' and the agreement" did not define bankruptcy as an event of default").

Likewise, the Southern District of New York has previously found language similar to the following from Form 2 to weigh against a finding that the transactions are loans:

> Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. BMF is entering this Agreement knowing the risks that Merchant's business may slow down or fail . . . Merchant and Guarantor . . . are not guaranteeing the payment of the Purchased Amount.

*See US Info. Grp. LLC*, 2023 WL 6198803, at *9.

In short, this factor also weighs in favor of finding the SMAs are not loans.

### 3.   Plaintiffs Cannot Establish Defendants Knew Their Conduct Was Illegal

The Second Circuit has held that RICO claims based on the collection of unlawful debt require proof that the defendant acted with specific knowledge that his conduct was unlawful. *See U.S. v. Grote*, 961 F.3d 105, 120-21 (2d Cir. 2020) (expressing "serious doubts" whether a rule providing RICO liability for violation of a state law that "does not require awareness of the illegality of the rate" could survive *Elonis v. United States*, 575 U.S. 723, 737 (2015)); *see also Haymount Urgent Care PC,* 609 F. Supp. 3d at 246.

In New York, to establish usury, the defendant must have intended "to take interest in excess of the legal rate." *Merch. Cash & Cap., LLC v. Transfer Int'l Inc.*, No. 605136/16, 2016 WL 7213444, at *3 (N.Y. Sup. Ct. Nov. 2, 2016); *see also* New York Penal Law § 190.40 ("A

person is guilty of criminal usury in the second degree when . . . he knowingly charges, takes or receives any money . . . as interest . . . at a rate exceeding twenty-five per centum per annum"); *Womack*, 2019 WL 4142740, at *4. It therefore follows that there is a knowledge requirement for the debt to be unenforceable under New York usury laws. Similarly, if the enterprise's purpose is to collect upon allegedly unlawful debt, a defendant must have knowledge of the illegal nature of the enterprise or of its unlawful activities to knowingly and willfully participate in the enterprise.

Plaintiffs cannot establish that Defendants knew the SMAs were illegal at the time they were entered into or that the nature of Funderz's business was illegal. When Defendants entered into the SMAs, New York courts uniformly held that substantially similar contracts were valid and non-usurious. *See, e.g*., *Womack*, 2019 WL 4142740, at *7; *Yellowstone Cap. LLC v. Cent. USA Wireless LLC*, 110 N.Y.S.3d 485 (N.Y. Sup. Ct. 2018) (noting that at least 38 decisions determined the merchant agreement was not a loan); *Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*, 69 N.Y.S.3d 798 (1st Dep't 2018); *Transfer Int'l Inc.*, 2016 WL 7213444, at *3; *Merch. Funding Servs., LLC v. Micromanos Corp.*, No. EF000598-2017 (N.Y. Sup. Ct. May 4, 2017), *aff'd*, 179 A.D.3d 1049 (2d Dep't 2020) (finding the agreement, which had a discretionary reconciliation provision, was not a criminally usurious loan); *Yellowstone Cap. LLC v. Cent. USA Wireless LLC*, 60 Misc. 3d 1220(A) (N.Y. Sup. Ct. 2018) (agreement had discretionary adjustment and reconciliation provisions).

Further, Funderz relied on counsel to draft its agreements. "[I]f a defendant honestly and in good faith sought the advice of a lawyer as to what he could lawfully do in the future . . . [i]t is the law that a defendant cannot be convicted of a crime that involves willful and unlawful intent, even if such advice were an inaccurate construction of the law, if the defendant relies in good faith on that advice." *U.S. v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989); *see also*

*Williamson v. U.S.*, 207 U.S. 425, 453 (1908).

Moreover, when it entered into the SMAs, FTE was a sophisticated public company that serviced Fortune 500 companies. Notably, FTE's in house counsel knew that FTE had entered into the SMAs, yet he did not say anything about their illegality. What's more, FTE did not believe the SMAs were illegal before meeting Plaintiffs' counsel in early 2021. Perhaps even more compelling, CFG, a company within Lateral Investment Management's portfolio, has been in the MCA business since 2015 and issuing Purchase Agreements—including to FTE and its affiliates in 2019 when FTE was no longer under the control of Palleschi or Lethem—using substantially similar forms as the ones used by Funderz. Indeed, the CEO of CFG testified that because the contracts are for "revenue-based purchased," they are not loans. [SMF ¶¶ 62-66].

Accordingly, there is no evidence that Defendants were aware of the purported unlawful nature of their business, and summary judgment in Defendants' favor is warranted.

### D.    Plaintiffs Cannot Prove Predicate Acts of Wire Fraud

Wire fraud has three elements: "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Plaintiffs must prove that Defendants "engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character and with an intention to be involved in the scheme and to help it succeed with a purpose of causing actual financial harm to another." *U.S. v. Dupre*, 339 F. Supp. 2d 534, 539 (S.D.N.Y. 2004), *aff'd*, 462 F.3d 131 (2d Cir. 2006). Plaintiffs must also prove that these predicate acts amount to or pose a threat of continuing criminal activity. *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017).

The predicate acts underlying the pattern of wire fraud fail as a matter of law. Plaintiffs' theory is that Funderz "unlawfully double, triple or even quadruple debit[ed] the daily amounts

from Plaintiffs' account." [Doc. 130 at 3] This conduct does not sound in fraud. Rather, if Funderz debited more than it was contractually entitled, then that would sound in contract. *See, e.g.*, *Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-CV-1245 (JSR), 2023 WL 5521901, at *7 (S.D.N.Y. Aug. 28, 2023) (finding "any complaint that plaintiffs were over-charged or improperly charged would suffer from the same flaw as the over-debiting theory of wire fraud that the Court previously dismissed" because "[a] breach of contract, without more, does not amount to actionable wire fraud"). Even if this conduct could be the basis for wire fraud, the only evidence is that the frequency of debits was agreed to by FTE or the result of banking holidays. There is no evidence that FTE complained about the frequency of debits or that it requested a refund for the alleged wrongful debits at the time they occurred. The facts thus do not support fraud.

Moreover, there is no threat of continued criminal activity. Closed-ended continuity requires that the predicate acts generally extend at least two years. *Reich*, 858 F.3d at 60. Here, the "unlawful" debits occurred between November 2018 and January 2019. "Predicate acts separated by only a few months will not do." *Id.* There is also no open-ended continuity because there is no "threat of repetition" since Funderz is no longer in the MCA business. Accordingly, Plaintiffs' RICO claims cannot be based on wire fraud.

## II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 1962(d) RICO CONSPIRACY CLAIM

Plaintiffs' RICO conspiracy claim fails for two reasons. ***First,*** the underlying substantive RICO violation to which it is bootstrapped fails as set forth above. ***Second***, the intracorporate conspiracy doctrine bars the claim.

### A.     The RICO Conspiracy Claims Fail As A Matter of Law Because Plaintiffs Cannot Prove A Substantive RICO Violation

To establish a Section 1962(d) RICO conspiracy, a plaintiff must prove "a conspiracy to commit a substantive RICO violation." *Boneta v. Rolex Watch USA, Inc.*, 232 F. Supp. 3d 354,

359 (S.D.N.Y. 2017) (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)). Here, Plaintiffs' RICO conspiracy claim fails because the underlying substantive RICO violation to which it is bootstrapped fails as set forth above. *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 126 (2d Cir. 2018) (finding the RICO conspiracy claim failed where "[t]he alleged conspiracy involved an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, and the plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering"); *see also First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (dismissing the RICO conspiracy claim "because Plaintiffs did not adequately allege a substantive violation").

### B.     The RICO Conspiracy Claims Further Fails As A Matter of Law Because The Intracorporate Conspiracy Doctrine Bars the Claim

The RICO conspiracy claim also fails for the independent reason that a company (Funderz) cannot conspire with its own employees or owners (Joe and Gabe). "Under the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [his] employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (internal quotations omitted). In other words, "[d]efendants—officers and directors of a single corporation, and the corporation itself— could not legally conspire with one another." *Kriss v. Bayrock Grp. LLC*, No. 10-CIV-3959-LGS, 2016 WL 7046816, at *19 (S.D.N.Y. Dec. 2, 2016), *on reconsideration in part*, 2017 WL 1901966 (S.D.N.Y. May 8, 2017) (internal quotations omitted) (finding that "the statutory requirement of a conspiracy between two or more persons" could not be satisfied).

Here, the alleged "conspiracy" involves Funderz, Joe, and Gabe. It is undisputed that Joe is the owner of Funderz and thus an officer. It is also undisputed that Gabe was an agent of Funderz and brokered the SMAs within the scope of that agency. Thus, the alleged conspiracy did not

involve any individuals beyond Funderz's officers or agents. Because Funderz can act only through its agents (Joe and Gabe), Funderz cannot also participate in a conspiracy with Joe and Gabe. Accordingly, the intracorporate conspiracy doctrine bars the Section 1962(d) claim.

## III.   PLAINTIFFS DO NOT HAVE RICO STANDING

### A.   Lateral Should Be Dismissed Because It Is Not The Real Party In Interest

The assignment of the claims to Lateral violates champerty and is thus void under New York Judicial Law § 489(1). Pursuant to New York Judicial Law § 489(1), no corporation "shall take an assignment of . . . any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." This provision does not apply to assignments that have "an aggregate purchase price of at least five hundred thousand dollars." N.Y. Jud. Law § 489(2).

In *Justinian Capital SPC v. WestLB AG*, the New York Court of Appeals interpreted § 489 as "restrict[ing] individuals and companies from purchasing or taking an assignment of notes or other securities 'with the intent and for the purpose of bringing an action or proceeding thereon.'" 28 N.Y.3d 160, 166 (2016). Therefore, "to constitute the offense of champerty[,] the *primary purpose* of the purchase must be to enable one to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." *Id.* (quoting *Moses v. McDivitt*, 88 N.Y. 62, 65 (1882)) (emphasis in original). The Court of Appeals interpreted "purchase price" under the § 489(2) safe harbor to mean "a binding and bona fide obligation to pay $500,000 or more for notes or other securities, which is satisfied by actual payment of at least $500,000 or the transfer of financial value worth at least $500,000." *Id.* at 169-70. A binding and bona fide obligation to pay $500,000 or more cannot be entirely contingent on a successful outcome in the litigation. *Id.* at 170.

Here, the primary purpose of the assignment was to enable Lateral to bring this Lawsuit. In 2019, Lateral Juscom foreclosed on a Credit Agreement with Jus-Com, which resulted in: (1) the transfer of all of FTE's equity interests in Benchmark and its cash on hand to Benchmark Holdings

LLC, and (2) the assignment of Litigation Claims, which included the rights to the claims brought in this Lawsuit, to Lateral. Notably, Lateral was incorporated two days before the Foreclosure Agreement "for the specific purpose of taking possession of and pursing certain commercial claims belonging to" FTE and its affiliates. Lateral was not the entity which made the loan that was being extinguished, and it had no prior involvement with FTE, the SMAs, or anything else at issue in this Lawsuit. Because Lateral was created for the specific purpose of pursing the claims asserted in this Lawsuit, this "[L]awsuit was not merely an incidental or secondary purpose of the assignment, but its very essence." *See Justinian Cap.*, 28 N.Y.3d at 168. Thus, the assignment violates champerty and is void.

The § 489(2) safe harbor does not apply here. The Foreclosure Agreement discloses no purchase price obligation whatsoever and the assignment was accomplished solely through a foreclosure rather than a purchase, meaning there was no exchange of money. In other words, Lateral neither paid nor transferred anything for the rights to the bring the claims in this Lawsuit. At best, the payment is entirely contingent on a successful outcome in this Lawsuit. However, that is not a binding and bona fide obligation to pay $500,000 or more. *See Justinian Cap.*, 28 N.Y.3d at 170. As such, the assignment is not exempt from New York Judicial Law § 489(1).

Moreover, under New York law, the assignment of the right to assert one type of claim does not automatically assign other, related claims. *See Banque Arabe Et Internationale D'Investissement v. Maryland Natl. Bank*, 57 F.3d 146, 151 (2d Cir. 1995). The Lateral Assignment assigns "certain commercial tort litigation claims, fraud claims, and insurance claims." It does not assign contract or **statutory** claims.

Accordingly, Lateral should be dismissed from this lawsuit. The naming of FTE and its affiliates should not cure the clear violation of champerty. Any holding otherwise would allow

parties to artfully plead around the champerty statute in direct violation of the statutory intent.

**B.    FTE's Affiliates Were Not The Intended Target Of The Alleged Conduct, And Thus, Do Not Have The Requisite Standing To Bring RICO Claims**

RICO limits standing to those individuals "whose injuries were caused proximately by the RICO predicate acts," meaning there must be "some direct relation" between the alleged injuries and the predicate acts. *Manson* v. *Stacescu*, 11 F.3d 1127, 1130 (2d Cir. 1993) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)) (finding plaintiffs did not have standing because the alleged looting of the company only indirectly harmed them); *see also Cohen v. Cohen*, 993 F. Supp. 2d 414, 423 (S.D.N.Y. 2014). "This requires a showing not only that the defendant's alleged RICO violation was the 'but-for' or cause-in-fact of his injury, but also that the violation was the legal or proximate cause." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994). A plaintiff may not use RICO to "complain[] of harm flowing merely from misfortunes visited upon a third person by the defendant's acts." *Greenwald v. Hall*, No. 01-Civ-5405-RO, 2003 WL 164279, at *1 (S.D.N.Y. Jan. 23, 2003) (citing *Holmes*, 503 U.S. at 268); *see, e.g., McKinney v. Moore*, No. 04-Civ-07926-RCC, 2007 WL 1149253, at *5 (S.D.N.Y. Apr. 16, 2007); *Paris Partners, L.P. v. Russo*, No. 94-CV-5684, 1995 WL 746585, at *1 (S.D.N.Y. Dec. 14, 1995).

Here, the SMAs were between FTE and Funderz. To the extent FTE's affiliates were harmed by the SMAs, that harm was derivative of any harm to FTE. As such, Benchmark, Jus-Com, and Focus Wireless cannot show that Defendants' alleged RICO violation was the proximate cause of their harm. It is undisputed that Funderz did not debit any account in the name of FTE's affiliates. They therefore should be dismissed for lack of RICO standing.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment, enter judgment in their favor, and grant any other relief it deems just.

Dated: February 22, 2024
　　　　New York, New York

Respectfully Submitted,

By: */s Stephanie L. Denker*
　　Hilda Piloto (admitted pro hac vice)
　　SAUL EWING LLP
　　701 Brickell Avenue, 17th Floor
　　Miami, FL 33131
　　(305) 428-4500
　　Hilda.Piloto@saul.com

　　Stephanie L. Denker
　　SAUL EWING LLP
　　1270 Avenue of the Americas, Suite 2800
　　New York, New York 10020
　　P: (212) 980-7200
　　F: (212) 980-7209
　　Stephanie.Denker@saul.com

　　*Attorneys for Defendant Funderz.net,*
　　*LLC and Joseph Yitzchakov*

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Local Civil Rule 11.1 and the Individual Practices of Judge Margaret M. Garnett, I hereby certify that this memorandum of law complies with the formatting rules and page limitations.

Dated: February 22, 2024

<u>*/s/ Stephanie L. Denker*</u>
Stephanie L. Denker

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Memorandum in Support of the Motion for Summary Judgment by Defendants Funderz.Net LLC d/b/a Hop Capital and d/b/a Business Merchant Funding and Joseph Yitzchakov a.k.a. Joseph Isaacov was filed with the Clerk of this Court via CM/ECF, which sent notification to all counsel as follows:

WHITE AND WILLIAMS LLP
Shane R. Heskin
7 Times Square, Suite 2900
New York, New York 10036-6524
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

FREEDMAN NORMAND FRIEDLAND LLP
Velvel (Devin) Freedman
Richard Cipolla
99 Park Avenue, 19th Floor
New York, New York 10016
rcipolla@fnf.law
*Attorneys for Defendant*
*Gabriel Yitzchakov*

This the 22nd day of February, 2024.

*/s/ Stephanie L. Denker*
Stephanie L. Denker